# 22-1661

## In the United States Court of Appeals
### for the Second Circuit

———————————

T.W.,
*Plaintiff-Appellant,*

v.

New York State Board of Law Examiners, Diane Bosse, John J. McAlary,
Bryan Williams, Robert McMillen, E. Leo Milonas, Michael Colodner,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

———————————————————————

**BRIEF OF PLAINTIFF-APPELLANT**

———————————————————————

Mary C. Vargas
Michael Steven Stein
STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
Tel: (240) 793-3185

Jo Anne Simon
JO ANNE SIMON, P.C.
99 Park Avenue, Suite 1510
New York, NY 10016
Tel: (718) 852-3528

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The following is a complete list of the trial judge, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held companies that own 10 percent or more of the party's stock, and other identifiable legal entities related of a party:

1. Bosse, Diane, Defendant-Appellee

2. Colodner, Michael, Defendant-Appellee

3. Dearie, Raymond, United States District Judge

4. Figueira, Elizabeth A., counsel for Defendants-Appellees

5. Lawrence, David, counsel for Defendants-Appellees

6. McAlary, John J., Defendant-Appellee

7. McMillen, Robert, Defendant-Appellee

8. Milonas, E. Leo, Defendant-Appellee

9. New York State Board of Law Examiners, Defendant-Appellee

10. New York State Office of the Attorney General, counsel for Defendants-Appellees

11. Simon, Jo Anne, counsel for Plaintiff-Appellant

12. Stein, Michael S., counsel for Plaintiff-Appellant

i

13.    T.W., Plaintiff-Appellant

14.    Vargas, Mary C., counsel for Plaintiff-Appellant

15.    Williams, Bryan, Defendant-Appellee

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................... i

TABLE OF CITATIONS ........................................................................ vi

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE .............................................................. 3

    A.    PROCEDURAL BACKGROUND ..................................... 3

    B.    FACTUAL BACKGROUND ............................................ 5

        i.    BOLE Exerts Tremendous Influence Over Legal Education ..... 5

        ii.    BOLE Is an Independent Entity .................................. 7

        iii.    BOLE Discriminated Against T.W. in Failing To Provide Necessary Accommodations on the Bar Examination ............... 9

    C.    STANDARD FOR REVIEW ......................................... 10

SUMMARY OF ARGUMENT .......................................................... 11

ARGUMENT ................................................................................. 13

I.    BOLE IS SUBJECT TO TITLE II OF THE AMERICANS WITH DISABILITIES ACT .................................................................. 13

II.    BOLE HAS NOT MET ITS BURDEN OF PROVING THAT IT IS AN ARM OF THE STATE ENTITLED TO SOVEREIGN IMMUNITY ........ 15

    A.    First *Mancuso* Factor:  BOLE Has Substantial Discretion Under New York Law ..................................................... 18

    B.    Second *Mancuso* Factor: The Court of Appeals Appoints But May Not Remove BOLE Members ......................................... 21

C. Third *Mancuso* Factor: BOLE Receives No Taxpayer Funding ........22

D. Fourth *Mancuso* Factor: BOLE Is an Educational Testing Entity, Not a Licensing Authority ....................................................26

E. Fifth *Mancuso* Factor: New York Has No Veto Power over BOLE's Actions ......................................................................28

F. Sixth *Mancuso* Factor: BOLE's Obligations Are Not Binding on the State ................................................................................30

G. Tie-Breaking *Mancuso* Factors: Judgment Against BOLE Does Not Implicate the Eleventh Amendment's Core Concerns ................33

    i. Allowing BOLE To Be Sued in Federal Court Preserves Federal Comity Concerns ..........................................................33

    ii. Judgment Against BOLE Will Not Expose the State Treasury to Risk ................................................................34

III. TITLE II VALIDLY ABROGATED SOVEREIGN IMMUNITY IN THE CONTEXT OF DISCRIMINATION IN EDUCATION AND EDUCATIONAL TESTING ......................................................35

A. BOLE Violated Title II of the ADA by Failing To Provide Necessary Accommodations on the Bar Examination ......................36

B. Congress Validly Abrogated Sovereign Immunity As Applied to Education and Educational Testing ....................................37

    i. Courts Have Recognized the Elevated Importance of Education and Educational Testing in Abrogating Sovereign Immunity ..................................................................39

    ii. Congress Has Identified a History and Pattern of Discrimination in Education and Educational Testing ............43

    iii. Title II Is a Congruent and Proportional Response .................47

C. The Right of Access to the Courts Is a Plus Factor that Further Supports the Abrogation of Sovereign Immunity ..............................47

IV. *EX PARTE YOUNG* PROVIDES FOR PROSPECTIVE RELIEF
EXPUNGING BAR EXAMINATION FAILURES OBTAINED
UNDER DISCRIMINATORY CONDITIONS ..............................................50

V. CONCLUSION ....................................................................................55

CERTIFICATE OF COMPLIANCE.......................................................57

CERTIFICATE OF SERVICE ................................................................58

# TABLE OF CITATIONS

## Cases

*Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*,
  795 F.3d 351 (2d Cir. 2015) ................................................................34

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................54

*Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*,
  405 F.3d 954 (11th Cir. 2005) ..................................................... *passim*

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  970 F. Supp. 1094 (S.D.N.Y. 1997), *vacated on other grounds*,
  156 F.3d 321 (2d Cir. 1998) ......................................................... 16, 17

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  226 F.3d 69 (2d Cir. 2000) ................................................................13

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
  93 Civ. 4986 (SS), 2001 U.S. Dist. LEXIS 11926
  (S.D.N.Y. Aug. 15, 2001)............................................................. 30, 33

*Board of Trustees of the University of Alabama v. Garrett*,
  531 U.S. 356 (2001).............................................................................45

*Bolmer v. Oliveira*,
  594 F.3d 134 (2d Cir. 2010) ..............................................................36

*Bowers v. Nat'l Collegiate Athletic Ass'n*,
  475 F.3d 524 (3d Cir. 2007) ..................................................... 35, 39, 44, 47

*Clissuras v. City Univ. of New York*,
  359 F.3d 79 (2d Cir. 2004) ................................................................31

*Constantine v. Rectors & Visitors of George Mason Univ.*,
  411 F.3d 474 (4th Cir. 2005) ....................................................... *passim*

*Crowe v. Oregon State Bar*,
989 F.3d 714 (9th Cir. 2021) ........................................................ *passim*

*CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.*,
306 F.3d 87 (2d Cir. 2002) ....................................................................10

*Cunningham v. Univ. of N.M. Bd. of Regents*,
779 F. Supp. 2d 1273 (D.N.M. 2011), *aff'd*,
531 F. App'x 909 (10th Cir. 2013) ................................................. 42, 43

*D'Amico v. N.Y. State Bar of Law Exam'rs*,
813 F. Supp. 217 (W.D.N.Y. 1993) ............................................... 13, 33

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*,
804 F.3d 178 (2d Cir. 2015) ...................................................... 35, 36, 42

*Deposit Ins. Agency v. Superintendent of Banks*,
482 F.3d 612 (2d Cir. 2007) ...................................................................53

*Desir v. Bd. of Coop. Educ. Servs. Nassau County*,
07-CV-1994 (RRM)(MJO), 2008 U.S. Dist. LEXIS 78965 (E.D.N.Y. Sept. 30,
2008), *aff'd*, 469 F. App'x 66 (2d Cir. 2012) ......................................52

*Doherty v. Bice*,
18-cv-10898 (NSR), 2020 U.S. Dist. LEXIS 169545
(S.D.N.Y. Sept. 16, 2020) .......................................................... 35, 36

*Elliott v. Hinds*,
786 F.2d 298 (7th Cir. 1986) ...................................................... 51, 53

*Enyart v. Nat'l Bd. of Law Exam'rs, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ...............................................................26

*Ernst v. Rising*,
427 F.3d 351 (6th Cir. 2005) ................................................................24

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................ 33, 50, 51, 55

*Flint v. Dennison*,
488 F.3d 816 (9th Cir. 2007) ........................................................ 51, 53

*Frank v. Univ. of Toledo*,
621 F. Supp. 2d 475 (N.D. Ohio 2007) ................................................42

*Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*,
280 F.3d 98 (2d Cir. 2001) ...............................................................36

*Goonewardena v. New York*,
475 F. Supp. 2d 310 (S.D.N.Y. 2007) ................................................35

*Gorton v. Gettel*,
554 F.3d 60 (2d Cir. 2009) .......................................................... 31, 34

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003) ........................................................ 33, 50

*Hess v. Port Auth. Trans-Hudson Corp.*,
513 U.S. 30 (1994)...........................................................................31

*In re Brennan*,
243 N.Y.S. 705 (N.Y. App. Div. 1930)..............................................5, 6

*In re De Orsey*,
312 A.2d 720 (R.I. 1973) ...................................................................21

*In re Sugarman*,
380 N.Y.S.2d 12 (N.Y. App. Div. 1976)...............................................48

*King v. McIntyer*,
9:11-CV-1457 (DNH/TWD), 2013 U.S. Dist. LEXIS 185277
(N.D.N.Y. Dec. 31, 2013), *adopted*, 2014 U.S. Dist. LEXIS 20852
(N.D.N.Y. Feb. 20, 2014) ............................................................ 51, 52

*Krutell v. N.Y. State Bd. of Law Exam'rs*,
799 N.Y.S.2d 680 (N.Y. App. Div. 2005).........................................6, 38

*Leitner v. Westchester Cmty. Coll.*,
779 F.3d 130 (2d Cir. 2015) ........................................... 17, 18, 28, 31

viii

*Loeb v. New York State Bd. of Law Exam'rs*,
   534 N.Y.S.2d 559 (N.Y. App. Div. 1988) ........................................................... 19

*Malkan v. Mutua*,
   12-CV-236-A, 2012 U.S. Dist. LEXIS 143311 (W.D.N.Y. Oct. 3, 2012),
   *aff'd*, 699 F. App'x 81 (2d Cir. 2017) .................................................................. 52

*Mancuso v. New York Thruway Auth.*,
   86 F.3d 289 (2d Cir. 1996) .......................................................................... *passim*

*Menaker v. Hofstra Univ.*,
   935 F.3d 20 (2d Cir. 2019) ............................................................................... 10

*Mosier v. Commonwealth of Kentucky*,
   No. 08-184-KSF, 2009 U.S. Dist. LEXIS 114699 (E.D. Ky. Dec. 9, 2009) ........ 49

*Nat'l Ass'n of the Deaf v. State of Florida*,
   980 F.3d 763 (11th Cir. 2020) ..................................................................... 12, 41

*Oliver v. Va. Bd. of Bar Exam'rs*,
   312 F. Supp. 3d 515 (E.D. Va. 2018), *appeal dismissed*, 2018 U.S. App. 37305
   (4th Cir. July 23, 2013) .................................................................................... 43

