# No. 22-1661

IN THE

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

T.W.,

PLAINTIFF-APPELLANT,

—v.—

NEW YORK STATE BOARD OF LAW EXAMINERS, DIANE BOSSE, JOHN J. MCALARY, BRYAN WILLIAMS, ROBERT MCMILLEN, E. LEO MILONAS, MICHAEL COLODNER,

DEFENDANTS-APPELLEES,

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
IN CASE NO. 16-CV-03029 (RJD),
U.S. DISTRICT JUDGE RAYMOND J. DEARIE

## BRIEF OF AMICI CURIAE NATIONAL DISABILITY RIGHTS NETWORK, ET AL., IN SUPPORT OF PLAINTIFF-APPELLANT AND IN SUPPORT OF REVERSAL

BRIDGET A. CLARKE
ANDREW J. DHUEY
456 Boynton Avenue
Berkeley, CA 94707
(510) 528-7755

September 28, 2022                    *Attorneys for Amici Curiae*

## RULE 26.1(a) DISCLOSURE STATEMENT

With the exception of amicus curiae National Disabled Legal Professionals Association, which is an unincorporated association, all amici are non-profit corporations. They have no parent corporations and no publicly held company owns 10 percent or more of their stock.

## RULE 29(a)(2) PERMISSION TO FILE AMICI BRIEF

Pursuant to Fed. R. App. P. 29(a)(2), amici certify that all parties have consented to the filing of this amicus curiae brief.

# TABLE OF CONTENTS

Page

RULE 26.1(a) CORPORATE DISCLOSURE STATEMENT ...................... i

RULE 29(a)(2) CONSENT OF PARTIES STATEMENT ........................... i

TABLE OF AUTHORITIES ......................................................... iv

RULE 29(a)(4)(E) AUTHORSHIP STATEMENT ........................................1

INTEREST OF AMICI CURIAE.................................................................1

I.   The Amici Curiae Are Organizations Committed to Broad
     Enforcement of Civil Rights Laws......................................................1

II.  Why This Case Matters to Amici .........................................................3

ARGUMENT...........................................................................................5

I.   Pervasive Irrational Discrimination against People with Disabilities
     Creates Barriers to Entry to the Legal Profession, Harming Aspiring
     Lawyers, Clients, and the Profession ..................................................6

II.  The Order Erred in Concluding that Title II Did Not Validly Abrogate
     Sovereign Immunity with Respect to the Claims Asserted in This
     Case .............................................................................................. 13

     a.   This Case Implicates the Constitutional Rights to Be Free from
          Irrational Disability Discrimination in Public Services and in
          Educational Testing in Particular ............................................. 13

     b.   The ADA's Legislative Record Adequately Identifies the
          Requisite History and Pattern of Irrational Discrimination to
          Support Congressional Abrogation of Sovereign Immunity in
          This Case .............................................................................. 17

     c.   Title II Is a Congruent and Proportional Response to the
          History and Pattern of Irrational Disability Discrimination in
          This Context ........................................................................... 23

III.    Affirming the Order Would Put This Court in Conflict
with Other Circuits Regarding Title II Abrogation of Sovereign
Immunity ............................................................................. 25

CONCLUSION............................................................................ 29

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT...................... 31

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anobile v. Pelligrino*, 303 F.3d 107 (2d Cir. 2001)...................................... 28

*Ass'n for Disabled Ams., Inc., v. Fla. Int'l Univ.*, 405 F.3d 954
(11th Cir. 2005)........................................................................... 17, 27

*Bowers v. NCAA*, 346 F.3d 402 (3d Cir. 2003) ................................. 8, 15, 27

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474
(4th Cir. 2005)........................................................................ 15, 23-24, 27

*D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217
(W.D.N.Y. 1993) ....................................................................... 16, 23-24

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178
(2d Cir. 2015)........................................................................................ 26

*Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98 (2d Cir. 2001) 26

*Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012).................................... 28

*Klingler v. Dep't of Revenue*, 455 F.3d 888 (8th Cir. 2006) ........................ 27

*Mancuso v. New York State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996) .... 28

*Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999)...................................... 25

*Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791 (9th Cir. 2004)........... 26

*Tennessee v. Lane*, 541 U.S. 509 (2004) .................... 14-15, 17-19, 23, 26-27

*Toledo v. Sanchez*, 454 F.3d 24 (1st Cir. 2006)..................6, 14-17, 23-24, 27

*Williams v. Kincaid*, 2022 U.S. App. LEXIS 22728 (4th Cir. 2022) ........... 21

## CONSTITUTIONAL PROVISIONS

U.S. Const. am. XI ............................................................ 5, 26
U.S. Const. am. XIV ............................................................. 15

## STATUTES

42 U.S.C. § 12101 ..................................................................4
42 U.S.C. § 12101(a) .............................................................. 19
42 U.S.C. § 12101(a)(1) ......................................................... 22
42 U.S.C. § 12101(a)(3) ......................................................... 19
42 U.S.C. § 12102(4)(A) ........................................................ 21
42 U.S.C. § 12131(2) ........................................................ 14, 23
42 U.S.C. § 12132 .................................................................. 14
42 U.S.C. § 12189 ...................................................... 16, 20, 24

22 N.Y.C.R.R. § 520.2(a) ...................................................... 14
22 N.Y.C.R.R. § 520.10 .......................................................... 15
N.Y. Jud. Law § 90(1) ............................................................ 15

## ACTS OF CONGRESS

ADA Amendments Act of 2008 ...................................... 10-11, 21
Americans with Disabilities Act ........................................ *passim*
Americans with Disabilities Act, Title II .................. 4-6, 8, 13-20, 23, 25-28
Americans with Disabilities Act, Title III ............................. 16, 20

Pub. L. 101-336, § 2(a), 104 Stat. 327 (1990) (ADA) ................................. 19
Pub. L. 110-325, § 2(b)(1), 122 Stat. 3553 (2008) (ADAAA) ..................... 21
Pub. L. 110-325, § 2(b)(5), 122 Stat. 3553 (2008) (ADAAA) ..................... 21
Pub. L. 110-325, § 3(1), 122 Stat. 3553 (2008) (ADAAA) ......................... 22

Rehabilitation Act, Section 504 ................................................. 20

