22-1661
T.W. v. New York State Board of Law Examiners

# In the
# United States Court of Appeals
## For the Second Circuit

———————————

August Term, 2022
No. 22-1661

T.W.,
*Plaintiff-Appellant,*


*v.*


NEW YORK STATE BOARD OF LAW EXAMINERS, DIANE BOSSE, JOHN J.
MCALARY, BRYAN WILLIAMS, ROBERT MCMILLEN, E. LEO MILONAS,
MICHAEL COLODNER,
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court for the Eastern
District of New York.

———————————

ARGUED: JUNE 5, 2023
DECIDED: JULY 19, 2024


Before: LIVINGSTON, *Chief Judge*, and NARDINI, *Circuit Judge*.[*]

———————————

[*] Judge Rosemary S. Pooler, originally a member of this panel, passed away
on August 10, 2023. The two remaining members of the panel, who are in
agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b);
*United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

———————————————

T.W. sued Defendant-Appellee the New York State Board of Law Examiners alleging, *inter alia*, that the Board violated Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act by denying her requests for certain accommodations on the New York State bar examination in 2013 and 2014.

The Board moved to dismiss T.W.'s complaint, asserting that the United States District Court for the Eastern District of New York (Raymond J. Dearie, *District Judge*) lacked subject matter jurisdiction because New York's sovereign immunity barred T.W.'s ADA and Rehabilitation Act claims under the Eleventh Amendment. The district court denied the Board's motion to dismiss, but this Court reversed, holding that the Board was immune from suit under Section 504 of the Rehabilitation Act and remanding for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA. On remand, the district court granted the Board's motion to dismiss, holding that the Board is entitled to immunity as an "arm of the state," that Title II does not abrogate the Board's sovereign immunity for money damages as applied to T.W.'s claim, and that T.W. could not maintain her requests for declaratory and injunctive relief under *Ex parte Young*.

On appeal, T.W. argues that the Board is not an arm of the state, and even if it were an arm of the state, Title II has abrogated Eleventh Amendment immunity in the context of T.W.'s claim. In addition, T.W. argues that even if the Board enjoys sovereign immunity, she may seek her requested declaratory and injunctive relief under *Ex parte Young*. We disagree and therefore AFFIRM the July 21, 2022, judgment of the district court.

———————————————

2

MARY C. VARGAS (Michael Steven Stein, *on the brief*), Stein & Vargas, LLP, Washington, D.C.; Jo Anne Simon, Jo Anne Simon, P.C., New York, NY, *for Plaintiff-Appellant*.

DENNIS FAN, Senior Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Ester Murdukhayeva, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, *for Defendants-Appellees.*

Bridget A. Clarke, Andrew J. Dhuey, Berkeley, CA, *for Amici Curiae* National Disability Rights Network et al., *in support of Plaintiff-Appellant*.

———————————

WILLIAM J. NARDINI, *Circuit Judge*:

Plaintiff-Appellant T.W. sued Defendants-Appellees the New York State Board of Law Examiners ("Board") and its members alleging that the Board violated Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code tit. 8, by

denying her requests for certain accommodations on the New York State bar examination in 2013 and 2014.  T.W. subsequently withdrew her claims under Title III of the ADA and the NYCHRL, as well as her claims against the Board members in their individual capacities.

The Board moved to dismiss T.W.'s complaint, asserting that the United States District Court for the Eastern District of New York (Raymond J. Dearie, *District Judge*) lacked subject matter jurisdiction because New York's sovereign immunity barred T.W.'s ADA and Rehabilitation Act claims under the Eleventh Amendment.  The district court denied the Board's motion to dismiss, holding that the Board is a program or activity of a department or agency that receives federal funds, and accordingly that its sovereign immunity had been waived under the Rehabilitation Act.  This Court reversed, holding that the Board was not a program or activity of a department or agency that receives federal funds and was therefore immune from suit under Section 504 of the Rehabilitation Act.  We remanded the

case for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA, which the district court had not addressed in the first instance because it concluded that "the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act," such that T.W. needed to prevail on only one of the claims to survive the Board's motion to dismiss. *T.W. v. N.Y. State Bd. of L. Exam'rs*, No. 16-cv-3029, 2019 WL 4468081, at *2 (E.D.N.Y. Sept. 18, 2019). On remand, the district court granted the Board's motion to dismiss the Title II claim, holding that the Board is entitled to immunity as an "arm of the state," that Title II does not abrogate the Board's sovereign immunity for money damages as applied to T.W.'s claim, and that T.W. could not maintain her requests for declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

On appeal, T.W. argues that the Board is not an arm of the state, and even if it were an arm of the state, that Title II has abrogated

Eleventh Amendment immunity in the context of T.W.'s claim.  In

addition, T.W. argues that even if the Board enjoys sovereign

immunity as to her damages claim, she may seek her requested

declaratory and injunctive relief under *Ex parte Young*.  We disagree

and therefore AFFIRM the July 21, 2022, judgment of the district

court.

## I.   Background

### A. Factual background[1]

T.W. is a Harvard Law School graduate who suffers from a

variety of complications resulting from a severe head injury.  While

at Harvard, she received testing accommodations for her disabilities,

including 50 percent extra time on exams, stop-clock breaks, and

separate testing facilities.  When she signed up for the July 2013 New

York bar examination, she requested these same testing

accommodations, citing her diagnosed impairments.

---

[1] We recounted this factual background in additional detail in our prior opinion, *T.W. v. New York State Board of Law Examiners* (*T.W. I*), 996 F.3d 87 (2d Cir. 2021).

The Board initially denied her request for any accommodations. But after she appealed the decision, the Board granted her request in part, providing off-the-clock breaks and seating her in a smaller room, although that room included others receiving similar accommodations. T.W. did not pass the July 2013 bar exam. At the time T.W. received her results, she had started as a law clerk at a law firm, and she alleges that failing the bar hurt her standing at the firm and required her to set aside time to study for the exam again.

T.W. signed up for the July 2014 exam and again requested the accommodations that she had received at law school. This time, the Board granted her 50 percent extra time, seating in a room with others receiving similar accommodations, but no off-the-clock breaks. She again did not pass, and her law firm fired her.

In February 2015, T.W. passed the bar examination on her third attempt. This time, the Board granted her double time on the exam,

an accommodation that she had requested to the extent that her initial request for off-the-clock breaks and 50 percent extra time was not granted. T.W. alleges that the Board's failure to provide her with the accommodations that she initially requested caused her to fail the bar exam twice and resulted in her inability to find employment comparable to the position she had held at her law firm. T.W. sued the Board, its chair, and members of the Board, alleging violations of the ADA, Section 504 of the Rehabilitation Act, and the NYCHRL, seeking declaratory, compensatory, and injunctive relief.