*Pasik v. State Bd. of Law Exam'rs*,
   478 N.Y.S.2d 270 (N.Y. App. Div. 1984) ...................................... 19, 20, 29, 30

*People ex rel. Karlin v. Culkin*,
   248 N.Y. 465 (N.Y. 1928) ................................................................................ 48

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
   No. 19-CV-2002, 2019 U.S. Dist. LEXIS 222782 (E.D. Pa. Dec. 30, 2019),
   *aff'd*, 968 F.3d 251 (3d Cir. 2020) .................................................................... 27

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
   968 F.3d 251 (3d Cir. 2020) ............................................................................. 13

*Schware v. Bd. of Bar Exam'rs of New Mexico*,
   353 U.S. 232 (1957) ......................................................................................... 47

*Sinapi v. R.I. Bd. of Law Exam'rs*,
  C.A. No. 15-311-M, 2016 U.S. Dist. LEXIS 51230 (D.R.I. Apr. 15, 2016),
  *aff'd in part*, 910 F.3d 544 (1st Cir. 2018) ..................................................... 17, 21

*Sodha v. New York State Bd. of Law Exam'rs*,
  431 N.Y.S.2d 885 (N.Y. Sup. Ct. 1980)....................................................... 19, 30

*State Emples. Bargaining Agent Coalition v. Rowland*,
  494 F.3d 71 (2d Cir. 2007) ............................................................................ 50, 51

*T.W. v. N.Y. State Bd. of Law Exam'rs*,
  996 F.3d 87 (2d Cir. 2021) .............................................................................3, 16

*Tennessee v. Lane*,
  541 U.S. 509 (2004)......................................................................... *passim*

*Toledo v. Sanchez*,
  454 F.3d 24 (1st Cir. 2006)............................................................... *passim*

*Turner v. Nat'l Council of State Bds. of Nursing, Inc.*,
  561 F. App'x 661 (10th Cir. 2014) ................................................................ 37, 38

*United States v. Georgia*,
  546 U.S. 151 (2006).................................................................................... 35, 36

*Vega v. Semple*,
  963 F.3d 259 (2d Cir. 2020) ........................................................................ 50, 54

*Verizon Md. Inc. v. PSC*,
  535 U.S. 635 (2002).............................................................................. 50, 51, 53

*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*,
  466 F.3d 232 (2d Cir. 2006) ......................................................... 15, 16, 25, 28

## Statutes

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1331 .......................................................................................................1

x

29 U.S.C. § 794 ...................................................................3, 16

42 U.S.C. § 12101 ...................................................................13

42 U.S.C. § 12101(a)(3) .............................................................44

42 U.S.C. § 12131 *et seq* ........................................................1, 3

42 U.S.C. § 12132 ...................................................................13

42 U.S.C. § 12189 ............................................................... 13, 43

N.Y. Gen. Bus. Law § 349-c(3) ......................................................24

N.Y. Jud. Law § 53(3) ...............................................................18

N.Y. Jud. Law § 56 ..................................................................21

N.Y. Jud. Law § 90(1) .............................................................5, 26

N.Y. Jud. Law § 90(2) ...............................................................26

N.Y. Jud. Law § 90(10) ..............................................................54

N.Y. Jud. Law § 460-b ........................................................... 19, 30

N.Y. Jud. Law § 462 ................................................................29

N.Y. Jud. Law § 468-a(4) ............................................................25

N.Y. Jud. Law § 468-b ...............................................................25

N.Y. Jud. Law § 468-4(a) ............................................................22

N.Y. Labor Law § 100(2) .............................................................24

N.Y. Pub. Off. Law § 17(3)(d) .......................................................32

N.Y. State Fin. Law § 8(9) ..........................................................24

N.Y. State Fin. Law § 41 ..................................................................32

N.Y. State Fin. Law § 97-t..............................................................25

N.Y. Tax Law § 170(6)....................................................................23

**Constitutional Provisions**

U.S. Const. amend. XI .............................................................. *passim*

N.Y. Const., art. VII, § 7................................................................23

**Regulations**

28 C.F.R. § 35.130(b)(7)................................................................47

22 N.Y.C.R.R. § 520.15..................................................................19

22 N.Y.C.R.R. § 6000.7(d)-(f) ..................................................... 19, 30

**Rules**

New York Rule of Professional Conduct 8.4(c) ....................................54

**Other Authorities**

154 Cong. Rec. H8286, 8296 (daily ed. Sept. 17, 2008) ........................46

*Americans with Disabilities Act of 1989: Hearings on H.R. 2273 Before the H. Subcomm. on Civil & Constitutional Rights of the House Comm. on the Judiciary*, 101st Cong., 1st Sess. 162 (1989) ................................. 45, 46

H.R. Rep. 101-485(III) (1990), *reprinted in* A&P H.R. Rep. 101-485 ..................46

S.B. 6500, 2021-2022 Reg. Sess. (N.Y. 2021), https://www.nysenate.gov/legislation/bills/2021/s6500 ......................................23

Stephanie Francis Ward, *Man Who Was Told He Failed Bar Exam Actually Passed, and He Blames Software*, ABA JOURNAL, Jan. 26, 2021, 2:36 PM), https://www.abajournal.com/news/article/man-who-was-told-he-failed-bar-exam-actually-passed-and-he-blames-software...................................................53

Donald Ziegler, et al., *Curriculum Design and Bar Passage: New York Law School's Experience*, 59 J. Legal Educ. 393 (2010)...............................................7

## JURISDICTIONAL STATEMENT

T.W. appeals from the District Court's order dismissing her claim under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, brought against the New York State Board of Law Examiners and its board members in their official capacities. T.W. also appeals from the District Court's entry of judgment on July 21, 2022. The District Court had jurisdiction under 28 U.S.C. § 1331. T.W. timely appealed on August 1, 2022. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Plaintiff-Appellant, T.W., is an individual with disabilities who has overcome a history of severe head trauma to study law. Her law school provided testing accommodations, including extended time, to ensure that she had an opportunity equal to that of her classmates to demonstrate her knowledge. When it came to the bar examination, which serves as the capstone of legal education, however, the New York State Board of Law Examiners (BOLE) refused to provide these same testing accommodations. BOLE has refused to expunge or disavow the resulting bar examination failures obtained under discriminatory conditions. BOLE's conduct violated and continues to violate Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

1

The District Court held that T.W. stated a Title II claim but that she was nonetheless not entitled to any remedy.  This appeal presents the following issues:

1.  Whether the District Court erred in holding that BOLE is an arm of the state entitled to sovereign immunity even though BOLE does not receive taxpayer funding.

2.  Whether the District Court erred in holding that Title II of the Americans with Disabilities Act does not validly abrogate sovereign immunity in the context of discrimination in education and educational testing.

3.  Whether the District Court erred in holding that sovereign immunity bars declaratory and injunctive relief expunging records of bar examination failures obtained and maintained under discriminatory conditions.

4.  Whether the District Court erred in holding that T.W. lacks standing to obtain injunctive relief expunging bar examination failures obtained under discriminatory conditions.

## STATEMENT OF THE CASE

### A. Procedural Background

T.W. filed the Complaint on June 10, 2016.  JA4.  T.W. alleged violations of both section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*  BOLE moved to dismiss.  District Judge Raymond Dearie denied this motion and ordered limited discovery on jurisdictional issues.  [Doc. No. 32].

Following the completion of jurisdictional discovery, BOLE renewed its motion to dismiss.  On September 18, 2019, the District Court denied this motion, holding that BOLE was subject to section 504 as a "program or activity" of the Unified Court System ("UCS").  [Doc. No. 86] at 13.  This Court reversed, holding that BOLE was not subject to section 504 because it is not part of the portion of the judicial branch receiving federal financial assistance.  *T.W. v. N.Y. State Bd. of Law Exam'rs*, 996 F.3d 87 (2d Cir. 2021).

This Court remanded to the District Court to decide in the first instance the Title II claim.  *Id.* at 102.  The District Court then held that T.W. stated a claim for discrimination but that BOLE is immune from all forms of relief.

First, the District Court held that BOLE is an arm of the state entitled to assert sovereign immunity.  The District Court relied on case law that merely assumed that BOLE is an arm of the state, though no court ever applied this

3

Court's multi-factor test for determining whether an entity is an arm of the state. JA38. The District Court then purported to apply those factors that this Court described in *Mancuso v. New York Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996). JA38-43. The District Court acknowledged that no taxpayer funding supports BOLE. The District Court, however, construed as state treasury funds the attorney registration fees that go into an escrow fund called the Attorney Licensing Fund. JA40. For the proposition that this fund constitutes part of the state treasury, the District Court relied on an elided portion of a BOLE witness' uncertain testimony about the source of BOLE's funding. *Id.* The District Court acknowledged that BOLE's actions are not subject to state veto, but asserted that since attorney registration dues are allegedly state treasury funds, state treasury funds would be used to satisfy any money judgment in this case. JA41-42. The District Court accordingly held that BOLE is an arm of the state. JA43.

Turning to whether Title II validly abrogates sovereign immunity in this case, the District Court held in a footnote that education is not a valid basis for abrogation because there is no fundamental right to education. JA48. The District Court then held that sovereign immunity bars T.W.'s damages claim. JA46-50. The District Court held that there is no fundamental right to practice law or obtain a license. JA46-48. The District Court asserted that congressional findings on discrimination in the administration of bar examinations and other educational

4

examinations were limited to "anecdotes" despite a congressional record showing otherwise.  JA48-49.  The District Court also held that Title II was not a congruent or proportional response to that history of discrimination even though Title II requires only reasonable modifications.  JA49.

Finally, the District Court held that sovereign immunity bars declaratory and injunctive relief expunging the bar examination failures obtained under discriminatory conditions.  JA50-51.  The District Court held that *Ex parte Young* does not apply, reaching this conclusion only after construing T.W.'s Complaint narrowly at this motion to dismiss stage to seek only retrospective relief.  JA50.  The District Court also held that T.W. lacks standing to seek expungement because BOLE must keep private her record of failing the bar examination, even though T.W. must still report the bar examination failures when asked by prospective employers about her bar examination record.  JA50-51.

## B. FACTUAL BACKGROUND

### i. BOLE Exerts Tremendous Influence Over Legal Education

BOLE is responsible for determining the content and administration of the New York bar examination.  BOLE does not evaluate bar candidates' moral character or make licensing decisions—those roles fall to the Appellate Divisions.  N.Y. Judiciary Law § 90(1).  BOLE, rather, is charged with evaluating the "law learning" of prospective attorneys.  *In re Brennan*, 243 N.Y.S. 705, 715 (N.Y.

App. Div. 1930). New York courts have described the bar examination as "pedagogical" in nature. *Krutell v. N.Y. State Bd. of Law Exam'rs*, 799 N.Y.S.2d 680, 681-82 (N.Y. App. Div. 2005).