## REGULATIONS

28 C.F.R. § 35.150(a)(2) ........................................................ 23
28 C.F.R. § 35.150(a)(3) ........................................................ 23
28 C.F.R. § 36.303(b) ............................................................ 25
28 C.F.R. § 36.309(b) ............................................................ 25

28 C.F.R. § 36.309(b)(1)(i) ............................................................. 24
28 C.F.R. § 36.309(b)(1)(iv) .......................................................... 11
29 C.F.R. § 1630.1(c)(4) ............................................................... 21

## RULES

Federal Rule of Appellate Procedure 26.1(a) ................................... i
Federal Rule of Appellate Procedure 29(a) ...................................... 5
Federal Rule of Appellate Procedure 29(a)(2) ................................. i
Federal Rule of Appellate Procedure 29(a)(4)(E) ........................... 1

## LEGISLATIVE HISTORY AUTHORITIES

H.R. Rep. 101-485(III) (1990), *reprinted in* A&P H.R. Rep. 101-485 ........ 20
75 Fed. Reg. 56,236 (Sept. 15, 2010) .......................................... 16
154 Cong. Rec. H8286 (daily ed. Sept. 17, 2008) (statement of Rep. Joe Courtney) ................................................. 22

## ARTICLES

ABA, *2022 ABA Profile of the Legal Profession* (July 2022), https://www.americanbar.org/content/dam/aba/administrative/news/2022/07/profile-report-2022.pdf .................................................... 7

ABA Commission on Mental and Physical Disability Law, *ABA Disability Statistics Report (2011)* (Jan. 28, 2011), https://www.americanbar.org/content/dam/aba/administrative/market_research/20110314_aba_disability_statistics_report.pdf ..................................... 6-9

ABA, *Diversity in Law: Who Cares?*, ABA (Apr. 30, 2016), https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares/ ....... 13

Advisory Committee on the Uniform Bar Examination, *Ensuring Standards and Increasing Opportunities for the Next Generation of New York Attorneys: Final Report to Chief Judge Jonathan Lippman and to the Court of Appeals* (Apr. 2015), *available at* https://ww2.nycourts.gov/sites/default/files/document/files/2019-02/UBE.pdf .......................................................... 9, 12-13

American Diabetes Association, *Going to College with Diabetes: A Self Advocacy Guide for Students* (2011), http://main.diabetes.org/dorg/PDFs/Advocacy/Discrimination/going-to-college-with-diabetes.pdf ............................................................................. 25

CDC, *Disability Impacts All of Us*, Disability and Health Promotion (Sept. 16, 2020), https://www.cdc.gov/ncbddd/disabilityandhealth/infographic-disability-impacts-all.html ............................................................................. 6

Chasity Bailey, *Disability and the Legal Profession*, ABA (Sept. 8, 2020), https://www.americanbar.org/groups/diversity/disabilityrights/initiatives_awards/ada30/bailey-ada/ ............................................................................. 7, 10

Debra Cassens Weiss, *New York Removes Mental Health Question from State Bar Application*, ABA Journal (Feb. 28, 2020), https://www.abajournal.com/news/article/new-york-removes-mental-health-questions-from-state-bar-application ............................................................................. 11

Haley Moss, *Raising the Bar on Accessibility: How the Bar Admissions Process Limits Disabled Law Graduates*, 28 Am. U. J. Gender Soc. Pol'y & L. 537 (2020), *available at* https://digitalcommons.wcl.american.edu/jgspl/vol28/iss4/2/ 8-10, 16, 23, 25

Leanne Shank, *Q&A: How Lawyers with Disabilities Can Change the World*, Law School Admission Council (Dec. 11, 2019), https://www.lsac.org/blog/qa-how-lawyers-disabilities-can-change-world. 12

NALP, *2021 Report on Diversity in U.S. Law Firms* (Jan. 2022), https://www.nalp.org/uploads/2021NALPReportonDiversity.pdf .................7

New York State Education Department, *New York Law School – Students with Disabilities (2018-19)* (Sept. 7, 2022), https://data.nysed.gov/highered-swd.php?year=2019&instid=800000047840 ...................................................7

Nicholas Gaffney, *In Conversation with Attorneys with Disabilities*, ABA Law Practice Today (July 16, 2018), https://www.lawpracticetoday.org/article/attorneys-disabilities/ .......... 7-8, 12

Stephanie Francis Ward, *Bar Examinees Have Little Success with Accommodation Requests and Say the Process Is Stressful*, ABA Journal (June 30, 2022), https://www.abajournal.com/web/article/bar-examinees-have-little-success-with-accommodation-requests-and-say-the-process-is-stressful ................................................................................................ 9-10

Working Group on Attorney Mental Health of the New York State Bar Association, *The Impact, Legality, Use and Utility of Mental Disability Questions on the New York State Bar Application* (Nov. 2019) https://nysba.org/app/uploads/2020/03/Working-Group-Report-FINAL-11.04.19-Following-adoption-by-HOD.pdf ...................................... 11-13, 15

# INTERESTS OF AMICI CURIAE[1]

## I. The Amici Curiae Are Organizations Committed to Broad Enforcement of Civil Rights Laws

Amici are a diverse array of 36 organizations which share a commitment to broad enforcement of hard-won civil rights laws in support of full participation by all in society. Amici are recognized for their expertise and experience in the interpretation of disability civil rights laws, and regarding barriers to higher education and to entering the legal profession. Amici advocate for and/or represent individuals, including aspiring lawyers with disabilities, who would be impacted by the Court's ruling in this case.

Lead amicus curiae, the **National Disability Rights Network**, is the non-profit membership organization for the federally mandated Protection and Advocacy (P&A) and Client Assistance Program (CAP) agencies for individuals with disabilities. The P&A and CAP agencies were established by the United States Congress to protect the rights of people with disabilities and their families through legal support, advocacy, referral, and education. There are P&A's and CAP's in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici curiae certify that: (i) no counsel for a party authored this brief in whole or in part; (ii) no such counsel or party made a monetary contribution to fund the preparation or submission of this brief; and (iii) no person other than amici and their counsel made any such monetary contribution.

Samoa, Guam, Northern Mariana Islands, and the U.S. Virgin Islands), and there is a P&A and CAP affiliated with the Native American Consortium which includes the Hopi, Navajo and San Juan Southern Paiute Nations in the Four Corners region of the Southwest. Collectively, the P&A and CAP agencies are the largest provider of legally-based advocacy services to people with disabilities in the United States.