### B. Procedural background

In November 2016, the Board moved to dismiss T.W.'s complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting, *inter alia*, that the district court lacked subject matter jurisdiction because Eleventh Amendment immunity barred T.W.'s ADA and Rehabilitation Act claims. Shortly thereafter, T.W. withdrew her claims under Title III of the ADA and the NYCHRL, as well as her claims against the chair and members of the Board in their

individual capacities.  Her only remaining claims were those under Title II of the ADA and Section 504 of the Rehabilitation Act.

Following limited discovery on whether the Board had accepted federal funds during the relevant time period, the district court denied the Board's motion to dismiss.  The district court found that although the Board had not directly received federal funds during the relevant time period, the Board had nonetheless waived its immunity as a "'program or activity' of a department or agency that itself accepts federal funds—in this case, New York's Unified Court system."  *T.W.*, 2019 WL 4468081, at *4.  The district court declined to reach the Board's dismissal argument as to T.W.'s Title II ADA claim, because "the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act."  *Id.* at *2.

The Board took an interlocutory appeal, and we reversed, holding that the Board was immune from suit under Section 504 of the Rehabilitation Act.  *See T.W. I*, 996 F.3d at 93, 102.  We agreed with

the district court that the Board did not receive any federal funds and likewise rejected T.W.'s argument that merely being an "*intended beneficiary*" of federal funds was sufficient to find immunity waived under Section 504 of the Rehabilitation Act. *Id.* at 93–94. But we disagreed with the district court as to the second of T.W.'s waiver arguments, namely whether the Board was a "program or activity" of a department or agency receiving federal funds. *Id.* at 94–102. The crux of our reasoning was that the district court had described the recipient of federal funds too broadly: it was not New York's Unified Court System that received federal funds during the relevant period, but rather only certain specialty courts within the Courts of Original Jurisdiction. *Id.* Because the Courts of Original Jurisdiction constituted the relevant funds-receiving "unit" for purposes of Section 504's immunity waiver, and because the Board is not a part of the Courts of Original Jurisdiction, we held that the Board had not waived its immunity under Section 504. *Id.* at 97–102. Accordingly,

we reversed the district court's denial of the motion to dismiss the Section 504 claim and remanded the case for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA. *See id.* at 102.

On remand, the district court held that the Board was immune from suit under Title II of the ADA. In a memorandum and order entered on July 19, 2022, the district court held that the Board was an arm of the state, that Title II of the ADA did not abrogate sovereign immunity in the context of professional licensing exams, that the declaratory relief T.W. seeks is not a valid application of the doctrine first articulated in *Ex parte Young*, 209 U.S. 123 (1908), and that T.W. lacked standing to pursue her requested injunctive relief. *T.W. v. N.Y. State Bd. of L. Exam'rs*, No. 16-cv-3029, 2022 WL 2819092, at *1–9 (E.D.N.Y. July 19, 2022). Accordingly, the district court granted the Board's motion to dismiss T.W.'s Title II claim. T.W. now appeals.

## II.     Discussion

On appeal, T.W. contends that the district court erred in dismissing her Title II claim.  She first argues that the Board is not an arm of the state, and therefore cannot claim sovereign immunity under the Eleventh Amendment.  In the alternative, she argues that her claim for money damages can nonetheless proceed against the Board because Title II of the ADA abrogated sovereign immunity in the context of the Board's operations.  Finally, she contends that her complaint states a valid claim for declaratory and injunctive relief pursuant to the *Ex parte Young* doctrine.

We "review[] the district court's factual findings for clear error and its legal conclusions *de novo*."  *T.W. I*, 996 F.3d at 93 (internal quotation marks omitted).  "The Board, as the party asserting immunity, bears the burden of demonstrating entitlement."  *Id.* (internal quotation marks and alteration omitted).  For the reasons that follow, we affirm in all respects.

## A. Arm of the state

T.W. first contends that the district court erred in concluding that the Board is an arm of the state, and therefore is entitled to sovereign immunity.

The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the text of the amendment speaks only of suits against a state by persons who are not citizens of that state, the Supreme Court has interpreted the Eleventh Amendment to extend to suits by all persons against a state in federal court." *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890)). Further, the Eleventh Amendment bars suits against states even where the state "is not named a party to the action." *Edelman v. Jordan*,

415 U.S. 651, 663 (1974).  "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."  *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945).  Accordingly, the Eleventh Amendment applies to a suit for damages brought against an entity that is fairly considered to be an "arm of the state."  *See Mancuso*, 86 F.3d at 292; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

　　We outlined a multi-factor inquiry to assess whether an entity is an "arm of the state" for Eleventh Amendment purposes in *Mancuso v. New York State Thruway Authority.  See* 86 F.3d at 293.  These factors include:

> (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over

14

the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Id.* Where those factors "point in different directions," a court asks "(a) will allowing the entity to be sued in federal court threaten the integrity of the state? and (b) does it expose the state treasury to risk?" *Id.* In cases that remain close, the most important factor is whether the suit exposes the state treasury to a risk of liability. *See id.*

The district court conducted a thorough analysis of the *Mancuso* factors, concluding that the Board was an arm of the state, and therefore entitled to Eleventh Amendment immunity. *T.W.*, 2022 WL 2819092, at *1–5. We affirm, though on procedural grounds rather than our own assessment of the merits. *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) ("We may affirm on any ground with support in the record." (internal quotation marks omitted)).

We begin by noting that this question—whether the Board is an arm of the state—is hardly an unfamiliar one. In *T.W. I,* our Court

wrote, point-blank: "The Board of Law Examiners, as an arm of the State of New York, shares in [Eleventh Amendment] immunity." 996 F.3d at 92 (cleaned up).  It therefore appears that we expressly decided this issue in *T.W. I.*

But even if we had not been so explicit, resolution of the sovereign immunity question was necessarily implicit in our holding that dismissal of the Rehabilitation Act claim was required; therefore, the law of the case doctrine settles the issue.  "[A] decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) (internal quotation marks omitted); *see also Unites States v. Quintieri*, 306 F.3d 1217, 1229

(2d Cir. 2002) ("[W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, it is considered waived and the law of the case doctrine bars the district court on remand and an appellate court in a subsequent appeal from reopening such issues unless the mandate can reasonably be understood as permitting it to do so." (internal quotation marks omitted)); *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 271 (2d Cir. 2012) (arguments not raised in prior appeal "were impliedly decided to have been waived in the first instance" (internal quotation marks omitted)). "[T]he law-of-the-case doctrine applies to everything decided by necessary implication in the first appeal." *County of Suffolk*, 106 F.3d at 1117 (cleaned up).