BOLE is the ultimate arbiter of what law students should learn in order to practice law. The subject matter that BOLE chooses for the bar examination determines what content students will study. Over the years, BOLE has added subjects and dropped other topics. JA107. BOLE collaborates with law schools in synchronizing law school curriculums with the bar examination. For instance, BOLE participated in a task force discussing "changes that could be made in the law school curriculum and in the content of the bar examination to incorporate access to justice issues." JA128.

As evidence of the significant influence that BOLE exerts on legal education, New York law schools state on their websites that they design their curriculums around the bar examination. CUNY, for instance, states on its website:

> At CUNY Law, preparing for the bar exam and licensing begins the day you arrive on campus. At the core of our academic program is the commitment to training students to be effective and practice-ready lawyers upon graduation – which means every student meets all bar and licensing requirements through our curriculum. . . .
>
> From our Bar Study Mentoring program, Bar Study Grants, and unique core doctrine course during your final semester, you'll have a clear path and be surrounded by support throughout your time at the Law School.

6

JA72.  BOLE notes in its own annual reports that New York law schools use bar exam results to evaluate their curriculums.  JA145-46; *see also, e.g.*, Donald Ziegler, *et al.*, *Curriculum Design and Bar Passage: New York Law School's Experience*, 59 J. Legal Educ. 393 (2010).

BOLE also offers its own educational programming.  BOLE develops and administers the New York Law Course, an educational program that covers numerous areas of New York law.  JA141-42.  To assist students in learning this material, BOLE has prepared a detailed overview of New York law.  JA143.[1] BOLE was explicit in its desire that students use these comprehensive course materials to learn New York law, stating that it "did not want to create a need for a new bar review course."  JA144.

### ii.  BOLE Is an Independent Entity

BOLE was originally situated in the executive branch under "Sundry Educational Boards and Commissions".  JA74-76 (categorizing BOLE as an "educational function").  BOLE's move to the judicial branch in 1927 had no discernable effect on BOLE's day-to-day operations, as it continued to administer

---

[1] Available at https://www.nybarexam.org/Content/NewYorkCourseMaterials.pdf (last accessed Sept. 18, 2022).

the bar examination as before.  JA84 (BOLE moving to the judicial branch); JA82

(move to take effect in 1927).

As BOLE has moved across branches of government, it has continued to

enjoy independence in carrying out its pedagogical function.  As BOLE stated in

deposition, "The board is an independent organization" that is not supervised by

UCS.  JA225 at 29:7-12; JA228 at 39:12-15.  BOLE explained that it does not seek

permission from the Court of Appeals to carry out its operations.  JA226 at 32:3-

21.  BOLE does not appear in UCS organizational charts, and instead has its own

organizational chart.  *See* JA205 (UCS organizational chart); JA166 (BOLE

organizational chart).[2]  BOLE also has "no interaction at all with the legislature or

the governor."  JA229 at 44:23-24.

BOLE prepares its own annual budgets.  JA228-29 at 41:15-42:20.[3]  BOLE

is funded entirely by attorney registration fees.  JA277 at 107:8-10.  These attorney

registration fees cover all of BOLE's expenses, including salaries, benefits, and

office space.  *E.g.*, JA154; JA230 at 46:2-6; JA278 at 112:21-25.  The attorney

---

[2] BOLE has its own website at https://www.nybarexam.org, unlike other entities situated within the judicial branch that are online through the nycourts.gov domain.

[3] The only revisions made to BOLE's budgets in the appropriations process are the additions of salaries and benefits in compliance with state bargaining practices.  JA278 at 110:13-111:19.  These funds for salaries and benefits, like the rest of the funding for BOLE, come out of the Attorney Licensing Fund.  *Id.* at 112:21-25.

registration fees also cover BOLE's review of requests for disability accommodations.  JA158, 161-62.

### iii. BOLE Discriminated Against T.W. in Failing To Provide Necessary Accommodations on the Bar Examination

BOLE repeatedly refused to provide T.W., an individual with a disability, with the necessary accommodations to ensure that she had a fair opportunity to demonstrate on the bar examination the knowledge that she worked hard in law school to master.

T.W. is an extraordinary woman who overcame severe head trauma to graduate from Harvard Law School and secure employment as an associate with Ropes & Gray.  T.W. suffers from cognitive impairments.  T.W. was medically evaluated, and on the basis of her doctor's conclusions, her law school provided her with necessary testing accommodations.  JA21-22 at ¶¶ 27-28, 30.

In 2013 and 2014, when T.W. applied to take the bar examination, she requested that BOLE provide the same accommodations her law school had determined necessary.  JA22 at ¶ 32.  T.W. provided extensive, uncontroverted medical documentation, comprehensive neuropsychological evaluations, and documentation of her history of accommodations.  JA22-24 at ¶¶ 34-35, 39, 43.  BOLE disregarded this uncontroverted evidence despite having never met T.W. or personally evaluated her.  *See* JA23-24 at ¶¶ 40-42.  It was only after T.W. twice

9

failed the bar examination that BOLE granted her the accommodations she needed, and BOLE notably did so without considering any new evidence. JA27 at ¶¶ 57-58.

By then, it was too late. T.W. lost her job at Ropes & Gray as a result of the law firm's policy of dismissing associates who twice fail the bar examination. JA27-28 at ¶¶ 56, 60, 63. She continues to suffer ongoing harm because she has not been able to find similar employment since many comparable law firms will not hire individuals who have twice failed the bar exam, and BOLE has refused to expunge or disavow the bar examination failures obtained under discriminatory conditions. JA28-29 at ¶¶ 63-64, 72-74; JA32 at ¶¶ 91-92.

## C. STANDARD FOR REVIEW

This Court reviews *de novo* "a district court's order granting a motion to dismiss," accepting "all factual allegations in the . . . Complaint as true and draw[ing] all inferences in [Plaintiff's] favor." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 29-30 (2d Cir. 2019). Whether an entity is entitled to sovereign immunity is a question of law that this Court reviews *de novo*. *CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 94 (2d Cir. 2002).

## SUMMARY OF ARGUMENT

BOLE cannot meet its burden of demonstrating that it is entitled to
sovereign immunity. BOLE is an independent entity which was established as an
educational board to conduct pedagogical evaluations. BOLE is not a licensing
authority. Instead, BOLE functions like private testing entities such as the
National Board of Medical Examiners which administers the board examinations
to medical students.

Under New York law, BOLE operates independently, courts do not interfere
with BOLE's educational functions, the state has no veto power over BOLE's
decisions, and BOLE's board members are not subject to removal. BOLE testified
in deposition that it is an independent organization and that it is not subject to
supervision or direction.

The entirety of BOLE's funding comes from attorney registration fees
deposited in an escrow fund called the Attorney Licensing Fund that was
established to ensure that all of BOLE's expenses are borne not by the state but by
members of the bar. Since any judgment against BOLE would not affect the state
treasury, the Eleventh Amendment is not implicated.

Further, even if BOLE could assert sovereign immunity, Title II validly
abrogates sovereign immunity in the context of education and educational testing.
The District Court erred in summarily holding in a footnote that education cannot

11

support abrogation. Every circuit court to address this issue has held otherwise, holding that even though education is not a fundamental right, it has such heightened importance in our society that it supports the abrogation of sovereign immunity. *See, e.g.*, *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-59 (11th Cir. 2005); *see also Nat'l Ass'n of the Deaf v. State of Florida*, 980 F.3d 763, 772 (11th Cir. 2020) (noting that abrogation of sovereign immunity in education would be meaningless if students are not able to use their education to become productive members of society). The District Court's holding would allow BOLE to evade accountability for failing to accommodate individuals with disabilities seeking to demonstrate their legal education. This implicates the very core of education and therefore supports abrogation.

Finally, the District Court erred in holding that T.W. may not seek declaratory or injunctive relief requiring BOLE to expunge and affirmatively disavow the bar examination failures obtained under discriminatory conditions. T.W. has been unable to find employment comparable to the work she had as an associate at a large law firm because such law firms will not hire individuals who have twice failed the bar examination. BOLE has refused to expunge her bar examination failures, resulting in ongoing harm to T.W. in her job search. Since expungement and affirmative disavowal will remedy this ongoing discrimination, T.W. has standing to seek declaratory and injunctive relief.

12

# ARGUMENT

## I.    BOLE IS SUBJECT TO TITLE II OF THE AMERICANS WITH DISABILITIES ACT

Congress enacted the Americans with Disabilities Act in 1990 as a comprehensive mandate to eradicate discrimination against individuals with disabilities.  42 U.S.C. § 12101.  This mandate requires public entities to take affirmative steps to ensure that all of their services, programs, and activities are accessible.  42 U.S.C. § 12132.

The ADA also requires entities such as BOLE that offer examinations or courses to do so "in a place and manner accessible to persons with disabilities."  42 U.S.C. § 12189.[4]  The Department of Justice has published guidance stating that in determining what accommodations to provide, testing entities "shall generally accept" the documentation that individuals with disabilities provide in support of their request for accommodations.  *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 260 (3d Cir. 2020) (citing Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297).  In *D'Amico v. N.Y. State Bar of Law Exam'rs*, 813 F. Supp. 217, 222-23 (W.D.N.Y. 1993), a court warned BOLE that without an expert

---

[4] Although § 12189 is found in Title III of the ADA, Titles II and III are interpreted in similar manner, and courts have looked to section 12189 in analyzing whether a bar examiner must provide testing accommodations, including in cases involving BOLE.  *See, e.g.*, *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 78 n.2 (2d Cir. 2000).

evaluation of its own, the board was in "no position to countermand plaintiff's treating physician's opinion as to what is the appropriate accommodation" on the bar examination.

T.W. provided BOLE with extensive documentation in support of her requests for accommodation including medical records, comprehensive neuropsychological evaluations, and history of receiving accommodations on law school examinations. JA22-24 at ¶¶ 34-35, 39, 43. BOLE rejected the conclusions of T.W.'s medical providers despite having never met T.W. or personally evaluated her. *See* JA23-24 at ¶¶ 40-42. Instead, BOLE required T.W. to fail without necessary accommodations before providing the accommodations she needed. *See* JA27 at ¶¶ 57-58. During these years in which it was supposed to be budgeting adequately for ADA compliance and instead took perfunctory action on T.W.'s requests for accommodations, BOLE came in hundreds of thousands of dollars under budget.[5]

The District Court, accepting T.W.'s allegations as true at this motion to dismiss stage, correctly ruled that T.W. has satisfactorily alleged a Title II claim. JA45. Yet, the District Court incorrectly held that she may not seek damages, declaratory relief, or injunctive relief—in other words, that there is no remedy

---

[5] JA104 ($621,068 below budget in 2013); JA121 ($762,150 below budget in 2014); JA139 ($395,333 under budget in 2015).

14

available to correct BOLE's civil rights violations against her. This case therefore

presents the question whether *any* remedy is available when BOLE fails to grant

well-supported requests for testing accommodations. For the reasons described

below, the District Court erred in depriving T.W. of remedies to redress BOLE's

civil rights violations.