The additional amici curiae are:

**American Council of the Blind**;
**American Diabetes Association**;
**Association on Higher Education and Disability**;
**Association of Late Deafened Adults**;
**Autistic Self Advocacy Network**;
**Autistic Women and Nonbinary Network**;
**Bazelon Center for Mental Health Law**;
**Center for Public Representation**;
**Civil Rights Education and Enforcement Center**;
**Coelho Center**;
**CommunicationFIRST**;
**Council of Parent Attorneys and Advocates**;
**Disability Law and Policy Program of Syracuse University College of Law**;
**disAbility Law Center of Virginia**;
**Disability Rights Advocates**;
**Disability Rights Connecticut**;
**Disability Rights Education & Defense Fund**;
**Disability Rights Legal Center**;
**Disability Rights New York**;
**Disability Rights North Carolina**;
**Disability Rights Vermont**;
**Georgia Advocacy Office**;
**Hearing Loss Legal Fund**;
**Lawyers for Children**;
**Legal Aid at Work**;
**Minnesota Disability Law Center**;
**National Association of the Deaf**;

**National Association for Rights Protection and Advocacy**;
**National Center for Law and Economic Justice**;
**National Disabled Law Students Association**;
**National Disabled Legal Professionals Association**;
**National Employment Lawyers Association New York**;
**National Federation of the Blind**;
**National Women's Law Center**; and
**World Institute on Disability**.[2]

## II. Why This Case Matters to Amici

Many qualified people with disabilities require reasonable accommodations to complete their legal educations and to successfully complete the bar exam. These accommodations are typically inexpensive and easy to provide. They ensure that the knowledge and abilities that law school and the bar exam seek to cultivate and to test are accurately measured. Testing accommodations do not confer an unfair advantage, but instead provide an equal opportunity to complete the testing milestones that ultimately lead to becoming a practicing attorney.

The Plaintiff-Appellant in this case, T.W., demonstrated tenacity and competence in pursuing and achieving her dream of becoming a Harvard-educated lawyer working in New York City at a "BigLaw" firm. JA16-17. As a young woman of color with disabilities, she worked hard to successfully overcome barriers not faced by the vast majority of law school students and graduates (JA16-17),

---

[2] For individual descriptions of most of the listed amici, *see* Case No. 19-4136, D.E. 131 at 3-21 (amicus curiae brief filed in support of Plaintiff T.W. in a prior appeal in this case).

exhibiting traits and capabilities that have, and will, serve her in good stead as a practicing attorney. But Defendant-Appellee the New York State Board of Law Examiners (BOLE) needlessly imposed additional barriers on T.W. by failing to provide the reasonable test-taking accommodations mandated by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (ADA). Without these accommodations, T.W. was not given a fair shot at passing the New York bar exam. Instead, BOLE waited until T.W. had failed the exam twice (and, by then, given notice of termination from her law firm) before finally providing her requested accommodations, enabling her to pass the exam on her third attempt. JA17, 22-27.

If the District Court's Order (JA36-51) (Order) is affirmed in this appeal, T.W.'s case against BOLE will be dismissed in its entirety, never having been considered on its merits. She and other law school graduates with disabilities seeking to take the NYS bar exam with reasonable accommodations will have been left without recourse. Without being legally required to adhere to Title II requirements, BOLE would be less likely to grant accommodations, resulting in fewer people with disabilities passing the NYS bar exam. And there would likely be a significant drop in the number of law school graduates with disabilities choosing to take the NYS bar exam in the first place, especially given that the process for seeking accommodations is already an arduous one. It would be rational to seek admission elsewhere (or

nowhere). The end result: a lowering of the already shamefully low number of practicing attorneys with disabilities.

Reversal is necessary to ensure that law school graduates with disabilities are afforded equal opportunities to demonstrate their knowledge and skills on the NYS bar exam. Reversal would also support ongoing efforts to remove discriminatory barriers to entry to the legal profession, leading to a more just and representative profession to the benefit of us all.

## ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 29(a), Amici respectfully submit this amicus curiae brief in support of T.W. and reversal. By invoking Eleventh Amendment sovereign immunity, BOLE seeks to avoid liability for failing to provide needed test-taking accommodations. It is vital that Title II be enforceable by aspiring lawyers who have disabilities, given the many barriers to entry to the legal profession that they already face, and the negative impact such discrimination has on the profession as a whole.

This case implicates the constitutional rights to be free from irrational disability discrimination in the context of public services generally and educational testing in particular. In enacting Title II of the ADA, Congress validly abrogated sovereign immunity in this context. Its abrogation is supported by a long, well-established history of discrimination by public entities like BOLE in the provision

of public services such as the bar exam – a history acknowledged by the Supreme Court and at least five appellate courts which have found valid sovereign immunity abrogation with respect to Title II. Affirming the Order would put this Court into conflict with those circuits. For these reasons, the Order must be reversed.

I.    **Pervasive Irrational Discrimination against People with Disabilities Creates Barriers to Entry to the Legal Profession, Harming Aspiring Lawyers, Clients, and the Profession**

In determining whether Title II validly abrogated sovereign immunity, the analysis includes identifying the unconstitutional discrimination that Congress sought to remedy and the harm wrought by that discrimination. *See Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006). That discrimination – irrational disability discrimination (*see* sections II.a and II.b. *infra*) – is still with us, and continues to wreak significant harm in legal education and the legal profession. Its impact is seen in the exceedingly low numbers of aspiring and practicing attorneys with disabilities.

Twenty-six percent of U.S. adults have some type of disability,[3] making people with disabilities "America's largest minority group."[4] And yet, percentages

---

[3] CDC, *Disability Impacts All of Us*, Disability and Health Promotion (Sept. 16, 2020), https://www.cdc.gov/ncbddd/disabilityandhealth/infographic-disability-impacts-all.html.