Applying these principles, we find that the Board's status as an arm of the state has become the law of the case. In *T.W. I*, we held that the Board had not waived its sovereign immunity, and that the district court was therefore obliged to dismiss the Rehabilitation Act

claims for lack of subject matter jurisdiction. By deciding that dismissal was required, we necessarily decided that the Board *had* sovereign immunity—a decision that had to be logically premised on a conclusion that the Board was an arm of the state. The Board's eligibility for sovereign immunity (that is, its status as an arm of the state) was "decided by necessary implication," *see id.*, even without regard to our explicit language on this issue, *see T.W. I*, 996 F.3d at 92 ("The Board of Law Examiners, as an arm of the State of New York, shares in [Eleventh Amendment] immunity."). But T.W. failed to raise in *T.W. I* the arm-of-the-state issue that she now seeks to litigate. *See* Brief of Appellee T.W., *T.W. v. N.Y. State Bd. of L. Exam'rs*, 996 F.3d 87 (2d Cir. 2021) (No. 19-4136), ECF No. 67 (raising no argument that the Eleventh Amendment did not apply to the Board). In fact, T.W.'s argument now essentially seeks vacatur of our prior decision, the holding of which is necessarily premised on the Board's Eleventh

Amendment immunity.  Under these circumstances, we conclude that the law of the case settles this issue.[2]

## B. Abrogation of sovereign immunity

T.W. next contends that even if the Board is an arm of the state for Eleventh Amendment purposes, Title II of the ADA validly abrogated its sovereign immunity in the context of her claim.

Section 5 of the Fourteenth Amendment grants Congress authority to abrogate state sovereign immunity.  *See, e.g., Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000).  But Section 5 only "grants Congress the authority to abrogate states' immunity as to conduct that actually violates the Fourteenth Amendment, as well as a

---

[2] T.W.'s waiver of this issue is even more apparent than it appears on the face of her appellate briefs.  Not only did she fail to litigate this issue before the district court when the Board first filed its motion to dismiss, *see* E.D.N.Y. Dkt. No. 16-cv-3029, ECF No. 11 (T.W responding to the Board's motion to dismiss in an opening letter brief, which does *not* argue that the Board lacked sovereign immunity), but she essentially conceded the Board's status in her complaint.  She alleges that "[t]he Board *is a public entity and state instrumentality* subject to the non-discrimination requirements of Title II of the Americans with Disabilities Act."  J. App'x 30, ¶ 78 (emphasis added).  It was not until October 15, 2021, after five years of litigation on the very issue of the Board's immunity to suit, that T.W. first challenged the Board's arm-of-the-state status.

somewhat broader swath of conduct that is constitutional but which Congress may prohibit in order to remedy or deter actual violations." *Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir. 2010) (internal quotation marks omitted). When an exercise of Section 5 enforcement power is directed in a "prophylactic" way, *id.*, there must be "congruence and proportionality between the [violation] to be prevented or remedied and the means adopted to that end," *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

"Congress has unambiguously purported to abrogate states' immunity from Title II claims." *Bolmer*, 594 F.3d at 146; *see also* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment . . . for a violation of this chapter."). Title II, however, sweeps more broadly than the Fourteenth Amendment. *See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 109–12 (2d Cir. 2001) (comparing Title II's breadth to the Fourteenth Amendment, the latter of which, "[w]here disability discrimination is at issue," "only

proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose").  Thus, to determine whether a Title II abrogation is valid, courts proceed on "on a claim-by-claim basis," considering "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  *United States v. Georgia*, 546 U.S. 151, 158–59 (2006).  We proceed accordingly.

### 1.  Step one: Title II violation

The first step of the *Georgia* framework requires us to identify "which aspects of the State's alleged conduct violated Title II."  *Id.*  In this case, the inquiry need not detain us.  The district court found that T.W. "plausibly alleged that the Board violated Title II by failing to

reasonably accommodate her disability." *T.W.*, 2022 WL 2819092, at *6. The Board does not contest this reading of T.W.'s complaint on appeal, waiving any argument to the contrary. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Accordingly, for the purposes of our sovereign immunity assessment, we conclude that T.W. has sufficiently alleged that the Board's conduct violated Title II of the ADA.

### 2. Step two: Fourteenth Amendment violation

The second step of the *Georgia* framework requires us to identify "to what extent such misconduct also violated the Fourteenth Amendment." 546 U.S. at 158–59. Again, this inquiry is an easy one here: T.W. has likewise declined to contest the district court's finding that the Board's alleged failure to provide sufficient accommodations

did not violate the Fourteenth Amendment, thereby conceding that issue.

In sum, the parties have agreed that T.W.'s complaint alleges a Title II violation, but not a Fourteenth Amendment violation.

### 3. Step three: Abrogation analysis

Our analysis thus turns on the third prong of the *Georgia* framework—whether Congress's purported abrogation of sovereign immunity is valid as to T.W.'s claim. In conducting this inquiry, we must: (a) identify the scope of the constitutional right at issue; (b) examine whether, in enacting Title II, Congress identified a history and pattern of unconstitutional discrimination by states in the relevant context; and (c) determine whether the right and remedies created by the statute are congruent and proportional both to the constitutional rights it purports to enforce and to the record of violations adduced by Congress. *City of Boerne*, 521 U.S. at 529–36; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365–74 (2001)

(applying the *City of Boerne* factors to conclude that abrogation of Eleventh Amendment sovereign immunity was invalid as to Title I of the ADA).

We note at the outset some disagreement among our sister Circuits as to the application of this framework to Title II claims. In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held that Title II of the ADA validly abrogated sovereign immunity in the context of a claim against the state of Tennessee for failure to make its courts accessible to disabled individuals. *Id.* at 514, 533–34. Circuits disagree, however, on how broadly *Lane* should be read. On the one hand, the Fourth, Fifth, Eighth, and Eleventh Circuits have read *Lane* to conclusively resolve the first two prongs of the *City of Boerne* inquiry as to Title II on the whole. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005); *McCarthy ex rel. Travis. v. Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004) (Garza, *J.*, concurring in part and dissenting in part); *Klingler v. Dir., Dep't of*

*Revenue, State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006); *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-58 (11th Cir. 2005). Were we to follow this approach, we would essentially skip to the third step of the *City of Boerne* test—congruence and proportionality. On the other hand, the First and Tenth Circuits have both held that *Lane* resolved these issues as to the "particular right and class of state action at issue." *Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012); *see Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006). Under this approach, *Lane* did not resolve the first two steps of the *City of Boerne* inquiry as to all Title II claims, but spoke only to Title II claims regarding "accessibility of judicial services." *Toledo*, 454 F.3d at 36 (quoting *Lane*, 514 U.S. at 531).