## II.     BOLE HAS NOT MET ITS BURDEN OF PROVING THAT IT IS AN ARM OF THE STATE ENTITLED TO SOVEREIGN IMMUNITY

This appeal presents the question of first impression in this Circuit whether

BOLE is an arm of the state pursuant to the multi-factor test set forth in *Mancuso*

*v. New York State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996).

Pursuant to well-established case law, only an "arm of the State" can assert

sovereign immunity. *Id.* at 292. The entity asserting sovereign immunity bears the

burden of establishing that it is an arm of the state. *Woods v. Rondout Valley Cent.*

*Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 237-39 (2d Cir. 2006).

This Court has identified a two-step procedure for determining whether an

agency is an arm of the state. *Mancuso*, 86 F.3d at 293. First, courts examine six

factors: "(1) how the entity is referred to in the documents that created it; (2) how

the governing members of the entity are appointed; (3) how the entity is funded;

(4) whether the entity's function is traditionally one of local or state government;

(5) whether the state has a veto power over the entity's actions; and (6) whether the

15

entity's obligations are binding upon the state." *Id.*[6]  Second, if these factors point

in different directions, courts ask: "(a) will allowing the entity to be sued in federal

court threaten the integrity of the state? and (b) does it expose the state treasury to

risk?" *Id.*

Whether an entity is an arm of the state is therefore a fact-intensive inquiry.

In the first appeal in this case, this Court assumed that BOLE is an arm of the state

without undertaking any of the fact-specific analysis that this Court's precedents

require.  Since that appeal concerned T.W.'s section 504 claim which does not

depend on whether BOLE is an arm of the state, no party briefed or argued

whether BOLE is an arm of the state, and the Court did not analyze the factors set

forth in *Mancuso*.  *See generally T.W.*, 996 F.3d 96.[7]

The District Court also noted that in *Bartlett v. N.Y. State Bd. of Law

Exam'rs*, 970 F. Supp. 1094, 1118 (S.D.N.Y. 1997), *vacated on other grounds*, 156

F.3d 321 (2d Cir. 1998), the district court observed that as between the parties in

that case, "[t]here [wa]s no dispute that the Board is a creature of the State."

---

[6] Although this inquiry examines state law characterizations of the entity in
question, "the ultimate question whether a particular governmental entity is an arm
of the state for Eleventh Amendment purposes is one of federal law."  *Woods*, 466
F.3d at 237.

[7] Whether BOLE is an arm of the state is an inquiry distinct from whether
BOLE is part of any larger "department, agency, special purpose district, or other
instrumentality" subject to section 504.  *Compare, e.g.*, *T.W.*, 996 F.3d 87, *with
Mancuso*, 86 F.3d at 293 (this Court applying different tests).

16

*Bartlett* accordingly did not consider or apply this Court's precedent in analyzing whether BOLE is an arm of the state. Moreover, the phrase "creature of the State" has no legal significance since as entities such as the New York Thruway Authority, which is a creature of New York law, are not arms of the state. *E.g.*, *Mancuso*, 86 F.3d at 293-96.

Since no court has previously applied the *Mancuso* factors in determining whether BOLE has met its burden of establishing that it is an arm of the state, the District Court erred as a matter of law in suggesting that prior case law dictates the conclusion that BOLE is an arm of the state.

Since whether an entity is an arm of the state is fact-specific and depends on the particular vagaries of that entity's relationship to the state, the bar examiner of one state can be an arm of the state, *see, e.g.*, *Sinapi v. R.I. Bd. of Law Exam'rs*, C.A. No. 15-311-M, 2016 U.S. Dist. LEXIS 51230, at *6 (D.R.I. Apr. 15, 2016), *aff'd in part*, 910 F.3d 544 (1st Cir. 2018), while the bar examiner of another state is not, *see, e.g.*, *Crowe v. Oregon State Bar*, 989 F.3d 714, 731-33 (9th Cir. 2021). This case law pointing in opposite directions depending on state specifics highlights the importance of undertaking the fact-intensive inquiry that *Mancuso* demands in determining whether an entity is an arm of the state. *See Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 136 & n.2 (2d Cir. 2015) (arm-of-the-state analysis is "state-specific").

17

For the reasons described below, applying this Court's six-factor test in *Mancuso* demonstrates that BOLE cannot meet its burden of demonstrating that it is an arm of the state.

### A. First *Mancuso* Factor:  BOLE Has Substantial Discretion Under New York Law

This Court has explained that when a statute creates an entity, that entity is separate and distinct from other entities for immunity purposes.  *Leitner*, 779 F.3d at 139-140 (although community colleges are part of SUNY, an arm of the state, community colleges created separately by statute are not arms of the state).  BOLE is an entity with its own organizing statutory provisions and therefore is analyzed separately from UCS for arm-of-the-state purposes.  *See id*.

The District Court erred in ignoring BOLE's history as an entity that was created separate and apart from other entities in the judicial branch.  Although the organizing statutes authorize the Court of Appeals to prescribe rules for the administration of the bar examination, N.Y. Jud. Law § 53(3), BOLE was originally located in the executive branch as an "educational board" performing an "educational function", a powerful indication that the legislature did not envision BOLE as a subunit of any particular entity in the judicial branch.  JA74-76.  BOLE's move to the judicial branch did not affect BOLE's statutory obligations.  *See* JA84.

18

The District Court also overlooked that pursuant to New York law, BOLE sets its own rules for the administration of the bar examination. 22 N.Y.C.R.R. § 520.15. Relevant to this case, the New York legislature vested BOLE with the authority to establish its own procedures "for review of applications for special arrangements" for the bar examination, with the only appeal provided for by statute being to BOLE itself. N.Y. Jud. Law § 460-b. BOLE thus makes the final determinations on requests for disability accommodations. *Id.*; 22 N.Y.C.R.R. § 6000.7(d)-(f).

The District Court also erred in ignoring how the New York courts "may not substitute its judgment for that of a duly constituted Board of Law Examiners in the evaluation of an applicant's qualifications." *Sodha v. New York State Bd. of Law Exam'rs*, 431 N.Y.S.2d 885, 887 (N.Y. Sup. Ct. 1980); *see also Loeb v. New York State Bd. of Law Exam'rs*, 534 N.Y.S.2d 559, 560 (N.Y. App. Div. 1988) (explaining that New York courts "are hesitant to interfere with determinations of [BOLE] in matters relating to the administration and grading of Bar examinations"). Further, in *Pasik v. State Bd. of Law Exam'rs*, 478 N.Y.S.2d 270, 273 (N.Y. App. Div. 1984), the First Department distinguished BOLE from other operations within the judicial branch, holding that whereas the Office of Court Administration has limited discretionary powers in implementing the "standards and policies formulated by the Chief Judge of the Court of Appeals and approved

19

by members of that Court," BOLE, "on the other hand, has substantial

discretionary power within the ambit in which it operates." *Id.*

As BOLE testified in this case, its organizing statutory provisions do not

require it to seek approval from the Court of Appeals in carrying out its operations:

> Q. Does the Board of Law Examiners need approval from the Court of
> Appeals to take certain actions?
>
> A. Pursuant to state law, the Court of Appeals has enacted rules for
> the admission of attorneys and counselors at law.  To the extent that
> the rules mandate the board to take certain actions, the board takes
> those actions without needing any approval.
>
> As far as its day-to-day operations, no.  There's no approval process
> with the board.  We, in the process, for example, we go out and
> procure test sites.  I don't seek approval from the court to do that.  I
> don't seek approval from the court to hire and retain proctors, to go
> out and rent tables and chairs for the exam.
>
> So no.  On a daily basis, there is no approval process required of --
> from the board from -- well, from the court to -- for the board to fulfill
> its mandates.

JA226 at 32:3-21.  BOLE, which does not appear in UCS organizational charts,

testified in deposition that it is "an independent organization."  JA225 at 28:20-23,

29:7-8.  BOLE must be taken at its word when it testifies under oath that it does

20

not take direction or supervision from UCS.  JA225 at 29:11-12; JA228 at 39:12-15.[8]

For these reasons, the first *Mancuso* factor—how BOLE is described under New York law—points towards a finding that BOLE is not an arm of the state.

### B. Second *Mancuso* Factor: The Court of Appeals Appoints But May Not Remove BOLE Members

The second factor in the arm-of-the-state analysis considers the appointment process for the members of the entity in question.  *Mancuso*, 86 F.3d at 295.  This Court also examines whether board members, once appointed, may be removed. *Id.* (holding that the lack of removability tilts against immunity).

The District Court noted that the Court of Appeals appoints the board members of BOLE to three-year terms or until a successor is appointed, N.Y. Jud. Law § 56, but overlooked that the Court of Appeals has no power to remove the

---

[8] The District Court erred in relying on the Rhode Island case of *Sinapi v. Rhode Island Bd. of Bar Exam'rs*, 2016 U.S. Dist. LEXIS 51230.  As described, *supra*, whether an entity is an arm of the state is a fact-intensive inquiry dependent on the specifics of a state's structure.  The *Sinapi* court did not undertake the nuanced multi-factor analysis required in determining whether an entity is an arm of the state.  *See id.* at *6.  Further, under Rhode Island law, the board of law examiners is an arm of the state supreme court and the state supreme court reviews the board's determinations.  312 A.2d 720, 724 (R.I. 1973); *see also Sinapi*, 2016 U.S. Dist. LEXIS 51230, at *6 (citing *In re De Orsey*).  In contrast, as described *supra*, BOLE has described itself as independent and does not take supervision or direction from UCS.

board members.  BOLE members, once appointed, regularly serve for decades.[9]

BOLE therefore does not have the accountability that comes with the threat of

removal.  As in *Mancuso*, when this Court held that the lack of removability of the

New York Thruway Authority's members counseled against immunity, the lack of

removability of BOLE's members indicates that BOLE is not an arm of the state.

86 F.3d at 295.

### C. Third *Mancuso* Factor: BOLE Receives No Taxpayer Funding

BOLE receives no taxpayer funding and instead relies solely on attorney

registration fees.  The Ninth Circuit recently held that the sole reliance on such

membership dues for funding counseled strongly against immunity with respect to

the Oregon entity that administers the bar examination.  *Crowe*, 989 F.3d at 731-

32.  As in *Crowe*, this fact points against immunity in this case.

BOLE is funded entirely by attorney registration fees that, per statute, go

into the Attorney Licensing Fund.  N.Y. Judiciary Law § 468-4(a); JA277 at 107:8-

10.  As one legislator reviewing the history of the Attorney Licensing Fund

explained:

---

[9] Diane Bosse recently retired after 22 years on the board and 19 years as the board's chair.  JA287.  Bryan Williams has served on the board since 1996, Robert McMillen since 2001, E. Leo Milonas since 2002, and Michael Colodner since at least 2011.  JA290, 294-95, 296.