[4] ABA Commission on Mental and Physical Disability Law, *ABA Disability Statistics Report (2011)* (Jan. 28, 2011), https://www.americanbar.org/content/dam/aba/administrative/market_research/20110314_aba_disability_statistics_report.pdf.

of law students and lawyers with disabilities are strikingly lower than for the population as a whole. A grand total of sixty-eight students with disabilities were enrolled at New York State law schools during the 2018-19 school year.[5] Nationally, in the class of 2020, only about 4.5 percent of law school graduates had disabilities.[6] While "[n]o reliable statistics exist on the total number of lawyers with disabilities throughout the legal profession," in 2021 just over one percent of lawyers at U.S. law firms reported having disabilities.[7]

A primary cause of these low percentages is the "attitudinal" barriers faced by people with disabilities.[8] Simply put, our "society does not consider people with disabilities as capable of doing legal work."[9]

---

[5] New York State Education Department, *New York Law School – Students with Disabilities (2018-19)* (Sept. 7, 2022), https://data.nysed.gov/highered-swd.php?year=2019&instid=800000047840.

[6] NALP, *2021 Report on Diversity in U.S. Law Firms* at 10 (Jan. 2022), https://www.nalp.org/uploads/2021NALPReportonDiversity.pdf.

[7] ABA, *2022 ABA Profile of the Legal Profession* at 30 (July 2022), https://www.americanbar.org/content/dam/aba/administrative/news/2022/07/profile-report-2022.pdf.

[8] ABA Commission, *supra* note 4.

[9] Chasity Bailey, *Disability and the Legal Profession*, ABA (Sept. 8, 2020), https://www.americanbar.org/groups/diversity/disabilityrights/initiatives_awards/ada30/bailey-ada/ (the author describes being "constantly confronted with" discriminatory "preconceptions" and having her career objectives not "taken seriously"); *see also* Nicholas Gaffney, *In Conversation with Attorneys with Disabilities*, ABA Law Practice Today (July 16, 2018), https://www.lawpracticetoday.org/article/attorneys-disabilities/ (attorney with

The destructive impact of pervasive discrimination against people with disabilities who aspire to become attorneys begins early, starting with educational barriers in childhood, and no doubt influencing whether they even dare to dream to become lawyers.[10] *See also Bowers v. NCAA*, 475 F.3d 524, 554 n.35, 555 (3d Cir. 2007) (in finding valid Title II abrogation of sovereign immunity, relying on the "long and sad history of discrimination against students" with disabilities, including "irrational misconceptions and stereotypes held about disabled students"). Many individuals with disabilities consequently "lack the educational background and academic prerequisites to apply to law school."[11] "[O]nly 12.3% of working-age persons with disabilities" have a Bachelor's degree or higher, creating "a pipeline problem: individuals with disabilities are less likely to apply and be admitted to law school."[12] Other barriers to entry include "problems with attaining accommodations for the" LSAT; "not everyone with a disability who attends [law school] graduates"; and "a greater percentage of law school graduates with disabilities do not find

___

disabilities similarly not taken "seriously" and describing bias she experienced from elementary through law school).

[10] Haley Moss, *Raising the Bar on Accessibility: How the Bar Admissions Process Limits Disabled Law Graduates*, 28 Am. U. J. Gender Soc. Pol'y & L. 537, 538-39 (2020), *available at* https://digitalcommons.wcl.american.edu/jgspl/vol28/iss4/2/ (describing "the barriers to access for students with disabilities [that] permeate through education, beginning in childhood" and all the way through the bar exam).

[11] ABA Commission, *supra* note 4.

[12] *Id.*

employment as lawyers" compared with other graduates.[13] In 2009, law school graduates with disabilities had "an employment rate 7.6 percentage points lower than" the rest of their class.[14]

The "bar exam is a gatekeeper for the profession."[15] Sadly, the bar exam is also a source of additional barriers for aspiring lawyers with disabilities. The process of applying for bar exam accommodations, as well as for related tests such as the New York Law Exam and the Multistate Professional Responsibility Examination, is time-consuming and can be prohibitively expensive.[16] In the words of one lawyer, "[e]ven completing the paperwork to sit for the bar exam became nearly impossible due to the avalanche of documentation that was required to prove that I do, in fact,

---

[13] *Id.*

[14] *Id.*

[15] Advisory Committee on the Uniform Bar Examination, *Ensuring Standards and Increasing Opportunities for the Next Generation of New York Attorneys: Final Report to Chief Judge Jonathan Lippman and to the Court of Appeals* at 52 (Apr. 2015), *available at* https://ww2.nycourts.gov/sites/default/files/document/files/2019-02/UBE.pdf.

[16] Moss, *supra* note 10 at 565 ("Sometimes, applicants begin applying for accommodations months or years in advance to secure the necessary supporting documentation"); Stephanie Francis Ward, *Bar Examinees Have Little Success with Accommodation Requests and Say the Process Is Stressful*, ABA Journal (June 30, 2022), https://www.abajournal.com/web/article/bar-examinees-have-little-success-with-accommodation-requests-and-say-the-process-is-stressful (neuropsychological evaluation reports "cost between $1,500 and $2,500" and are usually not covered by insurance).

have a disability."[17] Indeed, the application process can be so daunting that some "give up and do not take the exam," or sit for it without accommodations and fail.[18]

Requests for exam accommodations are often denied due to what law examiners deem to be "insufficient documentation and a history of strong or average achievement in testing and higher education," the latter suggesting that examiners " 'want to see academic failure in order to prove severity of disability.' "[19] It is not uncommon for "bar examiners [to] show skepticism that an attorney can be disabled enough to qualify for legal protection and accommodation while still being qualified to practice law."[20] Requiring "academic failure" and evincing such "skepticism" are inconsistent with the ADA Amendments Act of 2008.[21] Those amendments reaffirmed the intended broad scope of the ADA definition of "disability," clarified

---

[17] Bailey, *supra* note 9.

[18] *Id.*

[19] Ward, *supra* note 16.

[20] Moss, *supra* note 10 at 562. These discriminatory attitudes reflect

a larger trend in the legal profession: when an individual lawyer or law student claims protection under the ADA, she is often met with skepticism that her impairment could truly be sufficiently limiting to warrant legal protection, particularly in the context of invisible or non-apparent disabilities. On the other hand, if the impact of an impairment is more obvious to the observer, it is common in the profession to challenge whether the individual could ever be sufficiently qualified to practice in the esteemed profession of law.

*Id.* at 570 (internal quotation marks omitted).

[21] *See* Ward, *supra* note 16.

that extensive documentation is not required to prove disability (*see* 28 C.F.R. §
36.309(b)(1)(iv)), and confirmed that attitudes such as those expressed by some bar
examiners are irrational discrimination. *See* section II.b. *infra*.