We agree with the First and Tenth Circuits that *Lane* did not resolve the first two prongs of the *City of Boerne* framework for all of Title II's myriad applications. "Title II—unlike . . . the other statutes we have reviewed for validity under § 5 [of the Fourteenth

Amendment]—reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional guarantees." *Lane*, 541 U.S. at 530. Accordingly, "nothing in [Supreme Court] case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole." *Id.* Thus, as both the First and Tenth Circuits observed, the Supreme Court undertook its analysis of each of the *City of Boerne* prongs with respect to the specific fundamental right and state services at issue in *Lane*. *Id.* at 522–23, 527, 530–34; *see Guttman*, 669 F.3d at 1117–18 (observing same); *Toledo*, 545 F.3d at 35.[3] Furthermore, reading *Lane* broadly would imply that abrogation analyses should be conducted, at least to some extent, on a statute-by-statute basis, an approach that runs afoul of the Supreme Court's

---

[3] To be sure, passages in *Lane*, if read in isolation, could support a more expansive reading. *See, e.g., Lane*, 541 U.S. at 513 ("The question presented in this case is whether Title II exceeds Congress' power under § 5 of the Fourteenth Amendment."); *id.* at 524 (noting, with regards to the second *City of Boerne* prong, that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights"). But notwithstanding excerpts suggesting otherwise, *Lane* conducted its inquiry in the specific context of the right at issue in that case. *See, e.g., id.* at 522–23, 527, 530–34.

prescription that this analysis occur on a "claim-by-claim basis." *Georgia*, 546 U.S. at 159. We therefore "find that *Lane* does not conclusively settle the first two prongs of the *City of Boerne* test for all classes of services." *Guttman*, 669 F.3d at 1118. Accordingly, we proceed through the three-part *City of Boerne* analysis *seriatim*.

### a. Scope of the constitutional right

The first prong of the *City of Boerne* analysis requires us to determine the scope of the constitutional right at issue. T.W. contends that the constitutional right here is the right to education (and educational testing) and, as a "plus factor," the right of access to courts. The Board contends that the right at issue is that of occupational choice.

We agree with the Board that the right involved in T.W.'s case is a disabled person's right of occupational choice, and more specifically that of licensure to practice in a highly regulated profession. Both the Supreme Court and this Court have referred to

the bar exam as a professional licensure test. *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 68 (1988) (referencing the bar exam as being a hurdle to "professional licensure"); *United States v. Novak*, 903 F.2d 883, 888 (2d Cir. 1990) (describing passing the bar as "meet[ing] the threshold criteria of competence in the law"). Common sense supports this conclusion: the bar exam is a test that individuals typically become eligible to take following *completion* of their legal education; it is not a "part" of one's legal education in any practical sense. *See* Bar Exam Eligibility, N.Y. State Bd. of L. Exam'rs, https://www.nybarexam.org/Eligible/Eligibility.htm [https://perma.cc/6P6V-4WCY].

Additionally, concerns created by T.W.'s claims are very different from those that arise in the education context. Caselaw addressing the right of access to education has emphasized the *sui generis* nature of education, including its unique importance in civil society. "Public education is not a 'right' granted to individuals by

the Constitution.  But neither is it merely some governmental 'benefit'

indistinguishable from other forms of social welfare legislation. . . .

[E]ducation has a fundamental role in maintaining the fabric of our

society."  *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (internal citations

omitted); *see also Toledo*, 454 F.3d at 36–37 ("The Supreme Court has

recognized the vital importance of all levels of public education in

preparing students for work and citizenship as well as the unique

harm that occurs when some students are denied that opportunity."

(citing, *inter alia*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954))); *Bowers*

*v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555–56 (3d Cir. 2007);

*Ass'n for Disabled Ams.*, 405 F.3d at 959 ("Discrimination against

disabled students in education affects disabled persons' future ability

to exercise and participate in the most basic rights and responsibilities

of citizenship, such as voting and participation in public programs

and services.").  None of this reasoning applies to taking the bar exam,

which is surely not a prerequisite to participation in civil society.  On

this score, we note that T.W.'s alleged damages all concern her professional well-being, and she does not allege any inability to participate in society more broadly because of her difficulties passing the bar exam on her first two attempts. *See* J. App'x 27–28 (describing T.W.'s termination from her prior law firm and her difficulty finding comparable employment).

T.W.'s assertion that there is an access-to-courts angle to her claim (which she says is a "plus factor") fares no better. *Lane* addressed the "right of access to the courts," a fundamental civil right enshrined and expanded by other constitutional amendments. 541 U.S. at 523. These include the Confrontation Clause of the Sixth Amendment, the Due Process Clause, which "requires the States to afford certain civil litigants a meaningful opportunity to be heard by removing obstacles to their full participation in judicial proceedings," the Sixth Amendment right to trial "by a jury composed of a fair cross section of the community," and the First Amendment "right of access

to criminal proceedings." *Id.* (internal quotation marks omitted). But the right of access to courts in *Lane* did not involve the right of individuals to earn a living in courts *as a licensed lawyer* (and for that matter, bar admission is required for *all* practicing lawyers, even those whose work involves only transactional or advisory work, and who never appear in court). The Supreme Court's failure to mention that species of supposed "access" in *Lane* comes as no surprise, because nothing in the Constitution guarantees an individual a right to work as a lawyer, nor does T.W. identify any authority otherwise. Accordingly, we conclude that T.W.'s complaint invokes only the right of occupational choice, and more specifically that of professional licensing.

We next consider the scope of that right. "[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment," but this right is "subject to reasonable

government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999);

*see also Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019) ("[T]he

right of occupational choice is afforded Due Process protection only

when a plaintiff is completely prohibited from engaging in his or her

chosen profession." (cleaned up)).  Although T.W. does not press an

Equal Protection Clause claim on appeal, even if she did, the Board's

conduct "cannot run afoul of the Equal Protection Clause if there is a

rational relationship between the disparity of treatment and some

legitimate governmental purpose."  *Garrett*, 531 U.S. at 366–67

(internal quotation marks omitted).  In sum, the right at issue here—

a disabled person's right to practice her chosen profession—is not

afforded heightened scrutiny.

> ### b. History and pattern of unconstitutional discrimination

Under the second prong of the *City of Boerne* framework, we

consider to what extent Title II was "responsive to, or designed to

prevent, unconstitutional behavior," 521 U.S. at 532, "[w]ith respect to the particular services at issue in this case," *Lane*, 541 U.S. at 527.