> it is State policy for attorneys to bear the costs of the Judiciary's administration of the bar admission process and of attorney disciplinary programs; and that this policy is to be given effect by the Judiciary paying these costs out of the attorney-supported Attorney Licensing Fund.

S.B. 6500, 2021-2022 Reg. Sess. (N.Y. 2021), *at*

https://www.nysenate.gov/legislation/bills/2021/s6500 (last accessed Sept. 15, 2022); *see also id.* (describing the "decades-long policy of requiring the Bar to pay the costs of bar admission and attorney disciplinary programs"). Since the Attorney Licensing Fund was designed to avoid using the state treasury and instead placed the burden on attorneys by collecting attorney registration fees, the District Court erred in describing the Attorney Licensing Fund as part of the "state treasury".

The District Court cited no statute or other legal authority for its assertion that the Attorney Licensing Fund is part of the state treasury.[10] New York law makes clear that even when the state is a custodian of funds, this does not render the funds part of the "state treasury." *E.g.*, N.Y. Const., art. VII, § 7 (separating out "the state treasury or any of its funds" and "any of the funds under its management"); N.Y. Tax Law § 170(6) (distinguishing between the "state treasury,

---

[10] The District Court cited only deposition testimony from BOLE's executive director who stated that he did not know exactly how the funds arrive from the Attorney Licensing Fund to BOLE, and who surmised that the funds go through the state treasury. JA235 at 67:22-68:7. As described *infra*, the executive director's guess was inaccurate.

23

the custody of monies therein and the custody of all other funds"); N.Y. State Fin. Law § 8(9) (requiring the comptroller to report on all funds "from whatever source derived and whether or not deposited in the treasury").

Courts analyzing the source of an agency's funding have held that this factor points in favor of immunity when the underlying state statute specifically defines the funding as coming from the state treasury. *E.g.*, *Ernst v. Rising*, 427 F.3d 351, 360 (6th Cir. 2005) (noting that per Michigan statute, all funds for the entity in question were drawn from the state treasury). This is not such a case. The Attorney Licensing Fund is not described as part of the state treasury, even though elsewhere in the New York statutory code, other funds are explicitly described as part of the state treasury. *See, e.g.*, N.Y. Gen. Bus. Law § 349-c(3) (providing for "establish[ing] in the state treasury a special fund to be known as the elderly victim fund"); N.Y. Labor Law § 100(2) (providing for the Industrial Board of Appeals' board members' expenses to be paid "from the state treasury"). Given the Attorney Licensing Fund's purpose in ensuring that attorneys, rather than New York, bear the cost of the bar examination, this fund is not part of the state treasury but rather a segregated fund held to ensure that the programs it supports do not impact the state treasury.[11]

---

[11] That the Attorney Licensing Fund is an escrow fund that New York may not dip into for general purposes is further supported by examination of the other funds that attorney registration fees support. One such fund is the Lawyers' Fund

24

The District Court acknowledged that BOLE does not receive taxpayer funding but erred in suggesting that, based on comments in a proposed bill not law, BOLE *might* receive such funding in the future, BOLE is entitled to immunity. *See Mancuso*, 86 F.3d at 295 (holding that current funding is the relevant inquiry). The record is unequivocal that BOLE has been funded entirely by attorney registration fees. BOLE cannot meet its burden of establishing that it is an arm of the state by pointing to theoretical taxpayer funding in the future, particularly when it came in hundreds of thousands of dollars under budget during the relevant time period in this case.[12]

Finally, the District Court overlooked BOLE's independence in setting its own budgets. JA228-29 at 41:15-42:20. The judiciary makes no changes to these budgets, filling in only the amount to be paid in salaries and benefits as set by state collective bargaining agreements. JA278 at 110:13-111:13. The legislature does not change BOLE's budget. BOLE then spends its funds as it deems appropriate

---

for Client Protection. N.Y. Jud. Law § 468-a(4) (citing N.Y. State Fin. Law § 97-t). This fund reimburses clients whose funds were misused during the practice of law. N.Y. Jud. Law § 468-b. The monies contained therein are no more the property of New York than IOLA funds are the property of attorneys holding them for clients.

[12] The District Court also erred in suggesting that an entity must be entirely self-funded in order for it not to be an arm of the state. This Court has held that even entities receiving significant taxpayer funding are not arms of the state. *E.g.*, *Woods*, 466 F.3d at 244-45.

without further review.  JA229 at 42:8-10; *see also* JA226 at 32:18-21.  Thus while

BOLE's budget perfunctorily goes through an annual appropriations process, the

fact that BOLE sets its own budgets and spends its funds as it sees fit further

counsels against immunity.

Since BOLE relies solely on attorney licensing fees, does not rely on

taxpayer funding, and sets its own budgets, BOLE's funding points against

immunity.

### D. Fourth *Mancuso* Factor: BOLE Is an Educational Testing Entity, Not a Licensing Authority

The District Court erred in describing BOLE as "tasked with statewide

regulation of attorney admission."  JA41.  BOLE, however, is not a licensing

authority, and does not determine whether to admit candidates to the bar or

regulate attorney conduct.  N.Y. Jud. Law § 90(1), (2).

Since BOLE does not make licensing decisions, it is much more akin to the

National Conference of Bar Examiners, Inc. (NCBE), a corporate entity which

administers the Multistate Professional Responsibility Exam (MPRE) and the

Multistate Bar Exam (MBE).  *Enyart v. Nat'l Bd. of Law Exam'rs, Inc.*, 630 F.3d

1153, 1156 (9th Cir. 2011).  BOLE, like NCBE, administers examinations

designed to measure whether an individual has demonstrated sufficient mastery of

material learned in law school.  That NCBE is a private entity is evidence that the

26

development and administration of bar examinations is not a core governmental function.

Similarly, in other professions, private entities perform the same educational testing function as BOLE. For instance, the National Board of Medical Examiners (NBME), a private entity, administers board examinations to medical students. *Ramsay v. Nat'l Bd. of Med. Exam'rs*, No. 19-CV-2002, 2019 U.S. Dist. LEXIS 222782, at *1-2 (E.D. Pa. Dec. 30, 2019), *aff'd*, 968 F.3d 251 (3d Cir. 2020). BOLE is similar to the NBME in that it focuses on measuring the knowledge that a student has mastered in graduate school.

A similar division of responsibilities has weighed against immunity for bar examination entities that, like BOLE, do not grant licenses. In *Crowe v. Oregon State Bar*, the Ninth Circuit held that the Oregon State Bar (OSB), which "manages bar examinations and attorney admissions, discipline, resignations, and reinstatements," was not an arm of the state. 989 F.3d at 731-33. The Ninth Circuit noted that "under Oregon law, the Oregon Supreme Court—not OSB—makes final decisions on admitting attorneys, disciplining attorneys, and adopting rules of professional conduct." *Id.* at 732. OSB, in this manner, does not "participate in the general government of the State," but rather performs the function of measuring the knowledge of candidates and then leaves it "to those with the ultimate responsibility of governing the legal profession" whether such

27

candidates should be admitted to the bar. *Id.* (citations and quotation marks omitted). The Ninth Circuit accordingly held that OSB was not an arm of the state. *Id.* at 733.

BOLE's limited role in ensuring that candidates have demonstrated the requisite knowledge of the law is far more circumscribed than even that of OSB, which in addition to administering the bar examination, also manages attorney admissions, discipline, resignations, and reinstatements. *Crowe*, 989 F.3d at 732. Since OSB, which performs far more governmental functions than does BOLE, is not an arm of the state, this counsels strongly against immunity for BOLE.

### E. Fifth *Mancuso* Factor: New York Has No Veto Power over BOLE's Actions

The District Court acknowledged that the State exercises no veto power over BOLE and that this factor counsels against immunity.

This Court has explained that the degree of control over the entity's "day-to-day operations" is relevant to the determination whether an entity is an arm of the state. *Leitner*, 779 F.3d at 139. Even when the state exercises "considerable supervisory authority" over the entity in question, this does not "equate[] to a veto power over the unprotested day-to-day decisions" of the entity in question. *Woods*, 466 F.3d at 249.

In this case, this factor points strongly against immunity because BOLE, like the Thruway Authority in *Mancuso*, has only nominal reporting requirements to the state. *Compare* N.Y. Jud. Law § 462 (requiring BOLE to "render an annual account of all its receipts and disbursements to the court of appeals"), *with Mancuso*, 86 F.3d at 295 (noting that the Thruway Authority's "only obligation to the state" is to submit "an annual report outlining its operations and fiscal condition"). BOLE testified in deposition that the Court of Appeals does not set any requirements for the annual report and that BOLE meets its statutory reporting requirement solely by sending to the Court of Appeals an annual projection of expenses without any follow-up discussion. JA241-42 at 93:10-94:10. This is the extent of BOLE's accountability to the state, since, as described *supra*, state law does not provide a procedure for the removal of BOLE board members. *See Mancuso*, 86 F.3d at 295.

Also, as described *supra*, BOLE, which does not appear in UCS organizational charts, has testified that it has no daily interaction with the rest of the judicial branch and does not take "direction" or "supervision" from UCS. JA225 at 29:4-12; JA228 at 39:12-15. BOLE accordingly does not seek or require approval from the Court of Appeals in carrying out its daily operations. JA226 at 32:3-21. BOLE's independence is consistent with New York law which accords BOLE "substantial discretionary power" in carrying out its functions. *Pasik*, 478

29

N.Y.S.2d at 273; *see also Sodha*, 431 N.Y.S.2d at 886-87 (New York courts will not "substitute [their] judgment for that of a duly constituted Board of Law Examiners in the evaluation of an applicant's qualifications").

Further, as described, BOLE has the sole authority under statute to consider requests for "special arrangements," with the only right of appeal being to the board itself. N.Y. Jud. Law § 460-b; 22 N.Y.C.R.R. § 6000.7(d)-(f). Since BOLE has been sued in its own name for denying accommodations,[13] this is yet another indication that BOLE is not an arm of the state. *See, e.g.*, *Crowe*, 989 F.3d at 733 (noting that if an entity is suable in its own name, that suggests that it is not an arm of the state).

Given the substantial discretion that BOLE has in carrying out the functions assigned to it by statute, this factor strongly suggests that BOLE is not an arm of the state.

### F. Sixth *Mancuso* Factor: BOLE's Obligations Are Not Binding on the State

The Supreme Court has explained that the "impetus for the Eleventh Amendment" is "the prevention of federal-court judgments that must be paid out of

---

[13] *See, e.g.*, *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 93 Civ. 4986 (SS), 2001 U.S. Dist. LEXIS 11926, at *166 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.) (awarding damages for failure to provide necessary accommodations).

a State's treasury." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48 (1994).