It was only in 2020 that New York joined ten other states in deciding to
remove questions on its bar application about the applicant's mental health
conditions or treatment history.[22] As noted by the New York State Bar Association
in a report recommending removal of the questions, "when the ADA was being
debated, two of the groups that were most frequently cited by the supporters of the
ADA and Congress as the most stigmatized . . . were those with the diagnoses of
mental impairments and HIV."[23] Besides being harmful to bar applicants, including
those who "have left law school and forfeited their career goal to practice law" in
anticipation of having to answer these questions, such questions are not rationally
related to someone's fitness to be an attorney and violate the ADA.[24]

---

[22] Debra Cassens Weiss, *New York Removes Mental Health Question from State
Bar Application*, ABA Journal (Feb. 28, 2020),
https://www.abajournal.com/news/article/new-york-removes-mental-health-
questions-from-state-bar-application.

[23] Working Group on Attorney Mental Health of the New York State Bar
Association, *The Impact, Legality, Use and Utility of Mental Disability Questions
on the New York State Bar Application* at 12 (Nov. 2019)
https://nysba.org/app/uploads/2020/03/Working-Group-Report-FINAL-11.04.19-
Following-adoption-by-HOD.pdf.

[24] *Id.* at 15-18 and n.45 (" 'Research in the health field and clinical experience
demonstrate that neither diagnosis nor the fact of having undergone treatment

The end result of the discriminatory obstacles described *supra* is a paucity of practicing attorneys with disabilities, which in turn makes it more difficult for clients with disabilities to retain attorneys.[25] This scarcity is also a loss for the disability community because an attorney with disabilities is in a unique position to help clients with disabilities. As explained by a lawyer who practices in public accommodation law:

> Every single day of my life I am impacted by [the ADA]. I would not be successful if it was not for the ADA, hands-down. Having that unique connection to this important law helps me navigate its complex nature with my clients and I think that those who know about my situation find it beneficial for their situation.[26]

Finally, the impact of under-representation of people with disabilities in the legal profession as a result of irrational discrimination extends beyond the disability community to the legal profession as a whole. "It is now an accepted truism that increasing access to the legal profession is beneficial to employers and clients, and also a public interest imperative to ensure our society's promise of equality under the law."[27] A legal profession that includes individuals with disabilities is better

---

support any inferences about a person's ability to carry out professional responsibilities or to act with integrity, competence, or honor.' ").

[25] *See* Leanne Shank, *Q&A: How Lawyers with Disabilities Can Change the World*, Law School Admission Council (Dec. 11, 2019), https://www.lsac.org/blog/qa-how-lawyers-disabilities-can-change-world.

[26] Gaffney, *supra* note 9.

[27] Advisory Committee, *supra* note 15 at 53.

equipped to serve the diversity of people whom the profession serves. And a diverse profession that includes disabled attorneys creates greater trust in the rule of law, and is more just and intelligent, because diversity, "both cognitive and cultural, often leads to better questions, analyses, solutions and processes."[28] But " '[w]ithout a diverse bench and bar, the rule of law is weakened as the people see and come to distrust their exclusion from mechanisms of justice.' "[29]

## II. The Order Erred in Concluding that Title II Did Not Validly Abrogate Sovereign Immunity with Respect to the Claims Asserted in This Case

Amici address herein various errors in the Order's analysis of whether Congress validly abrogated sovereign immunity in the context of this case.

### a. This Case Implicates the Constitutional Rights to Be Free from Irrational Disability Discrimination in Public Services and in Educational Testing in Particular

This case is about a public entity's refusal to provide reasonable accommodations to a person with disabilities so that she could avail herself of a public service on an equal footing with others using the same service. At the heart of Title II is an anti-discrimination provision providing that "no qualified individual

---

[28] ABA, *Diversity in Law: Who Cares?,* ABA (Apr. 30, 2016), https://www.americanbar.org/groups/litigation/committees/diversity-inclusion/articles/2016/spring2016-0416-diversity-in-law-who-cares/; *see also* Working Group, *supra* note 23 at 19 (discussing the value of attorneys with mental disabilities for the legal profession).

[29] Advisory Committee, *supra* note 15 at 54 (quoting ABA).

with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the *services, programs, or activities* of a *public entity*, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).

There can be no dispute that T.W.'s case is about a public service (an examination) offered by a public entity (BOLE). And yet, the Order inexplicably asserts that the bar examination "is not a public service or program" and is "not open to the public." JA49. This is inconsistent with the Order's conclusion that T.W. has plausibly pled a violation of Title II. JA45. The bar exam is open to members of the public who meet its eligibility requirements. *See* 22 N.Y.C.R.R. § 520.2(a); *see also* 42 U.S.C. § 12131(2) (" 'qualified individual with a disability' means an individual with a disability who . . . meets the essential eligibility requirements for the receipt of services"). And the exam is administered by an entity (BOLE) asserting that it is an arm of the State of New York in this litigation.

Next, the Order erred in framing the rights implicated in this case as "the right to bar examination accommodations," "the right to practice law," and/or the right to be free of "unconstitutional discrimination in the context of professional licensing examinations like the bar examination." JA46, JA48. First, the Order's framing is too narrow. Based on the Supreme Court's "broad treatment" of Title II services in *Tennessee v. Lane*, 541 U.S. 509 (2004), analysis of the particular right or rights

involved for purposes of the sovereign immunity abrogation analysis here should be at a more general level. *See Toledo,* 454 F.3d at 36. Congress enacted Title II to enforce the Fourteenth Amendment right to be free of "irrational disability discrimination," i.e., "classifications based on disability" that "lack a rational relationship to a legitimate governmental purpose," in connection with public services and programs. *Lane*, 541 U.S. at 522. Consequently, the right implicated in T.W.'s case is the right to be free of irrational discrimination when it comes to accessing a public service. *See Bowers*, 475 F.3d at 554 (concluding that the "right at issue" was "the right to be free from irrational disability discrimination"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 486 (4th Cir. 2005) (same).