We find, as did the Tenth Circuit, that Congress has not identified "a longstanding pattern of disability discrimination in [the context of] professional licensing." *Guttman*, 669 F.3d at 1119. Our review of the legislative history uncovered no legislative findings documenting a pattern of unconstitutional discrimination in the administration of professional licensure examinations by states, in the granting of professional licenses, or regarding occupational choice more generally. *See* 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485, pts. 1–4 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 267; H.R. Rep. No. 101–558 (1990) (Conf. Rep.); H.R. Rep. No. 101–596 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 565.[4]

---

[4] As an appendix to his dissent in *Garrett*, Justice Breyer listed "Submissions made by individuals to the Task Force on Rights and Empowerment of Americans with Disabilities." *See Garrett*, 531 U.S. at 391, App. C (Breyer, *J.*, dissenting). That Appendix included five line-items that may indicate instances of disability discrimination in the professional licensing context. *See id.* (California 00261 (teachers), Texas 01503 (same), Texas 01549 (same); Texas 01542

T.W. identifies one isolated example from the congressional record that may support her position. Namely, in a written statement before Congress, a disabled private attorney indicated that she had heard "scores of horror stories on an annual basis arising from the experiences of persons with disabilities who attempt to take bar examinations." J. App'x 64 n.3 (quoting *Americans with Disabilities Act of 1989: Hearing on H.R. 2273 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 101st Cong. 162 (1989) (statement of Laura D. Cooper, Attorney, Pettit & Martin)). This isolated testimony, however, does not appear to have been adopted by Congress as any sort of finding. *See, e.g.,* 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485, pts. 1–4 (1990), *as reprinted in* 1990

---

(cosmetologists); Texas 01543 (chiropractors)). However, there is insufficient context to suggest that any of these examples constituted unconstitutional discrimination, particularly because government regulations affecting disabled individuals do not receive elevated scrutiny and survive constitutional review if they are rationally related to a legitimate government purpose. *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 435 (1985); *see also Garrett*, 531 U.S. at 370 ("Whether [the isolated examples of state employment discrimination against the disabled] were irrational under our decision in *Cleburne* is more debatable, particularly when the incident is described out of context.").

U.S.C.C.A.N. 267; H.R. Rep. No. 101–558 (1990) (Conf. Rep.); H.R. Rep. No. 101–596 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 565. Nor does this testimony necessarily flag unconstitutional conduct; it merely alleges without any context or description that the witness heard "scores of horror stories" regarding the bar examination. But because laws infringing on occupational choice are subject only to rational basis review, and because laws distinguishing individuals on the basis of disability are reviewed likewise, we are left with no basis to conclude that these unspecified "horror stories" describe events that were unconstitutional as opposed to simply unfortunate. *See Garrett*, 531 U.S. at 370 ("Whether [the isolated examples of state employment discrimination against the disabled] were irrational under our decision in *Cleburne* is more debatable, particularly when . . . described out of context.").

T.W. also points to a House committee report that discusses private testing discrimination under Title III of the ADA. That report

contains language implying that Title II requires states' "licensing[,] certification[,] and other testing authorities" to be accessible to those with disabilities, "which includes physical access as well as accommodations in the way the test is administered." H.R. Rep. No. 101-485, pt. 3, at 68. But this example is of little help to T.W.'s position, because it is not a finding of unconstitutional discrimination. Rather, this statement merely explains the purpose of a section in Title III with reference to Title II. It is not evidence that Title II was "responsive to, or designed to prevent, unconstitutional behavior" in the context of professional licensing. *City of Boerne*, 521 U.S. at 532. Accordingly, it provides no support to Congress's exercise of Section 5 power in this context.[5]

---

[5] T.W. points to additional legislative history of discrimination from the education and educational testing realms. However, even if that evidence were sufficient to establish a history of unconstitutional state conduct in education or educational testing, it is not relevant to our inquiry here, which is into whether Title II was passed in response to a history of unconstitutional conduct in *professional licensing*.

But even if we assumed that the testimony of this single attorney constituted a congressional finding (which it was not) and that her testimony described unconstitutional conduct (which it does not), the record of unconstitutional discrimination in this context would still be insufficient to justify abrogation of state sovereign immunity. "In *Lane*, the Court found that Congress 'enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs,' and that it specifically considered evidence of discrimination in areas such as education, access to the courts, transportation, communications, health care, and other public services. The Court noted the 'sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services,' and concluded that it is 'clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.'"

*Guttman*, 669 F.3d at 1118 (internal citation omitted) (quoting *Lane*, 541 U.S. at 528, 529). In contrast, the Supreme Court in *Garrett* found that six examples from the congressional record of state employment discrimination against disabled individuals "f[ell] far short of even suggesting the pattern of unconstitutional behavior on which § 5 legislation must be based." 531 U.S. at 370.

The congressional record of unconstitutional conduct in the professional licensing context is even sparser than the record was in *Garrett*, 531 U.S. at 370, and looks nothing like the record at issue in *Lane*, 541 U.S. at 528. T.W. points to *no* congressional findings of unconstitutional state behavior in the sphere of occupational choice and professional licensing. And even reading the record in her favor—and including both the testimony of attorney Cooper and those examples from Justice Breyer's dissent in *Garrett*, 531 U.S. at 391; *see supra* note 3—she would have at most six examples, all lacking

sufficient context for us to determine whether the conduct at issue was even unconstitutional.

Although determining what quantity of legislative history of unconstitutional discrimination is necessary to validate a particular exercise of Section 5 power may be a fraught exercise in some contexts, we have no such trouble here.  The congressional record of unconstitutional state conduct in the occupational choice and professional licensing context is perilously slim.

### c.  Congruence and proportionality

Finally, we consider whether the rights and remedies created by Title II are congruent and proportional to the specific violations at issue given the nature of the constitutional right and the history of unconstitutional violations.  Considering the low level of scrutiny applied to the relevant right and the scant, nearly non-existent record of constitutional violations, we find that abrogation of state sovereign immunity would not be congruent and proportional in this case.

We begin with a brief survey of Supreme Court jurisprudence on this issue. The Supreme Court has found "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" lacking where the injury to be prevented or remedied significantly exceeds the rights granted under the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 520. For example, in *City of Boerne*, the Court held that the Religious Freedom Restoration Act was not a congruent and proportional exercise of Section 5 power because the law protected free exercise of religion *beyond* the protections granted by the Free Exercise Clause of the Constitution as interpreted by the Supreme Court. *Id.* at 535–36. Congress, the Court wrote, "does not enforce a constitutional right by changing what the right is." *Id.* at 519; *see also United States v. Morrison*, 529 U.S. 598, 626 (2000) ("Section 13981 [of the Violence Against Women Act] is not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe" and "is,

therefore, unlike any of the § 5 remedies that we have previously upheld.").  In other words, the Court has found congruence and proportionality lacking where a statute's protections so significantly exceed the bounds of the Fourteenth Amendment right at issue that they effectively expand that right as it is defined in the Constitution.