This Court's precedents hold that the absence of any evidence authorizing the State to assume an entity's liabilities points against immunity. *Compare, e.g.*, *Gorton v. Gettel*, 554 F.3d 60, 63 (2d Cir. 2009) (holding no such evidence meant no immunity for the entity in question), *with Clissuras v. City Univ. of New York*, 359 F.3d 79, 82 (2d Cir. 2004) (finding immunity when statutory provisions specifically provided for New York to cover judgments against CUNY). This Court has explained that absent any express provision providing for the state to assume an entity's liabilities, the presumption is that any judgments are "simply paid out of the [entity's] operating budget." *Leitner*, 779 F.3d at 138 (citation and quotation marks omitted).

As described *supra*, the District Court erred in describing the Attorney Licensing Fund as part of the "state treasury", when the fund was designed as part of a closed loop to ensure that the bar examination program does not impact the state treasury in any way.

Further, during the relevant times in this lawsuit, BOLE came in well under budget each year, buttressing the presumption that any judgment would be paid out of BOLE's operating budget. *See id*. Moreover, BOLE, like the New York Thruway Authority in *Mancuso*, "has provided no evidence that it would have any

31

difficulty in satisfying a judgment in this case" out of its own funds. 86 F.3d at 296.

There is also no provision of New York law that expressly authorizes New York to assume BOLE's liabilities. Rather, New York law makes clear that to the extent BOLE's board members are state officers or employees, any judgment or settlement against such officers must draw from BOLE's own funds. N.Y. Pub. Off. Law § 17(3)(d) (stating that "such judgment or settlement shall be certified for payment" by "the head of the department, commission, division, office or agency in which he is employed"). Further, New York law prohibits BOLE from "bind[ing] the state, in an amount in excess of money appropriated or otherwise lawfully available". N.Y. State Fin. Law § 41.[14] *See also Crowe*, 989 F.3d at 731 (noting the presence of similar statutory language in Oregon "weighs strongly against immunity").

These statutory provisions, taken together, preclude New York from paying judgments against BOLE. Since BOLE is funded exclusively by the Attorney Licensing Fund, and there is no evidence that state treasury funds will be used to

---

[14] The District Court asserted without any authority that this provision merely limits BOLE from entering into contracts in excess of appropriations. While the first part of section 41 prohibits such contracts, the next clause in section 41 is broader, prohibiting BOLE from otherwise "assum[ing] to bind the state" in "excess of money appropriated or otherwise lawfully available." N.Y. State Fin. Law § 41.

pay any judgment, BOLE cannot meet its burden of establishing that it is an arm of the state.

### G. Tie-Breaking *Mancuso* Factors: Judgment Against BOLE Does Not Implicate the Eleventh Amendment's Core Concerns

As described, all six factors point against immunity because BOLE is an independent board that does not rely on taxpayer funding. Even if the factors did not all point in the same direction, this Court's additional two "tie-breaking" factors make clear that BOLE is not an arm of the state because judgment against BOLE will not implicate the core concerns of the Eleventh Amendment.

### i. Allowing BOLE To Be Sued in Federal Court Preserves Federal Comity Concerns

BOLE can already be sued in federal court for declaratory and injunctive relief for prospective violations of the ADA pursuant to *Ex parte Young*, 209 U.S. 123 (1908). *E.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 289 (2d Cir. 2003). Further, BOLE has already been held liable for damages in federal court for violating Title II, *Bartlett*, 2001 U.S. Dist. LEXIS 11926, at *165-66, and it will not offend federal comity concerns for BOLE to again be held accountable for violating Title II. *See also D'Amico*, 813 F. Supp. at 222-23 (holding that BOLE may not cursorily deny requests for accommodations). Permitting a civil rights victim to seek damages from BOLE will not threaten the integrity of the state, when, as described, judgments will not be paid out of the state treasury.

This suit can proceed against BOLE in federal court because the state is not a necessary party, and BOLE has not argued otherwise.  *See, e.g.*, *Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*, 795 F.3d 351, 357-59 (2d Cir. 2015) (holding that because the Thruway Authority is not an arm of the state and judgment would run only against the Thruway Authority, the state was not a necessary party).

For these reasons, permitting suit to move forward against BOLE will not harm the state's integrity.

### ii. Judgment Against BOLE Will Not Expose the State Treasury to Risk

Since, as described *supra*, "[t]here is no evidence that New York State would be liable for indemnifying a judgment against [BOLE] or that a judgment would come directly from the state treasury," BOLE is not an arm of the state entitled to immunity.  *Gorton*, 554 F.3d at 63 (citations and quotation marks omitted).  Judgment against BOLE will not affect any of the programs funded by the state treasury.  There will be no impact on the state education system or on any of the state parks, for instance.  Since holding BOLE accountable for violating federal law will not affect the state treasury, BOLE is not entitled to immunity.

34

### III.   TITLE II VALIDLY ABROGATED SOVEREIGN IMMUNITY IN THE CONTEXT OF DISCRIMINATION IN EDUCATION AND EDUCATIONAL TESTING

The District Court erred in holding that Congress cannot abrogate sovereign immunity in the context of education, a holding that creates a conflict not only within the district courts in the Second Circuit,[15] but which also directly conflicts with every circuit court to address this issue.  *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555-56 (3d Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005); *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005).  This Court has noted the holdings of its sister circuits but left for another day whether it will join those circuits in holding that Title II validly abrogates sovereign immunity in the context of education.  *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 195 & n.9 (2d Cir. 2015).  For the reasons set forth below, this Court should so join its sister circuits and hold that education is a valid basis for abrogation.

In analyzing whether Congress validly abrogated sovereign immunity, courts first determine whether there was a Title II violation.  *United States v. Georgia*,

---

[15] *See Doherty v. Bice*, 18-cv-10898 (NSR), 2020 U.S. Dist. LEXIS 169545, at *21-22 (S.D.N.Y. Sept. 16, 2020) (Roman, J.); *Goonewardena v. New York*, 475 F. Supp. 2d 310, 326 (S.D.N.Y. 2007) (Castel, J.).

546 U.S. 151, 159 (2006). If the "misconduct violated Title II but did not violate the Fourteenth Amendment," courts should analyze "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*[16] These steps are addressed in turn.

### A. BOLE Violated Title II of the ADA by Failing To Provide Necessary Accommodations on the Bar Examination

The District Court acknowledged that T.W. has made out the elements of a Title II claim for disability discrimination. For the reasons described *supra*, T.W. has plausibly alleged at this motion to dismiss stage that BOLE violated Title II by failing to provide necessary accommodations in timely manner. She therefore satisfies the first step of the *United States v. Georgia* test.

---

[16] This Court has, in recent years, moved away from its decision in *Garcia v. State Univ. of N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), a case that predated *United States v. Georgia.* In *Garcia*, this Court held that Title II validly abrogates sovereign immunity only when there is discriminatory animus present. *Garcia*, 280 F.3d at 111-12. Since then, as described *supra*, the Supreme Court has set forth a clear procedure for analyzing whether Title II claims validly abrogate sovereign immunity. *Georgia*, 546 U.S. at 159. Nowhere has the Supreme Court incorporated a *mens rea* element into sovereign immunity analysis, and in the years since, this Court limited *Garcia* to claims based on violations of the Equal Protection Clause, *Bolmer v. Oliveira*, 594 F.3d 134, 147 (2d Cir. 2010), and then outright questioned the continued vitality of *Garcia*. *Dean*, 804 F.3d at 194-95. District courts, including the District Court here, have followed *United States v. Georgia*. *E.g.*, *Doherty*, 2020 U.S. Dist. LEXIS 169545, at *19-21.

### B. Congress Validly Abrogated Sovereign Immunity As Applied to Education and Educational Testing

In cases where conduct violates Title II but not the Fourteenth Amendment, the Supreme Court has developed a test for determining whether Congress validly abrogated sovereign immunity. This test requires courts to (1) identify the constitutional right at issue; (2) examine whether Congress identified a history and pattern of the discrimination at issue; and (3) determine whether the remedy imposed by Congress is congruent and proportional to the history and pattern of unequal treatment. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 522, 523, 530 (2004).

This case concerns legal education and educational testing. The educational testing that BOLE administers—the bar examination—is a milestone in the education and training of law students, determining whether they have sufficiently mastered the legal knowledge they have worked hard in law school to master. Discrimination in educational testing diminishes the value of this education for students with disabilities. The District Court therefore erred in disregarding the centrality of education and educational testing in this case and focusing instead on whether there is a right to practice law or obtain a license. BOLE is not a licensing authority and this case is not about whether T.W. has a right to practice law.[17]

---

[17] The District Court therefore erred in relying on professional licensing cases such as *Turner v. Nat'l Council of State Bds. of Nursing, Inc.*, 561 F. App'x

37

BOLE, as the arbiter of what law students must learn, performs a quintessential educational function befitting BOLE's history as an "educational board" performing an "educational function." JA74-76. BOLE wields considerable influence over law school curriculums by deciding the subject areas that will be covered on the bar exam, and periodically revising the subject matters knowing that New York law schools will adjust their curriculums accordingly. JA128-29, 145-46. New York law schools themselves state on their websites that their curriculums are designed around the bar exam and will prepare students to pass the bar exam. *E.g.*, JA72 (CUNY School of Law website page). In this manner, BOLE has and continues to shape the education of generations of law students. *See, e.g.*, *Krutell*, 799 N.Y.S.2d at 681-82 (describing the bar examination as a "pedagogical evaluation").

Further, BOLE itself developed and administers the New York Law Course, an educational program designed to teach future lawyers about the specifics of New York law. JA141-42. It has also developed and regularly updates a content outline for aspiring lawyers to study. JA143-44. In this manner, BOLE not only

---

661 (10th Cir. 2014). *Turner* analyzed sovereign immunity with respect to a licensing board, not with respect to the actual testing entity—a private entity—that develops and administers the nursing board examination. *Id.* at 663 (explaining the differing roles of the licensing board and testing entity). Since BOLE is a testing entity and not a licensing board, *Turner* is not on point.

exerts tremendous influence over what law schools teach but also delivers educational programming of its own to future lawyers.

Given that BOLE was formed as an educational board, conducts pedagogical evaluations, carries out educational programming, and is not a licensing authority, the District Court erred in framing this case as about whether there is a right to practice law or a right to pursue a particular profession. The District Court, in footnote five in its opinion, cited district court cases discussing abrogation in cases concerning bar examination authorities, but none of these cases addressed whether Congress validly abrogated sovereign immunity in the context of education and educational testing.

As described *infra*, Congress specifically noted the history of discrimination in education and educational testing by public entities in the course of enacting the ADA. Congress acted within its Section 5 powers in prohibiting such discrimination.

### i. Courts Have Recognized the Elevated Importance of Education and Educational Testing in Abrogating Sovereign Immunity

Every circuit court to address the issue has held that Title II validly abrogates sovereign immunity in the context of higher education. *Bowers*, 473 F.3d at 555-56; *Toledo*, 454 F.3d at 40; *Constantine*, 411 F.3d at 490; *Ass'n for Disabled Ams.*, 405 F.3d at 959.