Second, while passage of the bar exam was one of several prerequisites to T.W. becoming a licensed attorney in New York,[30] the gravamen of T.W.'s complaint is *not* that BOLE refused to grant her a law license. JA30-32. Indeed, BOLE is not a licensing agency and did not have the power to grant T.W. a law license. *See* N.Y. Jud. Law § 90(1). Based on BOLE's (1) denial of needed test-taking accommodations and (2) requiring T.W. to "fail first" *twice* before finally

---

[30] The essential eligibility requirements are usually completion of a J.D. degree at an accredited law school, fitness of character, and passage of the NYS bar exam (Working Group, *supra* note 23 at 14) – unless the applicant meets the requirements for admission without examination (*see* 22 N.Y.C.R.R. § 520.10).

providing her requested accommodations, T.W.'s complaint invokes Title II's general discrimination prohibition as well as 42 U.S.C. § 12189 ("examinations" must be offered "in a place and manner accessible to persons with disabilities").[31] JA30-32.

Because at the center of this case is an exam that T.W. studied and sat for three times due to BOLE's discrimination, the case also implicates the right to be free from irrational disability discrimination in the context of educational testing. Discrimination in testing negatively impacts the education of individuals with disabilities, starting in childhood and continuing through post-secondary education. *See* Moss, *supra* note 10 at 539, 545, 568. Although the bar exam assesses knowledge gained during graduate school, the "Supreme Court has recognized the vital importance of all levels of public education . . ." *Toledo*, 454 F.3d at 36. And although "public education is not a fundamental right," the Supreme Court has " 'repeatedly acknowledged [its] overriding importance," especially in "preparing students for work and citizenship . . ." *Id.* at 33. There is no question that studying for and successfully completing the bar exam prepares law school graduates just for that. The bar examination covers the same material and serves the same purpose as

---

[31] Although appearing in Title III of the ADA, section 12189 also applies to public entities covered by Title II. *See D'Amico v. New York State Bd. of Law Examiners*, 813 F. Supp. 217, 221 (W.D.N.Y. 1993); 75 Fed. Reg. 56,236 (Sept. 15, 2010); *see also* discussion of the legislative history of section 12189 *infra* at section II.b.

law school examinations in guiding law students in their studies (what to focus on and which matters to review), and in measuring their legal knowledge.

### b. The ADA's Legislative Record Adequately Identifies the Requisite History and Pattern of Irrational Discrimination to Support Congressional Abrogation of Sovereign Immunity in This Case

The Order erroneously concluded that "the legislative record of Title II" is "devoid" of the requisite findings "of a widespread pattern of unconstitutional discrimination . . ." JA48. First, as part of its abrogation analysis, a court can "rely on the types of sources that the Supreme Court approved of in *Lane* . . ." *Toledo*, 454 F.3d at 37. The Court in *Lane* relied on "judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services." 541 U.S. at 529. The precise factual situation at issue in this case need not appear in these sources in order for there to be the requisite history and pattern of discrimination. *See Ass'n for Disabled Ams*., *Inc., v. Fla. Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005) (the *Lane* Court "considered the record supporting Title II *as a whole*"; emphasis in original).

Second, Title II's legislative record is more than adequate to support abrogation of sovereign immunity in this case. The Supreme Court in *Lane* described the comprehensive deliberations and investigations leading to Congress enacting the ADA in 1990:

The ADA was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities. In the years immediately preceding the ADA's enactment, Congress held 13 hearings and created a special task force that gathered evidence from every State in the Union. The conclusions Congress drew from this evidence are set forth in the task force and Committee Reports, described in lengthy legislative hearings, and *summarized* in the preamble to the statue.

*Lane*, 541 U.S. at 516 (emphasis added). As noted, Congress' findings were *summarized* in the statute's preamble, including the findings below about and relating to access to public services and education that are relevant to this case:

The Congress finds that –
. . .
(2) historically, society has tended to isolate and segregate individuals with disabilities, and . . . such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as . . . *education*, . . . and *access to public services*;

(4) . . . individuals who have experienced discrimination on the basis of disability *have often had no legal recourse to redress such discrimination*;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of . . . *failure to make modifications to . . . practices, exclusionary qualification standards and criteria*, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and *educationally*;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a purposeful unequal treatment, and relegated to a position of political

powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from *stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society*;

(8) the Nation's proper goals regarding individuals with disabilities are to assure *equality of opportunity*, full participation, independent living, and economic self-sufficiency for such individuals; and

(9) the continuing existence of *unfair and unnecessary* discrimination and prejudice denies people with disabilities the opportunity *to compete on an equal basis* and to pursue those opportunities for which our free society is justifiably famous . . .

Pub. L. 101-336, § 2(a), 104 Stat. 327, 328-29 (1990) (42 U.S.C. § 12101(a) as originally enacted; emphasis added).

Due to the ADA's vast legislative record documenting "hundreds of examples of unequal treatment of persons with disabilities by States," the "overwhelming majority" of which "concerned discrimination in the administration of public programs and services" (*Lane*, 541 U.S. at 526), it was not feasible, nor necessary, for Congress to put into the statute's findings specific examples of the many types of discrimination that provided justification for enacting the ADA in general and Title II in particular. Indeed, the Supreme Court relied on *one* of the findings *supra* (§ 12101(a)(3)) "together with the extensive record of disability discrimination that underlies it," to conclude "beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for [Title II's] prophylactic legislation." *See id.* at 529.

Congress considered irrational discrimination in educational testing to be so pervasive that it merited a separate section of the ADA. *See* 42 U.S.C. § 12189. In enacting section 12189, Congress explained that its intent was to ensure that *all* testing entities covered by the ADA – both public entities covered by Title II and private entities covered by Title III – be required to provide the types of testing accommodations at issue in this case:

> The purpose [of section 12189] is to fill a gap which is created when licensing certification and other testing authorities are not covered by Section 504 of the Rehabilitation Act or title II of the ADA. Any such [testing] authority that is covered by Section 504, because of the receipt of federal money, or *by title II, because it is a function of a state or local government, must make all of its programs accessible to persons with disabilities, which includes physical access as well as accommodations in the way the test is administered, e.g., extended time* or assistance of a reader.
>
> However, it is the Committee's belief that many licensing certification and testing authorities are not covered by either Section 504 of the Rehabilitation Act, because no federal money is received, or by title II of the ADA, because they are not state agencies. However, states often require the licenses provided by such authorities in order for an individual to practice a particular profession or trade. Thus, [section 12189] was adopted in order *to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities* because an examination or course is conducted in an inaccessible site or without an accommodation.

H.R. Rep. 101-485(III) at 68-69 (1990), *reprinted in* A&P H.R. Rep. 101-485 (emphasis added). Here Congress made explicit its concern about pervasive discrimination in educational testing by public entities and the importance of remedying it.