Even where a law conceivably prevents or remedies an actual violation of the Fourteenth Amendment, the Supreme Court has found congressional action to exceed the scope of Section 5 power where Congress did not exercise that power on a sufficient record of constitutional violations.  For example, in *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, the Court held that the Patent and Plant Variety Protection Remedy Clarification Act did not validly abrogate state sovereign immunity because there was "scant support for Congress' conclusion that States were depriving patent owners of property without due process of law by pleading sovereign immunity in federal-court patent actions," and "Congress did

nothing to limit the coverage of the Act to cases involving arguable

constitutional violations."  527 U.S. 627, 646 (1999).  Similar reasoning

guided the Court in *Kimel v. Florida Board of Regents*, which held that

the Age Discrimination in Employment Act, as applied to states,

exceeded Congress' authority under Section 5 because Congress

failed to identify "any pattern of age discrimination by the States,

much less any discrimination whatsoever that rose to the level of

constitutional violation."  528 U.S. at 89; *see also Garrett*, 531 U.S. at

369–70 (abrogation of state sovereign immunity under Title I of the

ADA exceeded congressional authority under Section 5 because only

"half a dozen examples" of state employment discrimination on the

basis of disability fell "far short of even suggesting the pattern of

unconstitutional discrimination on which § 5 legislation must be

based."); *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 35, 39 (2012) (self-

care provision of Family and Medical Leave Act of 1993 was not

congruent and proportional because it "was not directed at an

identified pattern of gender-based discrimination and was not congruent and proportional to any pattern of sex-based discrimination on the part of States"); *Allen v. Cooper*, 589 U.S. 248, 260–66 (2020) (abrogation of state sovereign immunity under the Copyright Remedy Clarification Act of 1990 was invalid because the Fourteenth Amendment intersects with copyright infringement only to the extent that a state infringed recklessly or intentionally, and, as in *Florida Prepaid*, 527 U.S. at 640, the congressional record contained almost no evidence of unconstitutional copyright infringement by states). In sum, the Supreme Court has found congressional exercises of Section 5 power to lack congruence and proportionality where the right being protected exceeds the protections of the Fourteenth Amendment without a sufficient congressional record of unconstitutional violations that the challenged law would remedy or deter.

On the other side of the ledger, the Supreme Court has upheld exercises of Section 5 power where the remedy is closely tailored to the Fourteenth Amendment right in need of protection, and where the congressional record contains ample evidence that the right requires prophylactic protection. In *Nevada Department of Human Resources v. Hibbs*, the Court upheld the abrogation of sovereign immunity within the Family and Medical Leave Act for violations of the family-care provision of that act. 538 U.S. 721, 725 (2003). The Court reached this holding by observing that "statutory classifications that distinguish between males and females are subject to heightened scrutiny," *id.* at 728 (citation omitted), and that the FMLA's "legislative record reflects . . . [that] stereotype-based beliefs about the allocation of family duties remained firmly rooted, and employers' reliance on them in establishing discriminatory leave policies remained widespread," *id.* at 730 (citations omitted). Similar reasoning appears in *Lane*. In that case, the right at issue was access

to the courts, a right that calls "for a standard of judicial review at least as searching . . . [as] the standard that applies to sex-based classifications." *Lane*, 541 U.S. at 529. Further, "the record of constitutional violations in [*Lane*]—including judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services—far exceeds the record in *Hibbs*." *Id.* In both *Lane* and *Hibbs*, then, the Supreme Court found exercises of Section 5 power to be valid—including abrogations of sovereign immunity—where the right (or class) being protected was subject to heightened judicial scrutiny, and where the record of unconstitutional state action was extensive.

Applying these principles to the present case, we conclude that Title II's abrogation of state sovereign immunity is not congruent and proportional as applied to professional licensing of disabled individuals. "Strong measures appropriate to address one harm may

45

be an unwarranted response to another, lesser one," *Lane*, 541 U.S. at 524 (internal quotation marks and alteration omitted), and so in enacting "prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent," *id*. at 523. In fact, several courts and commentators have questioned whether, following *Lane*, a Title II claim for money damages can be maintained against a state absent a fundamental right (subject to heightened scrutiny) being at issue. *See Guttman*, 669 F.3d at 1122–23 (discussing courts and academics addressing this question) (citing *Buchanan v. Maine*, 377 F. Supp. 2d 276, 283 (D. Me. 2005); *Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791, 793 (9th Cir. 2004) (O'Scannlain, *J.*, concurring); *Press v. State Univ. of N.Y. at Stony Brook*, 388 F. Supp. 2d 127, 135 (E.D.N.Y. 2005); *Roe v. Johnson*, 334 F. Supp. 2d 415, 421 n.9 (S.D.N.Y. 2004); *Johnson v. S. Conn. State Univ.*, 2004 WL 2377225, at *4 (D. Conn. Sept. 30, 2004); Erwin Chemerinsky, Federal Jurisdiction 477 (5th ed. 2007)).

Here, the right at issue is that of occupational choice, applied to the area of professional licensing.  Professional licensing rules are subject only to rational basis review.  *Gabbert*, 526 U.S. at 291–92 (observing that there is no right to practice one's profession free of restraints, and that there is no Due Process Clause violation absent a "complete prohibition of the right to engage in a calling").  This case is therefore distinguishable from *Lane*, which addressed the "class of cases implicating the fundamental right of access to the courts," 541 U.S. at 533–34, a right that warrants highly "searching" judicial review, *id.* at 529.[6]

---

[6] T.W. again contends that the right at issue here is that of education and educational testing.  For the reasons stated above, *see supra* Section II.B.3.a, we are unpersuaded.  We do note, however, that access to education does appear to be a unique class of cases where courts have found exercises of prophylactic Section 5 power to be valid, notwithstanding that education has not been identified as a fundamental right.  *See Toledo*, 454 F.3d at 39–40; *Bowers*, 475 F.3d at 555–56; *Constantine*, 411 F.3d at 490; *Ass'n for Disabled Ams.*, 405 F.3d at 959.  These cases have relied on the distinct importance of education in society and the unique and extensive history of discriminatory conduct in schools.  *See, e.g., Toledo*, 454 F.3d at 36–39.