39

Although there is no fundamental right to education, the Fourth Circuit has observed that education has "undisputed importance" and plays a "pivotal role" in our society. *Constantine*, 411 F.3d at 486-87 (citations omitted). Courts have noted that "[d]iscrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services." *Ass'n for Disabled Ams.*, 405 F.3d at 959; *Toledo*, 454 F.3d at 40 (quoting this language). As the Eleventh Circuit has explained:

> although classifications relating to education only involve rational basis review under the Equal Protection Clause, "both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child," distinguishes public education from other rights subject to rational basis review. *Plyler v. Doe*, 457 U.S. 202, 221, 102 S. Ct. 2382, 2396-97, 72 L. Ed. 2d 786 (1982). The Supreme Court long has recognized that even when discrimination in education does not abridge a fundamental right, the gravity of the harm is vast and far reaching. *See Brown v. Board of Educ.*, 347 U.S. 483, 493, 74 S. Ct. 686, 691, 98 L. Ed. 873 (1954) ("education is perhaps the most important function of state and local governments" because "it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education"). Thus, the constitutional right to equality in education, though not fundamental, is vital to the future success of our society.

*Ass'n for Disabled Ams.,* 405 F.3d at 957-958. Since the circuit courts have uniformly held that education is a valid basis for abrogation given the importance of education to society, it was error for the District Court to conclude otherwise.

40

In *Nat'l Ass'n of the Deaf v. State of Florida*, 980 F.3d 763 (11th Cir. 2020), the Eleventh Circuit held that abrogation in the education context supported abrogation in the context of captioning for legislative proceedings:

> We think it implausible that Congress could validly abrogate sovereign immunity to protect the right of students with disabilities to get an education but could not do the same to directly enable those students to participate in the democratic process. After all, this Court has recognized the importance of the education of disabled students insofar as it empowers them to better participate in the democratic process.

*Id.* at 772. In the same manner, abrogation of sovereign immunity in higher education would be meaningless if students could not then demonstrate on professional examinations what they learned in school, particularly when schools have designed their curriculums around those very examinations. Since examinations measuring what students have learned in higher education have a far closer relationship to education than does the captioning of legislative proceedings, the abrogation of sovereign immunity in the context of legislative proceedings means that sovereign immunity is similarly abrogated in the context of educational examinations. *See also Toledo*, 454 F.3d at 36 (collecting cases recognizing the "vital importance of all levels of public education in preparing students for work and citizenship as well as the unique harm that occurs when some students are denied that opportunity").

Courts have held that Title II abrogates sovereign immunity not just in the context of classroom education but also with respect to educational testing. In *Constantine v. Rectors & Visitors of George Mason Univ.*, for example, the Fourth Circuit held that Title II validly abrogated sovereign immunity in a case involving a law school's refusal to provide necessary accommodations for an examination and subsequent refusal to expunge the failed grade obtained under discriminatory conditions. 411 F.3d at 478-79, 484-90; *see also, e.g.*, *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 478-79, 481 (N.D. Ohio 2007) (Title II validly abrogated sovereign immunity in an educational testing case).

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, the case in which this Court reserved for another day whether education validly abrogates sovereign immunity, was itself a case that involved the lack of accommodations for national board examinations. A medical school had denied a student with a disability the extended time necessary for that student to study for a national board examination. 804 F.3d at 182-85. Although this Court declined to reach the issue whether education validly abrogates sovereign immunity in the Title II context, *id.* at 194-95, another court took the logical next step in a factually similar case in holding that Title II validly abrogated sovereign immunity as applied to "claims center[ing] around his medical school education and testing." *Cunningham v. Univ. of N.M.*

42

*Bd. of Regents*, 779 F. Supp. 2d 1273, 1279 (D.N.M. 2011), *aff'd*, 531 F. App'x 909 (10th Cir. 2013).[18]

In the case at bar, BOLE's discriminatory conduct prevented Plaintiff from demonstrating on the bar exam mastery of the material studied as part of her legal education. Without such testing accommodations in place for the bar exam, the benefits of T.W.'s entire legal education were significantly diminished, as she was then not able to demonstrate the true extent of legal knowledge that she paid law school tuition and expended countless hours to master. As described in the next section, Congress had in mind precisely this type of discrimination in education and educational testing when it enacted the ADA.

### ii. Congress Has Identified a History and Pattern of Discrimination in Education and Educational Testing

As the Supreme Court has explained, "Congress enacted Title II against a backdrop of pervasive unequal treatment of persons with disabilities in the

---

[18] In *Oliver v. Va. Bd. of Bar Exam'rs*, a district judge asserted that "education-related testing" differs from professional examinations. 312 F. Supp. 3d 515, 531 (E.D. Va. 2018), *appeal dismissed*, 2018 U.S. App. 37305 (4th Cir. July 23, 2013). The judge offered no authority for this proposition, and Congress made no such distinction when enacting 42 U.S.C. § 12189, which groups together courses, examinations, and professional licensing examinations in prohibiting disability discrimination. In the course of enacting this provision, Congress relied on the extensive history of discrimination in education and testing, including professional examinations, that is discussed *infra*. *Oliver* was dismissed on appeal before the Fourth Circuit, which has recognized abrogation in the education context, had the opportunity to apply its precedent in *Constantine*, 411 F.3d 474.

administration of state services and programs" including "public education". *Lane*, 541 U.S. at 524-525. In *Tennessee v. Lane*, the Supreme Court considered Title II as a whole, and held that Congress had sufficiently documented unconstitutional disability discrimination in the provision of public services to support prophylactic legislation pursuant to its section 5 powers under the Fourteenth Amendment. *Id.* at 529. The Supreme Court observed that Congress enacted this legislation after considering the "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services". *Id.* at 528. In this manner, the Supreme Court conclusively held that Congress satisfied this step with respect to Title II as a whole. *Id.*; *see also, e.g.*, *Ass'n for Disabled Ams.*, 405 F.3d at 958.

Further, with respect to education in particular, Congress made explicit in the ADA its finding that "discrimination against individuals with disabilities persists in such critical areas as . . . education". 42 U.S.C. § 12101(a)(3). Congress reached this conclusion after considering extensive evidence in the areas of education. *See, e.g.*, *Bowers*, 475 F.3d at 555 (noting that Congress enacted Title II "against the backdrop of our regrettable national history in educating students with disabilities" which "leaves much to be desired"); *Toledo*, 454 F.3d at 37-39 (describing this history).

With respect to educational testing, the District Court overlooked that Congress specifically documented numerous instances in which people with disabilities were not allowed by public educational testing entities to demonstrate their knowledge on examinations designed to measure their knowledge.[19] *See, e.g.*, CA 261 ("California Basic Educational Skills Test discriminated against deaf adults who wanted to become teachers of deaf students"); TX 1503, 1549 (state teachers' exam required deaf teachers who wanted to teach deaf children to pass section on speech assessment and listening); TX 1542 (deaf individual "not permitted to take state cosmetology exam with assistance from interpreter"); TX 1543 (blind individual "not permitted to take the state chiropractic board exam because he could not read x-rays alone"). On the basis of such a record of discrimination, Congress had ample reason to enact legislation prohibiting discrimination by public entities in education and educational testing.

Congress also, in its own words, heard "scores of horror stories on an annual basis arising from the experiences of persons with disabilities who attempt to take bar examinations." *Americans with Disabilities Act of 1989: Hearings on H.R.*

---

[19] *Lane* relied on historical materials collected by a congressional task force that were lodged with the Supreme Court in *Board of Trustees of the University of Alabama* v. *Garrett*, 531 U.S. 356 (2001), and catalogued in Appendix C to Justice Breyer's dissent in that case. *Lane*, 541 U.S. at 526-527. The *Garrett* appendix cites to historical documents by State and Bates stamp number, *Garrett*, 531 U.S. at 391-424, a practice followed in this brief.

*2273 Before the H. Subcomm. on Civil & Constitutional Rights of the House Comm. on the Judiciary*, 101st Cong., 1st Sess. 162 n.3 (1989) (statement of Laura D. Cooper) (JA55-71); *see also* JA at 71 (describing problems faced by lawyers with disabilities, including inaccessible bar examinations).

In response to this history that included public educational testing entities refusing to provide accommodations on examinations, Congress specifically sought to outlaw such discrimination in enacting Title II. H.R. Rep. 101-485(III) at 68 (1990), *reprinted in* A&P H.R. Rep. 101-485 (stating that public testing authorities "must make all of its programs accessible to persons with disabilities, which includes physical access as well as accommodations in the way the test is administered, e.g., extended time or assistance of a reader."). When Congress amended the ADA in 2008, it specifically noted ongoing discrimination by testing entities as a reason to amend. *See, e.g.*, 154 Cong. Rec. H8286, 8296 (daily ed. Sept. 17, 2008) (statement of Rep. Joe Courtney) ("Too many individuals with documented learning disabilities, including dyslexia, are denied access to easily administered and often low-cost accommodations that would make the critical difference in allowing them to demonstrate their knowledge."). In this manner, Congress has twice acted in response to documented problems in the accessibility of testing accommodations that have hindered the ability of individuals with disabilities to demonstrate the extent of their education.

46

### iii. Title II Is a Congruent and Proportional Response

Title II of the ADA is congruent and proportional to the violations it remedies in education and educational testing. The District Court overlooked that Title II requires only reasonable modifications. *E.g.*, 28 C.F.R. § 35.130(b)(7). Courts have held that Title II was a congruent and proportional response in the context of public education because it requires only those accommodations that do not result in undue burden or fundamental alteration. *E.g.*, *Bowers*, 475 F.3d at 555-56; *Toledo*, 454 F.3d at 39-40. Since Title II requires only reasonable modifications, it is congruent and proportional legislation as applied to the education and educational testing of students historically discriminated against based on disability.

### C. The Right of Access to the Courts Is a Plus Factor that Further Supports the Abrogation of Sovereign Immunity

Since the bar examination is not only the pinnacle of legal education but also a gateway to the legal profession, this case also implicates access to the courts, which the Supreme Court has held supports the abrogation of sovereign immunity in the Title II context. *Lane*, 541 U.S. at 533-34.[20] Although this is a case that

---

[20] The Supreme Court has also employed rational basis review with bite in evaluating proffered rationales for refusing to permit an individual to take the bar examination. *See Schware v. Bd. of Bar Exam'rs of New Mexico*, 353 U.S. 232, 234-35, 246-47 (1957) (holding that the exclusion of an individual from the New Mexico bar based on flimsy rationales was unconstitutional).

47

centers on education and educational testing, discrimination in these contexts has a significant downstream effect on the right of access to the courts.