In 2008, Congress reaffirmed its intent to remedy irrational discrimination against people with disabilities in the context of public services, including in educational testing. In response to Supreme Court decisions narrowing the ADA, Congress enacted the ADA Amendments Act (ADAAA) to reinstate "a broad scope of protection to be available under the ADA." 110 P.L. 325, § 2(b)(1), 122 Stat. 3553, 3554 (2008); *see also Williams v. Kincaid*, 2022 U.S. App. LEXIS 22728, **9-10 (4th Cir. 2022) (describing the ADAAA and following its mandate by construing "the ADA's exclusions narrowly" in favor of plaintiff). With the ADAAA, Congress sought "to make ' "it easier for people with disabilities to obtain protection under the ADA." ' " *Williams*, 2022 U.S. App. LEXIS 22728, *10 (quoting 29 C.F.R. § 1630.1(c)(4)). The ADAAA clarified Congress' intent "that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," while "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis . . ." Pub. L. 110-325, § 2(b)(5), 122 Stat. 3553, 3554 (2008); *see also* 29 C.F.R. § 1630.1(c)(4).

Per the ADAAA, "the definition of disability [must] be construed in favor of broad coverage of individuals . . . , to the maximum extent permitted by [the ADA's] terms." 42 U.S.C. § 12102(4)(A). Consistent with this broad coverage, Congress added a finding to the ADA which specifically recognizes that people with *mental*

disabilities have been precluded from fully participating in society "because of discrimination" against them. Pub. L. 110-325, § 3(1), 122 Stat. 3553, 3554-55 (amending 42 U.S.C. § 12101(a)(1)). And in enacting these amendments, the specific context of educational testing was considered by Congress:

> [T]he ADA has been misinterpreted by the courts resulting in a narrow view of those eligible to receive certain reasonable accommodations including individuals with learning disabilities. Historically, certain individuals with learning disabilities seeking accommodations in higher education – including high stakes exams – have seen their access to testing accommodations severely undercut by testing companies not willing to consider and support that learning disabilities are neurologically based, lifelong disabilities that may exist in students with high academic achievement because the individual has been able to cope and mitigate the negative impact while simultaneously being limited in one or more life activities.

> Too many individuals with documented learning disabilities, including dyslexia, are denied access to easily administered and often low-cost accommodations that would make the critical difference in allowing them to demonstrate their knowledge. These amendments to the ADA do not provide any special treatment, but rather, ensure that each individual with a learning disability has every opportunity to apply for and receive a reasonable accommodation so he/she can move forward in his/her chosen educational and career paths. . . .

> By supporting and fostering the academic potential for these individuals, we reap the benefits when talented, ambitious and creative individuals are able to fulfill their education dreams and contribute in a meaningful way to our society.

154 Cong. Rec. H8286, 8296 (daily ed. Sept. 17, 2008) (statement of Rep. Joe Courtney).

### c. Title II Is a Congruent and Proportional Response to the History and Pattern of Irrational Disability Discrimination in This Context

In its "congruent and proportional" analysis (JA49), the Order erred by failing to consider the many "limitations that Congress placed on the scope of Title II." *See Constantine*, 411 F.3d. at 488. Title II "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service." *Lane*, 541 U.S. at 532 (citing 42 U.S.C. § 12131(2)). "And in no event is the [public] entity required to undertake measures that would impose an undue financial or administrative burden, . . . or effect a fundamental alteration in the nature of the service." *Id.* (citing 28 C.F.R. §§ 35.150(a)(2), (a)(3)).

New York's "interest in regulating the legal profession" and its " 'special responsibility for maintaining standards among members of the licensed professions' " (JA49) are not bases to conclude that the remedial measures here are incongruent. "Title II does not require States to compromise their essential eligibility criteria for public programs." *Lane*, 541 U.S. at 532. Nor does it require educational institutions "to accommodate disabled students if the accommodation would substantially alter their programs or lower academic standards. . ." *Toledo*, 454 F.3d at 40. And lastly, a testing accommodation is improper under the ADA if it would substantially modify an examination's contents or compromise the integrity of the test. *See* Moss, *supra* note 10 at 545, 572; *see also D'Amico*, 813 F. Supp. at 221

(the purpose of ADA test accommodations is not "to give the disabled advantages over other" bar exam takers, but "to place those with disabilities on an equal footing").[32]

Accommodations that make an exam accessible to a test-taker ensure that "the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's" disabilities. *See* 28 C.F.R. § 36.309(b)(1)(i). Failing to provide needed test-taking accommodations like the ones T.W. sought is analogous to failing to provide a wheelchair ramp so that someone who uses a wheelchair can safely enter the building where the test is being administered. *See* 42 U.S.C. § 12189 (examinations must be offered in an accessible "place and manner"). Requiring such accommodations is "congruent with the constitutional imperative that States avoid *irrational* discrimination" because these accommodations directly address the harms wrought by such discrimination. *See Constantine*, 411 F.3d at 489 (emphasis in original); *see also* discussions of the harms *supra* at sections I. and II.b.

And accommodations such as the ones requested by T.W. – extra time, breaks, and a separate testing room (JA22) – are typically inexpensive and place minimal

---

[32] While BOLE could argue at a later stage of this litigation that T.W.'s requested accommodations would have lowered standards or fundamentally altered the exam, at this motion to dismiss stage such arguments would be premature. *See Toledo*, 454 F.3d at 32.

administrative burdens on the testing entity. *See* Moss, *supra* note 10 at 545 (describing common exam accommodations); 28 C.F.R. § 36.303(b) (examples of auxiliary aids and services); 28 C.F.R. § 36.309(b) (examination administration and modification). Additional examples are the accommodations commonly requested and needed by test-takers with diabetes. These include: access to their diabetes care supplies in the testing area, such as continuous glucose monitors and insulin pumps; and modifications to the testing schedule to allow test-takers to check their blood glucose levels, to eat or drink to respond to low blood glucose, or to administer insulin.[33] Even were such accommodations burdensome, a testing entity may take into account its limited resources as well as the needs of other test-takers with disabilities in determining which reasonable accommodations are appropriate under Title II. *See Olmstead v. L.C. by Zimring*, 527 U.S. 581, 604, 607 (1999).