Further, the congressional record of unconstitutional conduct by states in professional licensing is slim to non-existent. T.W., as noted above, points to a single individual's testimony before Congress, which identified "scores of horror stories" regarding disabled individuals taking the bar exam. J. App'x 64 n.3 (quoting *Americans with Disabilities Act of 1989: Hearing on H.R. 2273 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 101st Cong. 162 (1989) (statement of Laura D. Cooper, Attorney, Pettit & Martin)). In addition, we take notice of the isolated examples of licensing discrimination flagged in Justice Breyer's *Garrett* dissent. *See* 531 U.S. at 391, App. C (Breyer, *J.*, dissenting). But this record is insufficient for two reasons. First, these isolated examples do not establish a record of *unconstitutional* state behavior. These examples lack sufficient context to understand whether each describes actual unconstitutional state conduct, or whether each references events that, while perhaps unjust, were constitutional. The latter outcome is

particularly likely where, as here, restrictions related to professional

licensing are subject only to rational basis review, as are classifications

on the basis of disability. *See Gabbert*, 526 U.S. at 292 (the right to

choose one's field of private employment is a right "subject to

reasonable government regulation"); *Cleburne*, 473 U.S. at 446

(regulations affecting the disabled violate the Constitution only if not

"rationally related to a legitimate governmental purpose"); *see also*

*Lane*, 541 U.S. at 529 (in *Hibbs*, "it was easier for Congress to show a

pattern of state constitutional violations than in *Garrett* or *Kimel*, both

of which concerned legislation that targeted classifications subject to

rational-basis review." (internal quotation marks omitted)).

Second, even if these examples demonstrated unconstitutional

conduct, the record would still be too sparse to support the

abrogation. In *Garrett*, the Court held abrogation was invalid as to

Title I of the ADA because "[e]ven if it were to be determined that the

half a dozen relevant examples from the record showed

unconstitutional action on the part of States, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based." *Garrett*, 531 U.S. at 357. All the more so here, where the legislative record does not contain even six examples of unconstitutional conduct in the professional licensing context.

Finally, "the Title II remedy, as applied to professional licensing, 'far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses [to discrimination] that would be reasonable[.]'" *Guttman*, 669 F.3d at 1124 (quoting *Garrett*, 531 U.S. at 372); *see also id.* ("The abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional."); *Garcia*, 280 F.3d at 109–10 ("[W]hereas under the Fourteenth Amendment the absence of an accommodation would be presumptively permissible with the burden of challenging it squarely

on the plaintiff, Title II shifts the burden of proof onto the state to defend the absence.  Indeed, this burden shift is consistent with the elevated scrutiny generally applied to suspect classifications such as race and nationality, suggesting that Title II is working a substantive elevation in the status of the disabled in equal protection jurisprudence.").

In sum, Title II of the ADA does not validly abrogate sovereign immunity in the context of professional licensing.  This case exhibits three factors that the Supreme Court has found fatal to exercises of Section 5 power: the right at issue gets no heightened scrutiny, the congressional record of unconstitutional conduct is slim, and the statute cuts far wider than the Fourteenth Amendment.  We therefore conclude that sovereign immunity bars T.W.'s claim for damages under Title II.

C.  **Relief under** *Ex Parte Young*

Apart from her claim for damages, T.W. contends that she can pursue declaratory and injunctive relief under Title II against Board officials in their official capacities pursuant to the doctrine first articulated in *Ex parte Young*, 209 U.S. 123 (1908).

"Absent proper Congressional abrogation or State waiver, the Eleventh Amendment bars a federal court from hearing suits at law or in equity against a State brought by citizens of that State or another."  *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020).  However, "[t]here is a well-known exception to this rule—established by the Supreme Court in *Ex parte Young* and its progeny—by which suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law.  In determining whether a litigant's claim falls under the *Ex parte Young* exception, we ask two questions: whether the complaint (1) alleges an

ongoing violation of federal law; and (2) seeks relief properly characterized as prospective." *Id.* (footnotes omitted).

For the reasons that follow, we conclude that that T.W.'s claims for declaratory and injunctive relief cannot go forward. The declaratory relief sought by T.W. is retrospective, rather than prospective, in nature, and the injunctive relief she seeks is not sufficiently tied to an allegation of ongoing violations of federal law.

### 1. Declaratory relief

T.W. seeks "declaratory relief, finding that Defendants' actions violated Title II . . . of the Americans with Disabilities Act[.]" J. App'x 34. The district court found this relief "plainly foreclosed by the *Ex parte Young* doctrine [because a] declaration that a violation of federal law occurred in the past is entirely retroactive. It does not mandate compliance with federal law *in the future* as required by *Ex parte Young*." *T.W.*, 2022 WL 2819092, at *8.

"[T]he Supreme Court has declined to extend the reasoning of *Ex [p]arte Young* to claims for retrospective relief." *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000). "The line between prospective and retrospective relief is drawn because remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law, whereas compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Id*. (cleaned up).

We agree with the district court's conclusion that the declaratory relief sought is wholly retrospective, and therefore barred. T.W. seeks only a declaration—in the past tense—that the Board "*violated* Title II." J. App'x 34 (emphasis added). This relief is facially retrospective, as she seeks only a declaration regarding the Board's previous actions, not its future conduct.

This case is distinguishable from those in which declaratory relief for past violations have been allowed. For example, in *Verizon*

*Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 640 (2002), the plaintiff sought a declaration that a state regulation violated the 1996 Telecommunications Act, and an injunction against future enforcement of that state order.  The Court held that the declaratory relief sought did not run afoul of *Ex parte Young* because even though the declaration was "of the past, as well as the future," "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction."  535 U.S. at 646 (emphasis omitted); *see also id*. ("[T]he past financial liability of private parties may be affected.  But no past liability of the State, or of any of its commissioners, is at issue.").  In contrast, the declaratory relief sought by T.W. does not overlap with her injunctive relief, because the injunctive relief she seeks relates to the Board's continued maintenance of records of her failures on the bar exam.  *See* J. App'x 34 ("[E]njoin Defendants from maintaining and reporting records of Plaintiff's examination results received under discriminatory

conditions and require Defendants to take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment[.]").

Furthermore, the Supreme Court has relied, at least in part, on considerations of whether declaratory relief will lead to monetary exposure for a state in determining whether relief is prospective or retrospective. In *Green v. Mansour*, the Supreme Court found declaratory relief retrospective in part on concerns that, if issued against the government, the declaratory judgment would have a *res judicata* effect as to liability for damages in a future state court action, thus serving as an end run around the Eleventh Amendment. 474 U.S. 64, 73 (1985) ("We think that the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to

the state courts only a form of accounting proceeding whereby damages or restitution would be computed."); *see also Ward*, 207 F.3d at 119 ("At the risk of being obvious, a party armed with such relief from the federal court and the doctrine of *res judicata* would have little left to do but appear in state court, and employ the state court as a form of accounting proceeding for a retrospective (federal) award of damages against the state." (internal quotation marks omitted)). On the other side of that issue, the Supreme Court permitted the declaratory relief in *Verizon Maryland* in part because "no past liability of the State, or of any of its commissioners, is at issue. It does not impose upon the State 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.'" 535 U.S. at 646 (emphasis omitted) (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).

T.W.'s requested declaratory relief looks more like that in *Green* and *Ward* than that in *Verizon Maryland*. Although we decline to

speculate as to when or how T.W. or another litigant could use the

declaratory judgment here, we nonetheless note that a potential use,

and in fact, perhaps the only potential use, would be to seek damages

against the Board in state court. But "declaratory judgment is not

available when the result would be a partial 'end run' around the

Eleventh Amendment's bar on retrospective awards of monetary

relief." *Ward*, 207 F.3d at 120 (cleaned up).