As described *supra*, Title II validly abrogates sovereign immunity in the context of education because barriers to education hinder the ability of individuals with disabilities to be productive members of society. *See, e.g.*, *Ass'n of Disabled Ams.*, 405 F.3d at 959. Demonstrating sufficient legal learning to be a member of the New York bar "connotes more than an employment, license, permit, or other authority or privilege" because "[m]embers of the Bar are officers of the Court." *In re Sugarman*, 380 N.Y.S.2d 12, 13 (N.Y. App. Div. 1976) (ellipses omitted). Judge Cardozo explained that an attorney is "an officer of the court, and like the court itself, an instrument or agency to advance the ends of justice." *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 470-71 (N.Y. 1928). Legal education is meaningless if individuals with disabilities cannot then use this education to uphold justice as officers of the court. *See also, e.g.*, *Toledo*, 454 F.3d at 33 (describing education as "pivotal to sustaining our political and cultural heritage with a fundamental role in maintaining the fabric of society") (citations and quotation marks omitted).

Congress has broad authority to abrogate sovereign immunity in the context of access to the courts and in cases brought by individuals with disabilities who seek access to the courts as part of their profession. *Lane*, 541 U.S. 509. In *Lane*

itself, one of the plaintiffs was a court reporter who, like T.W., alleged that the lack of accommodations hampered her opportunity to participate in the judicial process. *Id.* at 514; *see also, e.g.*, *Mosier v. Commonwealth of Kentucky*, No. 08-184-KSF, 2009 U.S. Dist. LEXIS 114699, at *15-17 (E.D. Ky. Dec. 9, 2009) (sovereign immunity abrogated in the context of refusal to provide interpreters in court for a deaf attorney). Due to the lack of accommodations, T.W. was deprived of the opportunity to demonstrate the extent of her legal education, and therefore prevented from reaping the benefits of the legal education that she worked hard to obtain. *See, e.g.*, *Ass'n of Disabled Ams.*, 405 F.3d at 959.

There is a single unbroken line from the education of law students with disabilities to ensuring that they are able to demonstrate their legal knowledge on the bar examination under equitable testing conditions to serving as officers on the court. It would be anomalous indeed for Title II to abrogate sovereign immunity in the education and court contexts but not when the two intersect: at the administration of the bar examination. As this case demonstrates, BOLE's refusal to grant T.W. necessary accommodations hampered her career; her example is illustrative of the barriers that face individuals with disabilities who want to pursue careers in the law. Since legal education serves to equip students with the requisite knowledge to serve the interests of justice, Title II validly abrogates sovereign immunity in this case as applied to examinations measuring that knowledge.

#### IV. *EX PARTE YOUNG* PROVIDES FOR PROSPECTIVE RELIEF EXPUNGING BAR EXAMINATION FAILURES OBTAINED UNDER DISCRIMINATORY CONDITIONS

Whether there is sovereign immunity or not, T.W. can obtain declaratory and injunctive relief under Title II against BOLE officials named in their official capacities pursuant to *Ex parte Young*, 209 U.S. 123 (1908). *E.g.*, *Henrietta D.*, 331 F.3d at 289.

The Supreme Court has explained that in determining whether *Ex parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 645 (2002) (brackets and quotation marks omitted). As this Court has explained, "When a court reviews the merits of a claim for purposes of *Ex parte Young*, it reviews only whether a violation of federal law is *alleged*; appellate review of allegations is necessarily deferential, and only frivolous and insubstantial claims will not survive its scrutiny." *Vega v. Semple*, 963 F.3d 259, 282 n.120 (2d Cir. 2020) (emphasis in original and citation omitted).

In evaluating whether there is an ongoing violation of federal law, this Court has explained that "it is relevant—in considering the existence *vel non* of an ongoing violation—to ask whether the claimed remedy is still available." *State Emples. Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 96 (2d Cir.

50

2007). Relief is prospective when the declaratory and injunctive relief sought "does not impose upon the State a monetary loss resulting from a past breach of a legal breach on the part of the defendant state officials." *Verizon*, 535 U.S. at 646 (emphasis, citation, and quotation marks omitted).

*Ex parte Young* is available to remedy the expungement of records maintained in ongoing violation of federal law. For instance, in *Constantine v. Rectors & Visitors of George Mason Univ.*, the Fourth Circuit held that *Ex parte Young* permitted declaratory and injunctive relief expunging a failing grade obtained after a university failed to provide reasonable modifications for the plaintiff's disability. 411 F.3d at 496. Similarly, in *Flint v. Dennison,* 488 F.3d 816, 824 (9th Cir. 2007), the Ninth Circuit noted that negative information contained in a student file can constitute an ongoing violation when that information jeopardizes a student's future employment or college career. *See also, e.g.*, *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) (holding that the "expungement of personnel records" is "clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment").

Similarly, within the Second Circuit, district courts have repeatedly held expungement of records maintained in ongoing violation of federal law is prospective relief available under *Ex parte Young*. *E.g.*, *King v. McIntyer*, 9:11-CV-1457 (DNH/TWD), 2013 U.S. Dist. LEXIS 185277, *18-19 (N.D.N.Y. Dec.

51

31, 2013) (report and recommendation) (holding that the request to expunge false reports of misbehavior was prospective relief), *adopted*, 2014 U.S. Dist. LEXIS 20852 (N.D.N.Y. Feb. 20, 2014); *Malkan v. Mutua*, 12-CV-236-A, 2012 U.S. Dist. LEXIS 143311, at *20-22 (W.D.N.Y. Oct. 3, 2012) (holding that clearing plaintiff's personnel file of references to an unlawful termination was prospective relief), *aff'd*, 699 F. App'x 81 (2d Cir. 2017); *Desir v. Bd. of Coop. Educ. Servs. Nassau County*, 07-CV-1994 (RRM)(MJO), 2008 U.S. Dist. LEXIS 78965, at *5-6 (E.D.N.Y. Sept. 30, 2008) (holding that the expungement of employment records was prospective relief), *aff'd*, 469 F. App'x 66 (2d Cir. 2012).

The District Court erred in asserting that T.W. has not alleged ongoing harm. T.W. alleged in the Complaint that she "has diligently pursued employment comparable to the position she held at Ropes & Gray LLP, but she has been unable to obtain such a position" because "top law firms do not wish to employ someone who failed the bar examination twice." JA28 at ¶¶ 61, 63.  She further alleged that "[f]ailure on two bar examinations has hindered and continues to hinder" her ability to find comparable employment.  JA29 at ¶ 74.

The District Court further erred in characterizing as retrospective the relief that T.W. seeks, when her Complaint makes clear that she seeks prospective relief to redress ongoing harm.  Specifically, T.W. alleged that BOLE "maintain[s] records documenting" that she "failed the bar examination" and she has "no

official acknowledgment that the failures were the result of discriminatory test administration." JA29 at ¶ 72. She further alleged that "[a]bsent expungement and/or official knowledge of discrimination," she "must disclose and struggle to explain failure on the bar examination in her job search despite such failures having been the result of discriminatory testing conditions." JA29 at ¶ 73. BOLE continues to discriminate against T.W. by refusing to expunge these bar examination failures and hampering her search for employment.[21]

This prospective relief that T.W. seeks is comparable to the prospective expungement of student or employment records that would hamper the student's or employee's future prospects. *See, e.g.*, *Flint*, 488 F.3d at 824; *Elliott*, 786 F.2d at 302. Notably, awarding T.W. the declaratory and injunctive relief she seeks requiring BOLE to expunge the bar examination failures would have no impact on the state treasury, further indication that the relief sought is prospective in nature. *See Deposit Ins. Agency v. Superintendent of Banks*, 482 F.3d 612, 618-619 (2d Cir. 2007) (citing *Verizon*, 535 U.S. at 646).

---

[21] In recent news coverage, BOLE admitted mistakenly failing a bar exam test-taker who had actually passed. BOLE disavowed the bar examination failure and took corrective action. Stephanie Francis Ward, *Man Who Was Told He Failed Bar Exam Actually Passed, and He Blames Software*, ABA JOURNAL, Jan. 26, 2021, 2:36 PM), https://www.abajournal.com/news/article/man-who-was-told-he-failed-bar-exam-actually-passed-and-he-blames-software. BOLE can take similar action with T.W., admitting that the bar examination failures were obtained under discriminatory conditions and expunging those failures.

The District Court's constricted reading of the Complaint violates not only the Supreme Court's directive that courts draw plausible inferences in the plaintiff's favor at the motion to dismiss stage, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009), but also this Court's instruction that courts defer to the plaintiff's allegations in determining whether a plaintiff seeks declaratory or injunctive relief that is prospective and would remedy ongoing violations, *e.g.*, *Vega*, 963 F.3d at 282 n.120 (citations omitted).

The District Court further erred in asserting that because T.W.'s bar examination records are supposedly confidential,[22] she has no remedy available to her. The issue here is not, as the District Court suggested, whether BOLE is permitted to tell employers about T.W.'s bar examination results. Rather, the issue is that T.W. herself is asked about her bar examination results by prospective employers who then refuse to hire her based on the failures BOLE obtained under discriminatory conditions.[23] Since expungement and disavowal of the bar examination failures will remedy BOLE's ongoing discrimination against T.W. and allow her to move forward in her career with a bar examination record

---

[22] This statutory provision authorizes T.W.'s bar examination records to be made public without notice to her. N.Y. Jud. Law § 90(10).

[23] Pursuant to New York Rule of Professional Conduct 8.4(c), T.W. may not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

limited to only those results obtained under nondiscriminatory conditions, T.W. has standing to seek declaratory and injunctive relief.

Declaratory and injunctive relief requiring BOLE to expunge and disavow the record of bar examination failures is prospective relief that this Court can order to remedy BOLE's ongoing discrimination. *E.g.*, *Constantine*, 411 F.3d at 479, 496 (holding *Ex parte Young* permitted expungement of a failing grade obtained as a result of the lack of accommodations, a grade that the plaintiff alleged "continues to hamper her employment prospects").

## V.    CONCLUSION

BOLE may not use sovereign immunity to shield its discriminatory conduct. BOLE is not an arm of the state entitled to immunity.  Further, Title II validly abrogates sovereign immunity as applied to education and educational testing. Finally, sovereign immunity does not bar declaratory and injunctive relief requiring BOLE affirmatively disavow and expunge T.W.'s bar examination failures obtained under discriminatory conditions.  For the foregoing reasons, this Court should reverse the District Court's order and remand the case for further proceedings on the merits of T.W.'s Title II claim.

Respectfully submitted,

 /s/ Mary Vargas
Mary Vargas
Michael Steven Stein
STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
Tel: (240) 793-3185

 /s/ Jo Anne Simon
Jo Anne Simon
JO ANNE SIMON, P.C.
99 Park Avenue, Suite 1510
New York, NY 10016
Tel: (718) 852-3528

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of Microsoft Word, the brief contains 12,949 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii), and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1 as the font is Times New Roman, 14 point.

 /s/ Mary Vargas

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Brief for Appellant and Joint Appendix by using the CM/ECF system on September 21, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ Mary Vargas