### III. Affirming the Order Would Put This Court in Conflict with Other Circuits Regarding Title II Abrogation of Sovereign Immunity

Should the Court reach the issue, it has before it a clean slate on whether Congress validly abrogated state sovereign immunity with regard to Title II claims. JA44 ("this appears to be a question of first impression within the Second Circuit").

---

[33] American Diabetes Association, *Going to College with Diabetes: A Self Advocacy Guide for Students* at 29-31 (2011), http://main.diabetes.org/dorg/PDFs/Advocacy/Discrimination/going-to-college-with-diabetes.pdf.

In *Garcia v. State Univ. of N.Y. Health Scis. Ctr.*, 280 F.3d 98 (2d Cir. 2001), the Court held that Congress had exceeded its constitutional authority in enacting Title II. But the Court recognized that abrogation was valid with regard to Title II claims based on "discriminatory animus or ill will based on the plaintiff's disability." *Id.* at 111. This restrictive abrogation test is far more demanding than that of the later-decided Supreme Court decision in *Lane*. This Court has expressed doubt over *Garcia*'s continued vitality, but it has never squarely addressed that question. *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 194 (2d Cir. 2015) ("Continued uncertainty as to the vitality of *Garcia* has led to a divergence in the approaches adopted by district courts in this Circuit in their assessment of Congress's abrogation of sovereign immunity under Title II.").

Holding in this case that T.W.'s Title II claims against BOLE are barred by its sovereign immunity would directly conflict with the Ninth Circuit's decision in *Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791 (9th Cir. 2004), which held *categorically* that states are "not entitled to Eleventh Amendment immunity under Title II of the ADA." *Id.* at 792. There can be no doubt that such a circuit split would be outcome-determinative for T.W.: her Title II claim would be decided on the merits in the Ninth Circuit, but would be barred by sovereign immunity in this Circuit.

Denying T.W. an opportunity to reach the merits of her Title II claim would also put this Court in great tension with, if not outright conflict with, four other post-*Lane* decisions in circuits that have reached the Title II abrogation question and have held that the abrogation was valid. *See Toledo*, 454 F.3d at 38-39 (1st Cir. 2006); *Bowers*, 475 F.3d at 556 (3d Cir. 2007); *Constantine*, 411 F.3d at 490 (4th Cir. 2005); *Ass'n for Disabled Ams.*, 405 F.3d at 959 (11th Cir. 2005). It would be especially difficult to harmonize the Fourth Circuit's holding in *Constantine* that abrogation was valid with regard to Title II claims involving denial of reasonable accommodations in taking law school examinations (411 F.3d at 478-79), with BOLE's denial to T.W. of reasonable accommodations in taking a bar examination that is essentially the same as a law school examination, albeit with multiple subjects.

The two post-*Lane* circuit decisions holding that abrogation was improper with regard to the particular Title II claims at issue would be easily harmonized with a decision by this Court that abrogation was valid for T.W.'s claims. *Klingler v. Dep't of Revenue*, 455 F.3d 888 (8th Cir. 2006) concerned a $2 fee for parking placards – a vastly different matter than educational testing: "Title II did not validly abrogate Missouri's sovereign immunity in the context of these challenges to its surcharge on parking placards." *Id.* at 897.

*Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012) concerned a physician's Title II claim over a state's revocation of his medical license due to alleged personal misconduct. *Id.* at 1006-07. The Tenth Circuit held that sovereign immunity barred his Title II claim: "We conclude Title II does not validly abrogate New Mexico's sovereign immunity in the context of professional licensing." *Id.* at 1125. Unlike the plaintiff in *Guttman*, T.W. does not base her claim on any improper denial by the State of New York of a *license* to practice in the legal profession. Her claim concerns the improper denial of accommodations in *educational testing* that was one of several requirements to apply for a license to practice law in the first instance. Whether someone who passes a bar exam, medical board exam and the like is otherwise suitable and qualified to be licensed or to maintain a license is in no way at issue in this case.

It bears emphasis that there would be no need to address the constitutional question of whether Congress validly abrogated state sovereign immunity in enacting Title II if the Court were to agree with T.W. that under a proper application of the factors in *Mancuso v. New York State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996), BOLE is not arm of the State of New York. *Cf. Anobile v. Pelligrino*, 303 F.3d 107, 123 (2d Cir. 2001) ("Principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case.").

# CONCLUSION

For the forgoing reasons, Amici respectfully submit this brief in support of
T.W. and reversal.

Date: September 28, 2022          Respectfully submitted,

/s/ Bridget A. Clarke

BRIDGET A. CLARKE (Cal. Bar #161320)
ANDREW J. DHUEY (Cal. Bar #161286)
456 Boynton Avenue
Berkeley, CA 94707
(510) 528-7755
baclarke@comcast.net

*Attorneys for Amici Curiae National
Disability Rights Network; American
Council of the Blind; American Diabetes
Association; Association on Higher
Education and Disability; Association of
Late Deafened Adults; Autistic Self Advocacy
Network; Autistic Women and Nonbinary
Network; Bazelon Center for Mental Health
Law; Center for Public Representation; Civil
Rights Education and Enforcement Center;
Coelho Center; CommunicationFIRST;
Council of Parent Attorneys and Advocates;
Disability Law and Policy Program of
Syracuse University College of Law;
disAbility Law Center of Virginia; Disability
Rights Advocates; Disability Rights
Connecticut; Disability Rights Education &
Defense Fund; Disability Rights Legal
Center; Disability Rights New York;
Disability Rights North Carolina; Disability
Rights Vermont; Georgia Advocacy Office;
Hearing Loss Legal Fund; Lawyers for
Children; Legal Aid at Work; Minnesota*

*Disability Law Center; National Association of the Deaf; National Association for Rights Protection and Advocacy; National Center for Law and Economic Justice; National Disabled Law Students Association; National Disabled Legal Professionals Association; National Employment Lawyers Association New York; National Federation of the Blind; National Women's Law Center; World Institute on Disability*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

This brief complies with: (1) the type-volume limitation of Fed. R. App. P. Rule 29(a)(5) and Local Rule 29.1(c) because it contains 6,893 words, excluding the parts exempted by rule; and (2) the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type style requirements of Fed. R. App. P. Rule 32(a)(6) because the body of the brief has been prepared in 14-point Times New Roman font using Microsoft Word 2016.

Date: September 28, 2022                    /s/ Bridget A. Clarke