In sum, the declaratory relief T.W. seeks is retrospective in

nature, and is therefore barred by the Eleventh Amendment.

### 2. Injunctive relief

Finally, T.W. seeks an order to "enjoin Defendants from

maintaining and reporting records of Plaintiff's examination results

received under discriminatory conditions and [to] require Defendants

to take affirmative steps to alleviate the ongoing repercussions of the

discriminatory test administration that continue to hammer Plaintiff's

search for employment." J. App'x 34. The district court held that T.W.

lacked standing to pursue this relief, because it would not redress any of her alleged injuries. Specifically, it held that expungement of her failures would not redress her claimed injuries—including, for example, "that she did not have the opportunity to gain the experience they seek from a 2013 graduate due to the disruptions caused by her bar examination failure," J. App'x 28, ¶ 62—because "expungement will neither alter T.W.'s level of experience nor undo the fact that she did not successfully pass the bar until 2015," *T.W.*, 2022 WL 2819092, at *8. "Moreover," the district court wrote, "the injunctive relief T.W. requests would suppress a record that, according to the Board, it is prohibited from disclosing to employers under Section 90(10) of the Judiciary Law." *Id.* We agree with the district court's dismissal of T.W.'s claim for injunctive relief, but reach that conclusion on different grounds. *See Jusino*, 54 F.4th at 100 ("We may affirm on any ground with support in the record, including

grounds upon which the district court did not rely." (internal citations and quotation marks omitted)).

"*Ex parte Young* gives life to the Supremacy Clause[] [because] remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green*, 474 U.S. at 68. Accordingly, *Ex parte Young* permits suits against state officials that "seek[] only prospective injunctive relief *in order to* 'end a continuing violation of federal law.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996) (emphasis added) (quoting *Green*, 474 U.S. at 68); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 287 (2d Cir. 2003) ("The Eleventh Amendment, however, does not preclude suits against state officers in their official capacity for prospective injunctive relief *to prevent* a continuing violation of federal law." (emphasis added) (citing *Ex parte Young*, 209 U.S. at 155–56)). In other words, the doctrine of *Ex parte Young* permits federal

courts to grant injunctions against state officials, but it only permits injunctions to prevent future violations of federal law.

Turning to T.W.'s complaint, we conclude that the injunctive relief she seeks is unavailable under *Ex parte Young* because it would not prevent an alleged continuing violation of federal law.  To be sure, T.W.'s complaint alleges ongoing violations of federal law by the Board and, by extension, by the individual defendants named in their official capacities.  For example, she alleges that the Board's "acts, policies, and practices discriminate against individuals with disabilities, including those who have mental and/or cognitive disabilities and require additional time, stop-clock breaks, and/or separate, quiet testing areas."  J. App'x 31, ¶ 86.  And she further alleges that the Board has "failed to make reasonable modifications to its policies and practices to ensure that Plaintiff and others with disabilities do not face [] discrimination because of their disabilities."

61

*Id.* 31, ¶ 89.   In the context of her Title II claim, these allegations amount to allegations that the Board continues to violate federal law.

But what is missing from T.W.'s complaint—and why her claim for injunctive relief cannot go forward—is the necessary nexus between the injunctive relief she seeks and the continuing violations she alleges.   T.W.'s requested injunctive relief does not seek to prevent the Board's alleged "fail first policies and practices" that she alleges "discriminate against individuals with disabilities."   *Id.* 31, ¶¶ 86, 88. Rather, she seeks an injunction against the Board "maintaining and reporting records of Plaintiff's examination results" and a requirement that the Board "take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment."   *Id.* 34.   This relief does not align with the alleged continuing violations of federal law, because even if a court granted T.W. the full suite of injunctive relief she seeks, the alleged federal law violations could continue.

T.W.'s complaint, we note, does not allege that the Board's maintenance of records of her failures violates federal law. "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). Therefore, if T.W. had alleged that the Board's maintenance of records violated Title II, her claim may well have survived. But T.W. makes no allegation that the Board's maintenance of records constitutes an ongoing violation of her rights. The injunction she seeks is accordingly unavailable.

T.W. contends that expungement is available under *Ex parte Young* for either of two reasons. First, she argues that she "allege[s] ongoing harm as a result of [the Board's] maintenance of bar examination records and refusal to expunge." Reply Br. 25. This argument, however, is unresponsive to the issue here. Even if she alleges ongoing *harm*, injunctive relief under *Ex parte Young* must seek

to stop ongoing "*violation[s]* of federal law." *Green*, 474 U.S. at 68

(emphasis added).

Second, T.W. points to the Ninth Circuit's decision in *Flint v.

Dennison*, 488 F.3d 816, 824 (9th Cir. 2007), which she contends "noted

that *Ex parte Young* was available to expunge negative information in

a college student's file that might jeopardize that student's future

employment." Reply Br. 26. That case, to be sure, did hold that

expungement of negative information from university records may

be available under *Ex parte Young*, because "they serve the purpose of

preventing present and future harm to [the plaintiff]." *Flint*, 488 F.3d

at 825. We find this case distinguishable from the issue here. The

quoted language from *Flint* came in the course of the court's

determination that the injunctive relief sought by the plaintiff,

including expungement of records, "cannot be characterized solely as

retroactive." *Id.* And we do not disagree with that conclusion as it

applies here—T.W.'s requested expungement relief may well be

prospective in nature. But even if the *relief* is prospective, T.W.'s injunctive relief is unavailable under *Ex parte Young* because it is aimed exclusively at a *past violation*; it does not seek to remedy an alleged *ongoing violation* of federal law. We do not read *Flint*, 488 F.3d at 825, as having addressed this question and, in any event, we would not be bound by its holding even if it had.

## III.    Conclusion

In sum, we hold as follows:

1.  The New York State Board of Law Examiners is an arm of the state of New York for Eleventh Amendment purposes in this case because the law of the case doctrine settles that issue for this litigation.

2.  Title II of the Americans with Disabilities Act does not validly abrogate sovereign immunity as applied to T.W.'s claim, and in the context of occupational choice and professional licensing more broadly.

3. The declaratory relief sought by T.W. is unavailable under the doctrine of *Ex parte Young* because it is purely retrospective, rather than prospective, in nature.

4. The injunctive relief sought by T.W. is unavailable under the doctrine of *Ex parte Young* because it does not seek to remedy an alleged ongoing violation of federal law.

We therefore AFFIRM the district court's dismissal of T.W.'s Title II claim for compensatory, declaratory, and injunctive relief.