# No. 22-1661

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

T.W.,
*Plaintiff-Appellant*,

v.

New York State Board of Law Examiners, Diane Bosse, John J. McAlary, Bryan Williams, Robert McMillen, E. Leo Milonas, Michael Colodner,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Eastern District of New York, No. 16-cv-3029

_____

## PETITION FOR PANEL REHEARING OR REHEARING EN BANC
_____

Mary C. Vargas
Michael Steven Stein
STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
(240) 793-3185

Jo Anne Simon
JO ANNE SIMON, P.C.
195 Montague Street, #1430
Brooklyn, NY 11217
(718) 852-3528

Samir Deger-Sen
Emma Dougall
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Jordan R. Goldberg
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Plaintiff-Appellant T.W.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION AND RULE 35(b) STATEMENT .............................................. 1

BACKGROUND ............................................................................ 2

    A.   Factual Background ............................................................ 2

    B.   Procedural Background ......................................................... 3

REASONS FOR GRANTING THE PETITION ................................................... 4

I.    THE PANEL ERRONEOUSLY DECIDED TWO EXCEPTIONALLY IMPORTANT QUESTIONS, IN CONFLICT WITH SUPREME COURT PRECEDENT AND THE DECISIONS OF OTHER CIRCUITS ................ 5

    A.   The Panel Decision Created A Circuit Split By Wrongly Narrowing *Ex Parte Young* ...................................................... 5

    B.   The Panel's Abrogation Holding Conflicts With Supreme Court Precedent And Deepens An Entrenched Circuit Split ........................ 10

II.   REHEARING IS NEEDED TO CORRECT THE PANEL'S LAW-OF-THE-CASE HOLDING ................................................................. 13

CONCLUSION ........................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Association for Disabled Americans, Inc. v. Florida International University*,
405 F.3d 954 (11th Cir. 2005) ...........................................................12

*Brown v. City of New York*,
862 F.3d 182 (2d Cir. 2017) ..............................................................14

*Brown v. City of Syracuse*,
673 F.3d 141 (2d Cir. 2012) ..............................................................13

*City of Boerne v. Flores*,
521 U.S. 507 (1997)...........................................................................4

*Constantine v. Rectors & Visitors of George Mason University*,
411 F.3d 474 (4th Cir. 2005) ......................................................11, 12

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
543 U.S. 157 (2004).........................................................................13

*Crocker v. Piedmont Aviation, Inc.*,
49 F.3d 735 (D.C. Cir. 1995) ...........................................................14

*Financial Oversight & Management Board for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*,
598 U.S. 339 (2023).........................................................................15

*Flint v. Dennison*,
488 F.3d 816 (9th Cir. 2007) ..........................................................7, 9

*Hedgepeth ex rel. Hedgepeth v. Washington Metropolitan Area Transit Authority*,
386 F.3d 1148 (D.C. Cir. 2004) ..........................................................8

*Klingler v. Director, Department of Revenue, State of Missouri*,
455 F.3d 888 (8th Cir. 2006) ............................................................12

*Malhotra v. University of Illinois at Urbana-Champaign*,
77 F.4th 532 (7th Cir. 2023) .......................................................7, 8, 9

**Page(s)**

*McCarthy ex rel. Travis v. Hawkins*,
    381 F.3d 407 (5th Cir. 2004) ...........................................................12

*Morgan v. Board of Professional Responsibility of the Supreme Court*
    *of Tennessee*,
    63 F.4th 510 (6th Cir. 2023) ...............................................6, 7, 8, 9

*NAACP v. Merrill*,
    939 F.3d 470 (2d Cir. 2019) ...............................................................5

*Regents of the University of California v. Doe*,
    519 U.S. 425 (1997)...........................................................................15

*Seneca Nation v. Hochul*,
    58 F.4th 664 (2d Cir. 2023) ...............................................................8

*Shepard v. Irving*,
    77 F. App'x 615 (4th Cir. 2003) .....................................................7, 8

*Shipp v. Todd*,
    568 F.2d 133 (9th Cir. 1978) ..............................................................8

*T.W. v. New York State Board of Law Examiners*,
    996 F.3d 87 (2d Cir. 2021) ............................................................3, 13

*Tennessee v. Lane*,
    541 U.S. 509 (2004)..........................................................1, 10, 11, 12

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ...........................................................14

*Virginia Office for Protection & Advocacy v. Stewart*,
    563 U.S. 247 (2011)............................................................................5

*Woods v. Rondout Valley Central School District Board of*
    *Educaction*,
    466 F.3d 232 (2d Cir. 2006) .............................................................15

*Ex parte Young*,
    209 U.S. 123 (1908)............................................................................1

**Page(s)**

**STATUTES**

42 U.S.C. § 12202 ................................................................................10

**OTHER AUTHORITIES**

Fed. R. App. P. 35(b)(1) .......................................................................4

Fed. R. App. P. 40(a)(2) .......................................................................4

## INTRODUCTION AND RULE 35(b) STATEMENT

This case raises several important questions regarding the availability of relief under Title II of the Americans with Disabilities Act ("ADA").

In a sweeping decision, the panel held that the New York State Board of Law Examiners ("BOLE" or the "Board") has sovereign immunity from *all* ADA claims regarding a completed administration of a bar examination—leaving plaintiffs subject to clear and egregious discrimination with no remedy whatsoever.  In doing so, the panel departed from the uniform precedent of four other circuits to hold that *Ex parte Young*, 209 U.S. 123 (1908), does not allow injunctive relief to address *ongoing* harm, when that harm results from *past* unlawful conduct.  As the panel acknowledged, it also deepened another circuit split on the scope of *Tennessee v. Lane*, 541 U.S. 509 (2004)—wrongly holding that Title II does not abrogate BOLE's immunity.  And, finally, the panel erred in finding that BOLE is an "arm of the state" in the first place, based on a clear misapplication of the law-of-the-case doctrine.

The net result of the panel's decision is to fundamentally reshape the availability of relief for plaintiffs subject to disability discrimination.  Never before has this Court (or any court) held that a victim of discrimination subject to ongoing harm lacks any remedy whatsoever.  No principle of sovereign immunity supports that outrageous result.  En banc review is urgently needed to bring this Court's precedent back into line with other courts of appeals and the Supreme Court.

1

## BACKGROUND

### A.    Factual Background

Plaintiff T.W. is an extraordinary woman who overcame a severe head trauma (among other things) to graduate from Harvard Law School and secure employment at a top nationwide law firm.  JA16-17, 22.  During law school, Harvard provided T.W. with necessary testing accommodations—specifically, 50% extra time, stop-clock breaks, and separate rooms during law school examinations.  JA17, 20-21. And with these accommodations, T.W. did well at Harvard, earning praise from her instructors and a job at Ropes & Gray LLP.  JA22.

After graduating from law school in 2013, T.W. signed up to take the New York bar exam and applied for accommodations matching those she had in school— which BOLE routinely provides.  *Id.*  The first two times T.W. took the bar, BOLE denied her that request in meaningful part—and as a result, T.W. suffered panic attacks, was unable to complete major portions of the exam, and twice failed.  JA22-27.  As a direct result of the second failure, Ropes & Gray terminated T.W.'s employment.  JA27.  Finally, the third time around, BOLE granted the needed accommodations and T.W. passed.  *Id.*  Even so, BOLE's actions during the first two exams continue to cause T.W. major harm:  Law firms "do not wish to hire someone who failed the bar examination twice."  JA28.  T.W. has thus faced tremendous difficulty securing employment equivalent to the job she lost.  JA27-28.

2

## B.    Procedural Background

In 2016, T.W. sued BOLE, alleging violations of the Rehabilitation Act and Title II of the ADA—and seeking damages, an injunction requiring BOLE to expunge her first two exam results, and other relief.  JA34; Op. 7-8.  In 2019, BOLE moved to dismiss on sovereign immunity grounds.  Op. 9.  The district court rejected that bid, holding that BOLE was amenable to suit under the Rehabilitation Act because it "is 'a "program or activity" of a department or agency that . . . accepts federal funds—in this case, New York's Unified Court System.'"  *T.W. v. N.Y. State Bd. of L. Exam'rs* ("*T.W. I*"), 996 F.3d 87, 91 (2d Cir. 2021) (citation omitted).  But in an interlocutory appeal, this Court reversed.  *See id.* at 102.

On remand, BOLE sought dismissal of the Title II claim, again on sovereign immunity grounds.  With the Rehabilitation Act off the table, T.W. argued that BOLE is not an arm of the state (and so is not entitled to sovereign immunity).  *See* Dist. Ct. Dkt. No. 110 at 6-21.  T.W. alternatively argued that Title II validly abrogates any immunity that BOLE has and that, in any event, injunctive and declaratory relief is available under *Ex parte Young*.  *See id.* at 21-35.

The district court granted BOLE's motion to dismiss.  JA36-52.  On the arm-of-the-state issue, BOLE argued that this Court had already decided that BOLE *is* an arm of the state.  Dist. Ct. Dkt. No. 111 at 3-7.  But the district court addressed the question afresh, siding with BOLE on the merits.  JA37-43. The court then held that

even though "T.W. ha[d] plausibly alleged that the Board violated Title II," Title II's express abrogation of sovereign immunity is unconstitutional. JA45-50. The court also held that T.W. lacked standing to seek injunctive relief. JA50-51.

A two-judge panel affirmed.[1] First, the panel affirmed the district court on the alternative ground that *T.W. I* had already held, explicitly or implicitly, that BOLE is arm-of-the-state—making it law of the case either way. Op. 16-19 & n.2. On abrogation, the panel noted "disagreement among our sister Circuits" on whether *Lane* conclusively resolves the first two steps of the test set out by *City of Boerne v. Flores*, 521 U.S. 507 (1997). Op. 24-25. It then adopted the minority view that it does not, and held that Title II's abrogation of sovereign immunity was unlawful in this context. *Id.* at 23-51. Finally, as to injunctive relief, the panel again affirmed on alternative grounds, reasoning that the relief T.W. seeks "would not prevent an alleged violation of federal law." *Id.* at 60-61. As a result, T.W. is left with no remedies whatsoever for the disability discrimination she experienced.

## REASONS FOR GRANTING THE PETITION

This case easily meets each of this Court's criteria for rehearing. Fed. R. App. P. 35(b)(1), 40(a)(2).

---

[1] Judge Rosemary S. Pooler was originally a member of the panel but passed away on August 10, 2023. *See* Op. 1 n.*.

## I.    THE PANEL ERRONEOUSLY DECIDED TWO EXCEPTIONALLY IMPORTANT QUESTIONS, IN CONFLICT WITH SUPREME COURT PRECEDENT AND THE DECISIONS OF OTHER CIRCUITS

### A.    The Panel Decision Created A Circuit Split By Wrongly Narrowing *Ex Parte Young*

The panel's most serious error—and its farthest reaching—concerns the availability of relief under *Ex parte Young*.  *Ex parte Young* "established an important limit on the sovereign-immunity principle." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254-55 (2011).  That limit comes into play when "the relief sought is prospective—that is, it is not 'retrospective or designed to compensate for a past violation of federal law.'" *NAACP v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019) (citation omitted).  In such cases, *Ex parte Young* makes injunctive relief available to "promote the supremacy," and redress violations, of federal law.  Here, though, the panel held *Ex parte Young* relief "unavailable" because T.W. alleged an "'ongoing harm'" caused by a past violation, not an "ongoing '*violation*[] of federal law.'"  Op. 63-65 (citations omitted).  That holding conflicts with the decisions of four other circuits; it is wrong; and it threatens disastrous consequences.

Begin with the claims here.  T.W.'s complaint alleges not only that BOLE's unlawful discrimination cost her a job (though it surely did that).  JA28-29.  T.W. *also* alleges that BOLE "maintain[s] records documenting that [T.W.] failed the bar examination" and that "[a]bsent expungement and/or official acknowledgment of discrimination, [T.W.] must disclose and struggle to explain failure on the bar

5

examination in her job search . . . despite such failure being directly the result of [BOLE's] denial of her rights."  JA29, 32.  This "continues to hinder [T.W.]'s ability to obtain employment . . . and has required her to disclose her disability to employers."  JA29.  So "injunctive relief is necessary to clear the way for [T.W.] to fairly obtain employment."  JA32.  T.W. thus sought to "enjoin [BOLE] from maintaining and reporting records of [her] examination results received under discriminatory conditions and require [BOLE] to take affirmative steps to alleviate the ongoing repercussions of [its] discriminatory test administration."  JA34.

In any other circuit, those allegations would have been enough.  Take the Sixth.  Recently, a district court there held just like the panel here:  A plaintiff sued over a past, allegedly unlawful disciplinary proceeding and job termination, and the district court held that "*Ex parte Young* [did] not apply because [the plaintiff] failed to 'allege any ongoing violation of federal law.'"  *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 516 (6th Cir. 2023).  The court of appeals disagreed.  The defendant "continue[d] to maintain records related to the [allegedly unlawful] disciplinary proceeding," and the plaintiff sought injunctive relief "'requiring the [defendant] to expunge all reference to'" that proceeding and "'remov[e] any indication that [he] was terminated for cause.'"  *Id.* (citation omitted).  Thus, the complaint could "be plausibly read to extend to post-termination conduct of the Board that [is] an ongoing constitutional violation."  *Id.*  Just so here:  Because T.W.

6

"posits that [s]he is and will be harmed by the Board's continued maintenance of . . . records" resulting from discrimination, she alleges an ongoing legal violation sufficient to pursue *Ex parte Young* relief. *Id.*; *see* JA28-29, 32, 34.

As *Morgan* explained, that result was dictated by a mountain of precedent. The Sixth Circuit had already held as much. *See Morgan*, 63 F.4th at 516 (collecting cases). "Other circuits have similarly found that expungement of negative records [is] prospective and not barred by sovereign immunity." *Id.* at 516-17 (collecting cases). The Fourth Circuit, for example, has held—in a case under Title II and the Rehabilitation Act—that "expungement would relate to an ongoing violation of federal law" and so qualifies for *Ex parte Young* relief. *Shepard v. Irving*, 77 F. App'x 615, 617, 620 (4th Cir. 2003). The Ninth Circuit has likewise held that, just as "a wrongful discharge is a continuing violation" that can be redressed via *Ex parte Young*, efforts "to expunge" records "related to past violations . . . are not barred by the Eleventh Amendment." *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007). So too in the Seventh Circuit. *See Malhotra v. Univ. of Ill. at Urbana-Champaign*, 77 F.4th 532, 536 (7th Cir. 2023) (plaintiff's "official capacity claims fall within the situation contemplated by *Ex parte Young*" because "he seeks to compel state

7

officials to expunge his suspension from his record on grounds that their failure to do so continues to violate his due process rights").[2]

The panel decision thus opens up—and puts this Circuit alone on the bottom side of—a circuit split at least five courts deep. Even worse, it does so on a question of enormous consequence. As the cases collected above show, claims like T.W.'s arise not only in cases of disability discrimination. They also arise in cases of unlawful employment actions by public employers, *see Morgan*, 63 F.4th at 516; educational discipline, *see, e.g.*, *Malhotra*, 77 F.4th at 536; criminal arrests and convictions, *see, e.g.*, *Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 & n.3 (D.C. Cir. 2004); *Shipp v. Todd*, 568 F.2d 133, 133-34 (9th Cir. 1978); and many other contexts involving violations of federal law, *cf. Seneca Nation v. Hochul*, 58 F.4th 664, 670-71 (2d Cir. 2023) (rejecting claim that injunctive relief was unavailable to redress an invalid 1954 easement because suit was "concerned with the *ongoing effect* of the invalidity"). And even in swathes of discrimination cases, the unlawful conduct at issue may not be part of an ongoing policy or course of conduct—yet still, without judicial relief, that invidious conduct may have lasting harmful effects. *See, e.g.*, *Shepard*, 77 F. App'x at 620. In all

---

[2] The D.C. Circuit has suggested that it sees things similarly. *See Hedgepeth ex rel. Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 & n.3 (D.C. Cir. 2004) (holding that *Ex parte Young* "[o]f course" allowed a similar expungement claim (alteration in original) (citation omitted)).

these cases, the panel decision would preclude relief whenever a state official causes continuing harm through *inaction* rather than *action*—a distinction that has nothing to do with the Supremacy Clause interests that *Ex parte Young* is meant to vindicate, or the underlying principles animating sovereign immunity.

Finally, the panel's reasoning is unsupportable on the merits. The panel first distinguished BOLE's initial unlawful conduct (denying T.W. accommodations) from the lasting results of that misconduct (records of T.W.'s bar-exam failure), holding that only the former is a "continuing violation[] of federal law." Op. 62-63. This ignores that failing to correct the result of unlawful conduct is itself a continuing violation. *See, e.g.*, *Malhotra*, 77 F.4th at 536; *Morgan*, 63 F.4th at 516. The panel also distinguished one of the above cases (*Flint*) on the ground that it did not address the "*ongoing violation*" question. Op. 64-65. Passing review of *Flint* refutes that dodge: It held that "the injunctions sought *are not limited merely to past violations*," and that they "*[t]herefore . . . are not barred by the Eleventh Amendment.*" 488 F.3d at 825 (emphasis added).[3] Nothing in the panel decision supports making this Circuit an extreme outlier on this important question.

---

[3] The panel also suggested that T.W. has not alleged "that the Board's maintenance of records violated Title II" and that, if she had, her claim "may well have survived." Op. 63. This, too, appears to be premised on the panel's misguided harm/violation dichotomy. That T.W.'s complaint did not label BOLE's continuing discrimination a "violation" is plainly immaterial. *See, e.g.*, *Morgan*, 63 F.4th at 516 (explaining that similar allegations could "be plausibly read" to allege "an ongoing constitutional violation").

**B.** **The Panel's Abrogation Holding Conflicts With Supreme Court Precedent And Deepens An Entrenched Circuit Split**

Aside from foreclosing injunctive relief, the panel ensured that plaintiffs like T.W. would lack any remedy at all by also holding that Title II does not validly abrogate BOLE's immunity as to money damages. That, again, is wrong. And it, too, puts this Circuit in the minority of an acknowledged circuit split.

As all agree, Title II of the ADA unambiguously seeks to abrogate state sovereign immunity. Op. 20 (citing 42 U.S.C. § 12202). To determine whether that abrogation is valid, courts must (1) "identify the scope of the constitutional right at issue"; (2) "examine whether, in enacting Title II, Congress identified a history and pattern of unconstitutional discrimination by states in the relevant context"; and (3) "determine whether the right and remedies created by the statute are congruent and proportional both to the constitutional rights it purports to enforce and to the record of violations adduced by Congress." Op. 23.

Twenty years ago, the Supreme Court did most of that work in precisely this context, holding that Title II validly abrogates sovereign immunity as to disability discrimination claims related to access to courts. *See Tennessee v. Lane*, 541 U.S 509, 530-31 (2004). Thus, and as the panel acknowledged, much of *Lane* counsels an "expansive" approach to this analysis. Op. 26 n.3. At the first step, *Lane* spoke of Title II writ large, holding that "Title II . . . seeks to enforce [the Constitution's] prohibition on irrational disability discrimination," along with "a variety of other

10

basic constitutional guarantees." *Lane*, 541 U.S. at 522-23. At the second step, *Lane* held Congress "enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights"—citing historical examples of state discrimination against disabled persons far beyond court access. *Id.* at 524-25 (identifying discrimination in voting, marriage, jury service, civil commitment, treatment in hospitals, and zoning). And last—turning to the particular right at issue—*Lane* held that Congress's tailored remedies for court-access discrimination were congruent and proportional to the right and its history of violations. *Id.* at 530-34.

As the panel recognized, since *Lane* was decided, most appellate courts to address the question have read *Lane* "to conclusively resolve the first two prongs of the [abrogation] inquiry as to Title II on the whole." Op. 24-25 (collecting cases). Of course that's right. At the first two steps, *Lane* considered the "right[s] that Congress purportedly sought to enforce when it enacted Title II," and the history of violations to which "Title II was 'responsive.'" *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 486-87 (4th Cir. 2005) (citation omitted). Both questions concern Title II in general, not as to a particular claim. *Lane* thus "settle[s] that Title II was enacted in response to a pattern of unconstitutional disability discrimination" by state entities providing public services. *Id.* at 487. As the circuits have recognized, "[t]his conclusion is sufficient to satisfy the historical

11

inquiry into the harms sought to be addressed by Title II." *Id.*; *see Klingler v. Dir., Dep't of Rev., State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006) (*Lane* "forecloses the need for further inquiry"); *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-58 (11th Cir. 2005); *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004) (Garza, J., concurring in part and dissenting in part).

True, two other circuits have come out the other way—holding that *Lane* spoke to nothing more than the "accessibility of judicial services." Op. 25 (citation omitted) (collecting cases). But the panel's reason for endorsing that minority view fails on inspection. Although the panel was right that *Lane* counseled against approaching Title II "as an undifferentiated whole," Op. 26 (quoting *Lane*, 541 U.S. at 530), *Lane* only did so at the *third* step of the congruence-and-proportionality analysis, *see Lane*, 541 U.S. at 530. At the first two steps, *Lane* looked broadly to the rights Title II protects and to the history of their violation—not exclusively to the particular claim asserted. *Compare id.* at 522-24, *with* Op. 27-39.

Had the panel here done so, it would have ruled for T.W. Instead, it wrongly narrowed the *Lane* inquiry, and as a result authorized state disability discrimination in the field of "professional licensing," Op. 38—overriding Congress's contrary judgment and eliminating all effective relief for plaintiffs like T.W.

## II. REHEARING IS NEEDED TO CORRECT THE PANEL'S LAW-OF-THE-CASE HOLDING

Before reaching the above questions, the panel also made a more basic, procedural error. Despite this Court never having analyzed whether BOLE is an arm of the state, the panel held that it is entitled to sovereign immunity under the law of the case. Op. 15-19. Rehearing is needed to ensure that the panel decision does not bestow on BOLE a permanent immunity from suit—and a license to discriminate—without any actual assessment of whether BOLE qualifies as an arm of the state.

Several key errors undergird the panel decision on this point. First, the panel suggested that *T.W. I* "expressly decided this issue" (which, if taken seriously, could mean that BOLE must be considered an arm of the state in all cases going forward). Op. 16. But nothing in *T.W. I* "decided" anything on this question. True, the Court *referred* to BOLE "as an '"arm[]"' of the State." *T.W. I*, 996 F.3d 87, 92 (2d Cir. 2021). But it nowhere analyzed the complex, "multi-factor inquiry" underlying that question (no surprise, since it was not the issue on appeal). Op. 14. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided . . . ." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (citation omitted); *Brown v. City of Syracuse*, 673 F.3d 141, 148 (2d Cir. 2012) (law of the case not implicated where "issue was not before" the Court).

13

So next, the panel pivoted, reasoning that whatever *T.W. I expressly* held, an arm-of-the-state holding was "necessarily implicit" in *T.W. I.* Op. 16. Also wrong. To begin, the Court incorrectly relied on cases discussing an *appellant's* obligations, which hold that "a party who has chosen not to argue a point on a first appeal" cannot raise that point in a later one. *Id.* (citation omitted). But as this Court has explained, things are different for an *appellee*—like T.W. in *T.W. I. See Brown v. City of New York*, 862 F.3d 182, 188 (2d Cir. 2017) (distinguishing *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002), on which the panel relied, on this ground). "This Court has not held that an *appellee* is required, upon pain of subsequent waiver, to raise every possible alternate ground upon which the lower court could have decided an issue." *Id.* (emphasis added); *see Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740-41 (D.C. Cir. 1995) (explaining why the panel's rule would "increase the complexity and scope of appeals more than it would streamline the progress of the litigation"). Having prevailed below on the federal-funding issue, T.W. had no obligation in *T.W. I* to do anything more than defend that result.

Nor did *T.W. I*'s reversal on the waiver question "necessarily" decide that BOLE had immunity. Op. 17-18. As the Supreme Court recently explained in a case reviewing a circuit decision finding a state entity's immunity to have been abrogated, appellate courts may easily "'assume[] without deciding' that [an entity] shares in [a State's] immunity"—and "reverse" on waiver (or abrogation) without

deciding anything about the antecedent immunity question. *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 344-46 (2023) (citation omitted). Here too, *T.W. I* decided the Rehabilitation Act waiver question without "necessarily" deciding anything about BOLE's immunity.

Finally, the panel suggested, in footnote two, that because T.W.'s complaint described BOLE as "'a public entity and state instrumentality subject to [Title II],'" she had "conceded the Board's status." Op. 19 n.2 (emphasis omitted) (quoting JA30). That is nonsense. The multi-factor test the district court applied here is aimed precisely at determining *whether* a "state instrumentality may invoke the State's immunity" as an "'arm of the State.'" *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997) (citation omitted); *see* Op. 14. The panel's assumption that *every* "state instrumentality" is an "arm of the state" misunderstands the purpose of this inquiry and risks undermining the entire law-of-the-state doctrine. *See, e.g.*, *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236, 239 (2d Cir. 2006) (state instrumentality *not* an arm of the state).

The panel's decision thus transforms BOLE into an arm of the state with no analysis or justification for doing so. Rehearing is warranted to address this important question on the merits. At the very least, panel rehearing is needed to revisit footnote two of the panel decision and dispel the notion that every "state instrumentality" is, by definition, entitled to a state's sovereign immunity.

* * *

The panel unnecessarily created or compounded two clear circuit splits in order to ensure—contrary to Congress's clear intent—that bar examinees subject to egregious disability discrimination will lack any remedies whatsoever. And it did so despite its members recognizing that T.W. *had* suffered harms that the Court *could* redress. *See, e.g.*, Oral Argument at 21:04-10, 32:36-45 (June 5, 2023), https://tinyurl.com/2p8scydd (Judge Nardini recognizing that "there's no . . . remedy for [T.W.]" even though "she has plausibly alleged that there's something that could be done to redress the injury she's got"). There is no basis for that harsh and senseless result. Rehearing is needed.

16

## CONCLUSION

The petition for rehearing should be granted.

Dated: August 16, 2024

Respectfully submitted,

/s/ *Samir Deger-Sen*

Mary Vargas
Michael Steven Stein
STEIN & VARGAS, LLP
10 G Street NW, Suite 600
Washington, DC 20002
(240) 793-3185
michael.stein@steinvargas.com
mary.vargas@steinvargas.com

Samir Deger-Sen
Emma Dougall
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
samir.deger-sen@lw.com
emma.dougall@lw.com

Jo Anne Simon
JO ANNE SIMON, P.C.
195 Montague Street, #1430
Brooklyn, NY 11217
(718) 852-3528

Jordan R. Goldberg
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
jordan.goldberg@lw.com

*Counsel for Plaintiff-Appellant T.W.*

17

# CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limitations of Federal Rules of Appellate Procedure 35(b)(2)(A) and 40(b)(1) because it contains 3,896 words, excluding parts of the document exempted by Federal Rule of Appellate Procedure 32(f). The petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated: August 16, 2024        */s/ Samir Deger-Sen*
                                    Samir Deger-Sen

ADDENDUM

22-1661
T.W. v. New York State Board of Law Examiners

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2022
No. 22-1661

T.W.,
*Plaintiff-Appellant,*

*v.*

NEW YORK STATE BOARD OF LAW EXAMINERS, DIANE BOSSE, JOHN J.
MCALARY, BRYAN WILLIAMS, ROBERT MCMILLEN, E. LEO MILONAS,
MICHAEL COLODNER,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the Eastern
District of New York.

_____

ARGUED: JUNE 5, 2023
DECIDED: JULY 19, 2024

Before: LIVINGSTON, *Chief Judge*, and NARDINI, *Circuit Judge.*[*]

_____

[*] Judge Rosemary S. Pooler, originally a member of this panel, passed away
on August 10, 2023. The two remaining members of the panel, who are in
agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b);
*United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

—————————————

T.W. sued Defendant-Appellee the New York State Board of Law Examiners alleging, *inter alia*, that the Board violated Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act by denying her requests for certain accommodations on the New York State bar examination in 2013 and 2014.

The Board moved to dismiss T.W.'s complaint, asserting that the United States District Court for the Eastern District of New York (Raymond J. Dearie, *District Judge*) lacked subject matter jurisdiction because New York's sovereign immunity barred T.W.'s ADA and Rehabilitation Act claims under the Eleventh Amendment. The district court denied the Board's motion to dismiss, but this Court reversed, holding that the Board was immune from suit under Section 504 of the Rehabilitation Act and remanding for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA. On remand, the district court granted the Board's motion to dismiss, holding that the Board is entitled to immunity as an "arm of the state," that Title II does not abrogate the Board's sovereign immunity for money damages as applied to T.W.'s claim, and that T.W. could not maintain her requests for declaratory and injunctive relief under *Ex parte Young*.

On appeal, T.W. argues that the Board is not an arm of the state, and even if it were an arm of the state, Title II has abrogated Eleventh Amendment immunity in the context of T.W.'s claim. In addition, T.W. argues that even if the Board enjoys sovereign immunity, she may seek her requested declaratory and injunctive relief under *Ex parte Young*. We disagree and therefore AFFIRM the July 21, 2022, judgment of the district court.

—————————————

MARY C. VARGAS (Michael Steven Stein, *on the brief*), Stein & Vargas, LLP, Washington, D.C.; Jo Anne Simon, Jo Anne Simon, P.C., New York, NY, *for Plaintiff-Appellant*.

DENNIS FAN, Senior Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Ester Murdukhayeva, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General for the State of New York, *for Defendants-Appellees.*

Bridget A. Clarke, Andrew J. Dhuey, Berkeley, CA, *for Amici Curiae* National Disability Rights Network et al., *in support of Plaintiff-Appellant*.

———————————

WILLIAM J. NARDINI, *Circuit Judge*:

Plaintiff-Appellant T.W. sued Defendants-Appellees the New York State Board of Law Examiners ("Board") and its members alleging that the Board violated Titles II and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code tit. 8, by

3

denying her requests for certain accommodations on the New York State bar examination in 2013 and 2014.  T.W. subsequently withdrew her claims under Title III of the ADA and the NYCHRL, as well as her claims against the Board members in their individual capacities.

The Board moved to dismiss T.W.'s complaint, asserting that the United States District Court for the Eastern District of New York (Raymond J. Dearie, *District Judge*) lacked subject matter jurisdiction because New York's sovereign immunity barred T.W.'s ADA and Rehabilitation Act claims under the Eleventh Amendment.  The district court denied the Board's motion to dismiss, holding that the Board is a program or activity of a department or agency that receives federal funds, and accordingly that its sovereign immunity had been waived under the Rehabilitation Act.  This Court reversed, holding that the Board was not a program or activity of a department or agency that receives federal funds and was therefore immune from suit under Section 504 of the Rehabilitation Act.  We remanded the

case for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA, which the district court had not addressed in the first instance because it concluded that "the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act," such that T.W. needed to prevail on only one of the claims to survive the Board's motion to dismiss. *T.W. v. N.Y. State Bd. of L. Exam'rs*, No. 16-cv-3029, 2019 WL 4468081, at *2 (E.D.N.Y. Sept. 18, 2019). On remand, the district court granted the Board's motion to dismiss the Title II claim, holding that the Board is entitled to immunity as an "arm of the state," that Title II does not abrogate the Board's sovereign immunity for money damages as applied to T.W.'s claim, and that T.W. could not maintain her requests for declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

On appeal, T.W. argues that the Board is not an arm of the state, and even if it were an arm of the state, that Title II has abrogated

Eleventh Amendment immunity in the context of T.W.'s claim. In addition, T.W. argues that even if the Board enjoys sovereign immunity as to her damages claim, she may seek her requested declaratory and injunctive relief under *Ex parte Young*. We disagree and therefore AFFIRM the July 21, 2022, judgment of the district court.

## I.  Background

### A. Factual background[1]

T.W. is a Harvard Law School graduate who suffers from a variety of complications resulting from a severe head injury. While at Harvard, she received testing accommodations for her disabilities, including 50 percent extra time on exams, stop-clock breaks, and separate testing facilities. When she signed up for the July 2013 New York bar examination, she requested these same testing accommodations, citing her diagnosed impairments.

---

[1] We recounted this factual background in additional detail in our prior opinion, *T.W. v. New York State Board of Law Examiners* (*T.W. I*), 996 F.3d 87 (2d Cir. 2021).

The Board initially denied her request for any accommodations.  But after she appealed the decision, the Board granted her request in part, providing off-the-clock breaks and seating her in a smaller room, although that room included others receiving similar accommodations.  T.W. did not pass the July 2013 bar exam.  At the time T.W. received her results, she had started as a law clerk at a law firm, and she alleges that failing the bar hurt her standing at the firm and required her to set aside time to study for the exam again.

T.W. signed up for the July 2014 exam and again requested the accommodations that she had received at law school.  This time, the Board granted her 50 percent extra time, seating in a room with others receiving similar accommodations, but no off-the-clock breaks.  She again did not pass, and her law firm fired her.

In February 2015, T.W. passed the bar examination on her third attempt.  This time, the Board granted her double time on the exam,

an accommodation that she had requested to the extent that her initial request for off-the-clock breaks and 50 percent extra time was not granted.  T.W. alleges that the Board's failure to provide her with the accommodations that she initially requested caused her to fail the bar exam twice and resulted in her inability to find employment comparable to the position she had held at her law firm.  T.W. sued the Board, its chair, and members of the Board, alleging violations of the ADA, Section 504 of the Rehabilitation Act, and the NYCHRL, seeking declaratory, compensatory, and injunctive relief.

### B.  Procedural background

In November 2016, the Board moved to dismiss T.W.'s complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), asserting, *inter alia*, that the district court lacked subject matter jurisdiction because Eleventh Amendment immunity barred T.W.'s ADA and Rehabilitation Act claims.  Shortly thereafter, T.W. withdrew her claims under Title III of the ADA and the NYCHRL, as well as her claims against the chair and members of the Board in their

individual capacities. Her only remaining claims were those under Title II of the ADA and Section 504 of the Rehabilitation Act.

Following limited discovery on whether the Board had accepted federal funds during the relevant time period, the district court denied the Board's motion to dismiss. The district court found that although the Board had not directly received federal funds during the relevant time period, the Board had nonetheless waived its immunity as a "'program or activity' of a department or agency that itself accepts federal funds—in this case, New York's Unified Court system." *T.W.*, 2019 WL 4468081, at *4. The district court declined to reach the Board's dismissal argument as to T.W.'s Title II ADA claim, because "the same legal standards and remedies apply to claims under Title II of the ADA and the Rehabilitation Act." *Id.* at *2.

The Board took an interlocutory appeal, and we reversed, holding that the Board was immune from suit under Section 504 of the Rehabilitation Act. *See T.W. I*, 996 F.3d at 93, 102. We agreed with

9

the district court that the Board did not receive any federal funds and likewise rejected T.W.'s argument that merely being an "*intended beneficiary*" of federal funds was sufficient to find immunity waived under Section 504 of the Rehabilitation Act. *Id.* at 93–94. But we disagreed with the district court as to the second of T.W.'s waiver arguments, namely whether the Board was a "program or activity" of a department or agency receiving federal funds. *Id.* at 94–102. The crux of our reasoning was that the district court had described the recipient of federal funds too broadly: it was not New York's Unified Court System that received federal funds during the relevant period, but rather only certain specialty courts within the Courts of Original Jurisdiction. *Id.* Because the Courts of Original Jurisdiction constituted the relevant funds-receiving "unit" for purposes of Section 504's immunity waiver, and because the Board is not a part of the Courts of Original Jurisdiction, we held that the Board had not waived its immunity under Section 504. *Id.* at 97–102. Accordingly,

we reversed the district court's denial of the motion to dismiss the Section 504 claim and remanded the case for consideration of the Board's motion to dismiss as to T.W.'s Title II claim under the ADA. *See id.* at 102.

On remand, the district court held that the Board was immune from suit under Title II of the ADA. In a memorandum and order entered on July 19, 2022, the district court held that the Board was an arm of the state, that Title II of the ADA did not abrogate sovereign immunity in the context of professional licensing exams, that the declaratory relief T.W. seeks is not a valid application of the doctrine first articulated in *Ex parte Young*, 209 U.S. 123 (1908), and that T.W. lacked standing to pursue her requested injunctive relief. *T.W. v. N.Y. State Bd. of L. Exam'rs*, No. 16-cv-3029, 2022 WL 2819092, at *1–9 (E.D.N.Y. July 19, 2022). Accordingly, the district court granted the Board's motion to dismiss T.W.'s Title II claim. T.W. now appeals.

## II.    Discussion

On appeal, T.W. contends that the district court erred in dismissing her Title II claim.  She first argues that the Board is not an arm of the state, and therefore cannot claim sovereign immunity under the Eleventh Amendment.  In the alternative, she argues that her claim for money damages can nonetheless proceed against the Board because Title II of the ADA abrogated sovereign immunity in the context of the Board's operations.  Finally, she contends that her complaint states a valid claim for declaratory and injunctive relief pursuant to the *Ex parte Young* doctrine.

We "review[] the district court's factual findings for clear error and its legal conclusions *de novo*."  *T.W. I*, 996 F.3d at 93 (internal quotation marks omitted).  "The Board, as the party asserting immunity, bears the burden of demonstrating entitlement."  *Id.* (internal quotation marks and alteration omitted).  For the reasons that follow, we affirm in all respects.

12

## A. Arm of the state

T.W. first contends that the district court erred in concluding that the Board is an arm of the state, and therefore is entitled to sovereign immunity.

The Eleventh Amendment to the Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although the text of the amendment speaks only of suits against a state by persons who are not citizens of that state, the Supreme Court has interpreted the Eleventh Amendment to extend to suits by all persons against a state in federal court." *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996) (citing *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890)). Further, the Eleventh Amendment bars suits against states even where the state "is not named a party to the action." *Edelman v. Jordan*,

415 U.S. 651, 663 (1974). "[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945). Accordingly, the Eleventh Amendment applies to a suit for damages brought against an entity that is fairly considered to be an "arm of the state." *See Mancuso*, 86 F.3d at 292; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

We outlined a multi-factor inquiry to assess whether an entity is an "arm of the state" for Eleventh Amendment purposes in *Mancuso v. New York State Thruway Authority*. *See* 86 F.3d at 293. These factors include:

> (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over

14

the entity's actions; and (6) whether the entity's obligations are binding upon the state.

*Id.* Where those factors "point in different directions," a court asks "(a) will allowing the entity to be sued in federal court threaten the integrity of the state? and (b) does it expose the state treasury to risk?" *Id.* In cases that remain close, the most important factor is whether the suit exposes the state treasury to a risk of liability. *See id.*

The district court conducted a thorough analysis of the *Mancuso* factors, concluding that the Board was an arm of the state, and therefore entitled to Eleventh Amendment immunity. *T.W.*, 2022 WL 2819092, at *1–5. We affirm, though on procedural grounds rather than our own assessment of the merits. *See Jusino v. Fed'n of Cath. Tchrs., Inc.*, 54 F.4th 95, 100 (2d Cir. 2022) ("We may affirm on any ground with support in the record." (internal quotation marks omitted)).

We begin by noting that this question—whether the Board is an arm of the state—is hardly an unfamiliar one. In *T.W. I,* our Court

15

wrote, point-blank: "The Board of Law Examiners, as an arm of the State of New York, shares in [Eleventh Amendment] immunity." 996 F.3d at 92 (cleaned up). It therefore appears that we expressly decided this issue in *T.W. I.*

But even if we had not been so explicit, resolution of the sovereign immunity question was necessarily implicit in our holding that dismissal of the Rehabilitation Act claim was required; therefore, the law of the case doctrine settles the issue. "[A] decision made at a previous stage of litigation, which could have been challenged in the ensuing appeal but was not, becomes the law of the case; the parties are deemed to have waived the right to challenge that decision, for it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost." *County of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997) (internal quotation marks omitted); *see also Unites States v. Quintieri*, 306 F.3d 1217, 1229

(2d Cir. 2002) ("[W]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, it is considered waived and the law of the case doctrine bars the district court on remand and an appellate court in a subsequent appeal from reopening such issues unless the mandate can reasonably be understood as permitting it to do so." (internal quotation marks omitted)); *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.*, 671 F.3d 261, 271 (2d Cir. 2012) (arguments not raised in prior appeal "were impliedly decided to have been waived in the first instance" (internal quotation marks omitted)). "[T]he law-of-the-case doctrine applies to everything decided by necessary implication in the first appeal." *County of Suffolk*, 106 F.3d at 1117 (cleaned up).

Applying these principles, we find that the Board's status as an arm of the state has become the law of the case. In *T.W. I*, we held that the Board had not waived its sovereign immunity, and that the district court was therefore obliged to dismiss the Rehabilitation Act

claims for lack of subject matter jurisdiction. By deciding that dismissal was required, we necessarily decided that the Board *had* sovereign immunity—a decision that had to be logically premised on a conclusion that the Board was an arm of the state. The Board's eligibility for sovereign immunity (that is, its status as an arm of the state) was "decided by necessary implication," *see id.*, even without regard to our explicit language on this issue, *see T.W. I*, 996 F.3d at 92 ("The Board of Law Examiners, as an arm of the State of New York, shares in [Eleventh Amendment] immunity."). But T.W. failed to raise in *T.W. I* the arm-of-the-state issue that she now seeks to litigate. *See* Brief of Appellee T.W., *T.W. v. N.Y. State Bd. of L. Exam'rs*, 996 F.3d 87 (2d Cir. 2021) (No. 19-4136), ECF No. 67 (raising no argument that the Eleventh Amendment did not apply to the Board). In fact, T.W.'s argument now essentially seeks vacatur of our prior decision, the holding of which is necessarily premised on the Board's Eleventh

Amendment immunity.  Under these circumstances, we conclude that the law of the case settles this issue.[2]

## B.  Abrogation of sovereign immunity

T.W. next contends that even if the Board is an arm of the state for Eleventh Amendment purposes, Title II of the ADA validly abrogated its sovereign immunity in the context of her claim.

Section 5 of the Fourteenth Amendment grants Congress authority to abrogate state sovereign immunity.  *See, e.g., Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000).  But Section 5 only "grants Congress the authority to abrogate states' immunity as to conduct that actually violates the Fourteenth Amendment, as well as a

---

[2] T.W.'s waiver of this issue is even more apparent than it appears on the face of her appellate briefs.  Not only did she fail to litigate this issue before the district court when the Board first filed its motion to dismiss, *see* E.D.N.Y. Dkt. No. 16-cv-3029, ECF No. 11 (T.W responding to the Board's motion to dismiss in an opening letter brief, which does *not* argue that the Board lacked sovereign immunity), but she essentially conceded the Board's status in her complaint.  She alleges that "[t]he Board *is a public entity and state instrumentality* subject to the non-discrimination requirements of Title II of the Americans with Disabilities Act."  J. App'x 30, ¶ 78 (emphasis added).  It was not until October 15, 2021, after five years of litigation on the very issue of the Board's immunity to suit, that T.W. first challenged the Board's arm-of-the-state status.

19

somewhat broader swath of conduct that is constitutional but which

Congress may prohibit in order to remedy or deter actual violations."

*Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir. 2010) (internal quotation

marks omitted).  When an exercise of Section 5 enforcement power is

directed in a "prophylactic" way, *id.*, there must be "congruence and

proportionality between the [violation] to be prevented or remedied

and the means adopted to that end," *City of Boerne v. Flores*, 521 U.S.

507, 520 (1997).

"Congress has unambiguously purported to abrogate states'

immunity from Title II claims."  *Bolmer*, 594 F.3d at 146; *see also* 42

U.S.C. § 12202 ("A State shall not be immune under the eleventh

amendment . . . for a violation of this chapter.").  Title II, however,

sweeps more broadly than the Fourteenth Amendment.  *See Garcia v.*

*S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 109–12 (2d Cir. 2001)

(comparing Title II's breadth to the Fourteenth Amendment, the latter

of which, "[w]here disability discrimination is at issue," "only

20

proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose"). Thus, to determine whether a Title II abrogation is valid, courts proceed on "on a claim-by-claim basis," considering "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *United States v. Georgia*, 546 U.S. 151, 158–59 (2006). We proceed accordingly.

### 1. Step one: Title II violation

The first step of the *Georgia* framework requires us to identify "which aspects of the State's alleged conduct violated Title II." *Id.* In this case, the inquiry need not detain us. The district court found that T.W. "plausibly alleged that the Board violated Title II by failing to

reasonably accommodate her disability." *T.W.*, 2022 WL 2819092, at *6. The Board does not contest this reading of T.W.'s complaint on appeal, waiving any argument to the contrary. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Accordingly, for the purposes of our sovereign immunity assessment, we conclude that T.W. has sufficiently alleged that the Board's conduct violated Title II of the ADA.

## 2. Step two: Fourteenth Amendment violation

The second step of the *Georgia* framework requires us to identify "to what extent such misconduct also violated the Fourteenth Amendment." 546 U.S. at 158–59. Again, this inquiry is an easy one here: T.W. has likewise declined to contest the district court's finding that the Board's alleged failure to provide sufficient accommodations

22

did not violate the Fourteenth Amendment, thereby conceding that issue.

In sum, the parties have agreed that T.W.'s complaint alleges a Title II violation, but not a Fourteenth Amendment violation.

### 3. Step three: Abrogation analysis

Our analysis thus turns on the third prong of the *Georgia* framework—whether Congress's purported abrogation of sovereign immunity is valid as to T.W.'s claim.  In conducting this inquiry, we must: (a) identify the scope of the constitutional right at issue; (b) examine whether, in enacting Title II, Congress identified a history and pattern of unconstitutional discrimination by states in the relevant context; and (c) determine whether the right and remedies created by the statute are congruent and proportional both to the constitutional rights it purports to enforce and to the record of violations adduced by Congress.  *City of Boerne*, 521 U.S. at 529–36; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365–74 (2001)

(applying the *City of Boerne* factors to conclude that abrogation of Eleventh Amendment sovereign immunity was invalid as to Title I of the ADA).

We note at the outset some disagreement among our sister Circuits as to the application of this framework to Title II claims. In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court held that Title II of the ADA validly abrogated sovereign immunity in the context of a claim against the state of Tennessee for failure to make its courts accessible to disabled individuals. *Id.* at 514, 533–34. Circuits disagree, however, on how broadly *Lane* should be read. On the one hand, the Fourth, Fifth, Eighth, and Eleventh Circuits have read *Lane* to conclusively resolve the first two prongs of the *City of Boerne* inquiry as to Title II on the whole. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005); *McCarthy ex rel. Travis. v. Hawkins*, 381 F.3d 407, 423 (5th Cir. 2004) (Garza, *J.*, concurring in part and dissenting in part); *Klingler v. Dir., Dep't of*

*Revenue, State of Mo.*, 455 F.3d 888, 896 (8th Cir. 2006); *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957-58 (11th Cir. 2005). Were we to follow this approach, we would essentially skip to the third step of the *City of Boerne* test—congruence and proportionality. On the other hand, the First and Tenth Circuits have both held that *Lane* resolved these issues as to the "particular right and class of state action at issue." *Guttman v. Khalsa*, 669 F.3d 1101, 1117 (10th Cir. 2012); *see Toledo v. Sanchez*, 454 F.3d 24, 35 (1st Cir. 2006). Under this approach, *Lane* did not resolve the first two steps of the *City of Boerne* inquiry as to all Title II claims, but spoke only to Title II claims regarding "accessibility of judicial services." *Toledo*, 454 F.3d at 36 (quoting *Lane*, 514 U.S. at 531).

We agree with the First and Tenth Circuits that *Lane* did not resolve the first two prongs of the *City of Boerne* framework for all of Title II's myriad applications. "Title II—unlike . . . the other statutes we have reviewed for validity under § 5 [of the Fourteenth

25

Amendment]—reaches a wide array of official conduct in an effort to enforce an equally wide array of constitutional guarantees." *Lane*, 541 U.S. at 530. Accordingly, "nothing in [Supreme Court] case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole." *Id.* Thus, as both the First and Tenth Circuits observed, the Supreme Court undertook its analysis of each of the *City of Boerne* prongs with respect to the specific fundamental right and state services at issue in *Lane*. *Id.* at 522–23, 527, 530–34; *see Guttman*, 669 F.3d at 1117–18 (observing same); *Toledo*, 545 F.3d at 35.[3] Furthermore, reading *Lane* broadly would imply that abrogation analyses should be conducted, at least to some extent, on a statute-by-statute basis, an approach that runs afoul of the Supreme Court's

---

[3] To be sure, passages in *Lane*, if read in isolation, could support a more expansive reading. *See, e.g., Lane*, 541 U.S. at 513 ("The question presented in this case is whether Title II exceeds Congress' power under § 5 of the Fourteenth Amendment."); *id.* at 524 (noting, with regards to the second *City of Boerne* prong, that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights"). But notwithstanding excerpts suggesting otherwise, *Lane* conducted its inquiry in the specific context of the right at issue in that case. *See, e.g., id.* at 522–23, 527, 530–34.

prescription that this analysis occur on a "claim-by-claim basis." *Georgia*, 546 U.S. at 159.  We therefore "find that *Lane* does not conclusively settle the first two prongs of the *City of Boerne* test for all classes of services."  *Guttman*, 669 F.3d at 1118.  Accordingly, we proceed through the three-part *City of Boerne* analysis *seriatim*.

### a.  Scope of the constitutional right

The first prong of the *City of Boerne* analysis requires us to determine the scope of the constitutional right at issue.  T.W. contends that the constitutional right here is the right to education (and educational testing) and, as a "plus factor," the right of access to courts.  The Board contends that the right at issue is that of occupational choice.

We agree with the Board that the right involved in T.W.'s case is a disabled person's right of occupational choice, and more specifically that of licensure to practice in a highly regulated profession.  Both the Supreme Court and this Court have referred to

the bar exam as a professional licensure test. *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 68 (1988) (referencing the bar exam as being a hurdle to "professional licensure"); *United States v. Novak*, 903 F.2d 883, 888 (2d Cir. 1990) (describing passing the bar as "meet[ing] the threshold criteria of competence in the law"). Common sense supports this conclusion: the bar exam is a test that individuals typically become eligible to take following *completion* of their legal education; it is not a "part" of one's legal education in any practical sense. *See* Bar Exam Eligibility, N.Y. State Bd. of L. Exam'rs, https://www.nybarexam.org/Eligible/Eligibility.htm [https://perma.cc/6P6V-4WCY].

Additionally, concerns created by T.W.'s claims are very different from those that arise in the education context. Caselaw addressing the right of access to education has emphasized the *sui generis* nature of education, including its unique importance in civil society. "Public education is not a 'right' granted to individuals by

28

the Constitution. But neither is it merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation. . . . [E]ducation has a fundamental role in maintaining the fabric of our society." *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (internal citations omitted); *see also Toledo*, 454 F.3d at 36–37 ("The Supreme Court has recognized the vital importance of all levels of public education in preparing students for work and citizenship as well as the unique harm that occurs when some students are denied that opportunity." (citing, *inter alia*, *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954))); *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555–56 (3d Cir. 2007); *Ass'n for Disabled Ams.*, 405 F.3d at 959 ("Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public programs and services."). None of this reasoning applies to taking the bar exam, which is surely not a prerequisite to participation in civil society. On

29

this score, we note that T.W.'s alleged damages all concern her professional well-being, and she does not allege any inability to participate in society more broadly because of her difficulties passing the bar exam on her first two attempts. *See* J. App'x 27–28 (describing T.W.'s termination from her prior law firm and her difficulty finding comparable employment).

T.W.'s assertion that there is an access-to-courts angle to her claim (which she says is a "plus factor") fares no better. *Lane* addressed the "right of access to the courts," a fundamental civil right enshrined and expanded by other constitutional amendments. 541 U.S. at 523. These include the Confrontation Clause of the Sixth Amendment, the Due Process Clause, which "requires the States to afford certain civil litigants a meaningful opportunity to be heard by removing obstacles to their full participation in judicial proceedings," the Sixth Amendment right to trial "by a jury composed of a fair cross section of the community," and the First Amendment "right of access

30

to criminal proceedings." *Id.* (internal quotation marks omitted). But the right of access to courts in *Lane* did not involve the right of individuals to earn a living in courts *as a licensed lawyer* (and for that matter, bar admission is required for *all* practicing lawyers, even those whose work involves only transactional or advisory work, and who never appear in court). The Supreme Court's failure to mention that species of supposed "access" in *Lane* comes as no surprise, because nothing in the Constitution guarantees an individual a right to work as a lawyer, nor does T.W. identify any authority otherwise. Accordingly, we conclude that T.W.'s complaint invokes only the right of occupational choice, and more specifically that of professional licensing.

We next consider the scope of that right. "[T]he liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment," but this right is "subject to reasonable

31

government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999);

*see also Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019) ("[T]he

right of occupational choice is afforded Due Process protection only

when a plaintiff is completely prohibited from engaging in his or her

chosen profession." (cleaned up)).  Although T.W. does not press an

Equal Protection Clause claim on appeal, even if she did, the Board's

conduct "cannot run afoul of the Equal Protection Clause if there is a

rational relationship between the disparity of treatment and some

legitimate governmental purpose."  *Garrett*, 531 U.S. at 366–67

(internal quotation marks omitted).  In sum, the right at issue here—

a disabled person's right to practice her chosen profession—is not

afforded heightened scrutiny.

### b. History and pattern of unconstitutional discrimination

Under the second prong of the *City of Boerne* framework, we

consider to what extent Title II was "responsive to, or designed to

prevent, unconstitutional behavior," 521 U.S. at 532, "[w]ith respect to the particular services at issue in this case," *Lane*, 541 U.S. at 527.

We find, as did the Tenth Circuit, that Congress has not identified "a longstanding pattern of disability discrimination in [the context of] professional licensing." *Guttman*, 669 F.3d at 1119. Our review of the legislative history uncovered no legislative findings documenting a pattern of unconstitutional discrimination in the administration of professional licensure examinations by states, in the granting of professional licenses, or regarding occupational choice more generally. *See* 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485, pts. 1–4 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 267; H.R. Rep. No. 101–558 (1990) (Conf. Rep.); H.R. Rep. No. 101–596 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 565.[4]

---

[4] As an appendix to his dissent in *Garrett*, Justice Breyer listed "Submissions made by individuals to the Task Force on Rights and Empowerment of Americans with Disabilities." *See Garrett*, 531 U.S. at 391, App. C (Breyer, *J.*, dissenting). That Appendix included five line-items that may indicate instances of disability discrimination in the professional licensing context. *See id.* (California 00261 (teachers), Texas 01503 (same), Texas 01549 (same); Texas 01542

T.W. identifies one isolated example from the congressional record that may support her position.  Namely, in a written statement before Congress, a disabled private attorney indicated that she had heard "scores of horror stories on an annual basis arising from the experiences of persons with disabilities who attempt to take bar examinations."  J. App'x 64 n.3 (quoting *Americans with Disabilities Act of 1989: Hearing on H.R. 2273 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 101st Cong. 162 (1989) (statement of Laura D. Cooper, Attorney, Pettit & Martin)).  This isolated testimony, however, does not appear to have been adopted by Congress as any sort of finding.  *See, e.g.*, 42 U.S.C. § 12101; S. Rep. No. 101–116 (1989); H.R. Rep. No. 101–485, pts. 1–4 (1990), *as reprinted in* 1990

---

(cosmetologists); Texas 01543 (chiropractors)).  However, there is insufficient context to suggest that any of these examples constituted unconstitutional discrimination, particularly because government regulations affecting disabled individuals do not receive elevated scrutiny and survive constitutional review if they are rationally related to a legitimate government purpose.  *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 435 (1985); *see also Garrett*, 531 U.S. at 370 ("Whether [the isolated examples of state employment discrimination against the disabled] were irrational under our decision in *Cleburne* is more debatable, particularly when the incident is described out of context.").

U.S.C.C.A.N. 267; H.R. Rep. No. 101–558 (1990) (Conf. Rep.); H.R. Rep. No. 101–596 (1990) (Conf. Rep.), *as reprinted in* 1990 U.S.C.C.A.N. 565. Nor does this testimony necessarily flag unconstitutional conduct; it merely alleges without any context or description that the witness heard "scores of horror stories" regarding the bar examination. But because laws infringing on occupational choice are subject only to rational basis review, and because laws distinguishing individuals on the basis of disability are reviewed likewise, we are left with no basis to conclude that these unspecified "horror stories" describe events that were unconstitutional as opposed to simply unfortunate. *See Garrett*, 531 U.S. at 370 ("Whether [the isolated examples of state employment discrimination against the disabled] were irrational under our decision in *Cleburne* is more debatable, particularly when . . . described out of context.").

T.W. also points to a House committee report that discusses private testing discrimination under Title III of the ADA. That report

contains language implying that Title II requires states' "licensing[,] certification[,] and other testing authorities" to be accessible to those with disabilities, "which includes physical access as well as accommodations in the way the test is administered." H.R. Rep. No. 101-485, pt. 3, at 68. But this example is of little help to T.W.'s position, because it is not a finding of unconstitutional discrimination. Rather, this statement merely explains the purpose of a section in Title III with reference to Title II. It is not evidence that Title II was "responsive to, or designed to prevent, unconstitutional behavior" in the context of professional licensing. *City of Boerne*, 521 U.S. at 532. Accordingly, it provides no support to Congress's exercise of Section 5 power in this context.[5]

---

[5] T.W. points to additional legislative history of discrimination from the education and educational testing realms. However, even if that evidence were sufficient to establish a history of unconstitutional state conduct in education or educational testing, it is not relevant to our inquiry here, which is into whether Title II was passed in response to a history of unconstitutional conduct in *professional licensing*.

But even if we assumed that the testimony of this single attorney constituted a congressional finding (which it was not) and that her testimony described unconstitutional conduct (which it does not), the record of unconstitutional discrimination in this context would still be insufficient to justify abrogation of state sovereign immunity.  "In *Lane*, the Court found that Congress 'enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs,' and that it specifically considered evidence of discrimination in areas such as education, access to the courts, transportation, communications, health care, and other public services.  The Court noted the 'sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services,' and concluded that it is 'clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation.'"

*Guttman*, 669 F.3d at 1118 (internal citation omitted) (quoting *Lane*, 541 U.S. at 528, 529). In contrast, the Supreme Court in *Garrett* found that six examples from the congressional record of state employment discrimination against disabled individuals "f[ell] far short of even suggesting the pattern of unconstitutional behavior on which § 5 legislation must be based." 531 U.S. at 370.

The congressional record of unconstitutional conduct in the professional licensing context is even sparser than the record was in *Garrett*, 531 U.S. at 370, and looks nothing like the record at issue in *Lane*, 541 U.S. at 528. T.W. points to *no* congressional findings of unconstitutional state behavior in the sphere of occupational choice and professional licensing. And even reading the record in her favor—and including both the testimony of attorney Cooper and those examples from Justice Breyer's dissent in *Garrett*, 531 U.S. at 391; *see supra* note 3—she would have at most six examples, all lacking

sufficient context for us to determine whether the conduct at issue was even unconstitutional.

Although determining what quantity of legislative history of unconstitutional discrimination is necessary to validate a particular exercise of Section 5 power may be a fraught exercise in some contexts, we have no such trouble here. The congressional record of unconstitutional state conduct in the occupational choice and professional licensing context is perilously slim.

### c. Congruence and proportionality

Finally, we consider whether the rights and remedies created by Title II are congruent and proportional to the specific violations at issue given the nature of the constitutional right and the history of unconstitutional violations. Considering the low level of scrutiny applied to the relevant right and the scant, nearly non-existent record of constitutional violations, we find that abrogation of state sovereign immunity would not be congruent and proportional in this case.

We begin with a brief survey of Supreme Court jurisprudence on this issue. The Supreme Court has found "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end" lacking where the injury to be prevented or remedied significantly exceeds the rights granted under the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 520. For example, in *City of Boerne*, the Court held that the Religious Freedom Restoration Act was not a congruent and proportional exercise of Section 5 power because the law protected free exercise of religion *beyond* the protections granted by the Free Exercise Clause of the Constitution as interpreted by the Supreme Court. *Id.* at 535–36. Congress, the Court wrote, "does not enforce a constitutional right by changing what the right is." *Id.* at 519; *see also United States v. Morrison*, 529 U.S. 598, 626 (2000) ("Section 13981 [of the Violence Against Women Act] is not aimed at proscribing discrimination by officials which the Fourteenth Amendment might not itself proscribe" and "is,

therefore, unlike any of the § 5 remedies that we have previously upheld.").  In other words, the Court has found congruence and proportionality lacking where a statute's protections so significantly exceed the bounds of the Fourteenth Amendment right at issue that they effectively expand that right as it is defined in the Constitution.

Even where a law conceivably prevents or remedies an actual violation of the Fourteenth Amendment, the Supreme Court has found congressional action to exceed the scope of Section 5 power where Congress did not exercise that power on a sufficient record of constitutional violations.  For example, in *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, the Court held that the Patent and Plant Variety Protection Remedy Clarification Act did not validly abrogate state sovereign immunity because there was "scant support for Congress' conclusion that States were depriving patent owners of property without due process of law by pleading sovereign immunity in federal-court patent actions," and "Congress did

nothing to limit the coverage of the Act to cases involving arguable constitutional violations."  527 U.S. 627, 646 (1999).  Similar reasoning guided the Court in *Kimel v. Florida Board of Regents*, which held that the Age Discrimination in Employment Act, as applied to states, exceeded Congress' authority under Section 5 because Congress failed to identify "any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation."   528 U.S. at 89; *see also Garrett*, 531 U.S. at 369–70 (abrogation of state sovereign immunity under Title I of the ADA exceeded congressional authority under Section 5 because only "half a dozen examples" of state employment discrimination on the basis of disability fell "far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based."); *Coleman v. Ct. of Appeals of Md.*, 566 U.S. 30, 35, 39 (2012) (self-care provision of Family and Medical Leave Act of 1993 was not congruent and proportional because it "was not directed at an

identified pattern of gender-based discrimination and was not congruent and proportional to any pattern of sex-based discrimination on the part of States"); *Allen v. Cooper*, 589 U.S. 248, 260–66 (2020) (abrogation of state sovereign immunity under the Copyright Remedy Clarification Act of 1990 was invalid because the Fourteenth Amendment intersects with copyright infringement only to the extent that a state infringed recklessly or intentionally, and, as in *Florida Prepaid*, 527 U.S. at 640, the congressional record contained almost no evidence of unconstitutional copyright infringement by states). In sum, the Supreme Court has found congressional exercises of Section 5 power to lack congruence and proportionality where the right being protected exceeds the protections of the Fourteenth Amendment without a sufficient congressional record of unconstitutional violations that the challenged law would remedy or deter.

On the other side of the ledger, the Supreme Court has upheld exercises of Section 5 power where the remedy is closely tailored to the Fourteenth Amendment right in need of protection, and where the congressional record contains ample evidence that the right requires prophylactic protection. In *Nevada Department of Human Resources v. Hibbs*, the Court upheld the abrogation of sovereign immunity within the Family and Medical Leave Act for violations of the family-care provision of that act. 538 U.S. 721, 725 (2003). The Court reached this holding by observing that "statutory classifications that distinguish between males and females are subject to heightened scrutiny," *id.* at 728 (citation omitted), and that the FMLA's "legislative record reflects . . . [that] stereotype-based beliefs about the allocation of family duties remained firmly rooted, and employers' reliance on them in establishing discriminatory leave policies remained widespread," *id.* at 730 (citations omitted). Similar reasoning appears in *Lane*. In that case, the right at issue was access

to the courts, a right that calls "for a standard of judicial review at least as searching . . . [as] the standard that applies to sex-based classifications." *Lane*, 541 U.S. at 529. Further, "the record of constitutional violations in [*Lane*]—including judicial findings of unconstitutional state action, and statistical, legislative, and anecdotal evidence of the widespread exclusion of persons with disabilities from the enjoyment of public services—far exceeds the record in *Hibbs*." *Id.* In both *Lane* and *Hibbs*, then, the Supreme Court found exercises of Section 5 power to be valid—including abrogations of sovereign immunity—where the right (or class) being protected was subject to heightened judicial scrutiny, and where the record of unconstitutional state action was extensive.

Applying these principles to the present case, we conclude that Title II's abrogation of state sovereign immunity is not congruent and proportional as applied to professional licensing of disabled individuals. "Strong measures appropriate to address one harm may

be an unwarranted response to another, lesser one," *Lane*, 541 U.S. at 524 (internal quotation marks and alteration omitted), and so in enacting "prophylactic remedial legislation, the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent," *id*. at 523. In fact, several courts and commentators have questioned whether, following *Lane*, a Title II claim for money damages can be maintained against a state absent a fundamental right (subject to heightened scrutiny) being at issue. *See Guttman*, 669 F.3d at 1122–23 (discussing courts and academics addressing this question) (citing *Buchanan v. Maine*, 377 F. Supp. 2d 276, 283 (D. Me. 2005); *Phiffer v. Columbia River Corr. Inst*., 384 F.3d 791, 793 (9th Cir. 2004) (O'Scannlain, *J.*, concurring); *Press v. State Univ. of N.Y. at Stony Brook*, 388 F. Supp. 2d 127, 135 (E.D.N.Y. 2005); *Roe v. Johnson*, 334 F. Supp. 2d 415, 421 n.9 (S.D.N.Y. 2004); *Johnson v. S. Conn. State Univ.*, 2004 WL 2377225, at *4 (D. Conn. Sept. 30, 2004); Erwin Chemerinsky, Federal Jurisdiction 477 (5th ed. 2007)).

Here, the right at issue is that of occupational choice, applied to the area of professional licensing. Professional licensing rules are subject only to rational basis review. *Gabbert*, 526 U.S. at 291–92 (observing that there is no right to practice one's profession free of restraints, and that there is no Due Process Clause violation absent a "complete prohibition of the right to engage in a calling"). This case is therefore distinguishable from *Lane*, which addressed the "class of cases implicating the fundamental right of access to the courts," 541 U.S. at 533–34, a right that warrants highly "searching" judicial review, *id.* at 529.[6]

---

[6] T.W. again contends that the right at issue here is that of education and educational testing. For the reasons stated above, *see supra* Section II.B.3.a, we are unpersuaded. We do note, however, that access to education does appear to be a unique class of cases where courts have found exercises of prophylactic Section 5 power to be valid, notwithstanding that education has not been identified as a fundamental right. *See Toledo*, 454 F.3d at 39–40; *Bowers*, 475 F.3d at 555–56; *Constantine*, 411 F.3d at 490; *Ass'n for Disabled Ams.*, 405 F.3d at 959. These cases have relied on the distinct importance of education in society and the unique and extensive history of discriminatory conduct in schools. *See, e.g., Toledo*, 454 F.3d at 36–39.

47

Further, the congressional record of unconstitutional conduct by states in professional licensing is slim to non-existent.  T.W., as noted above, points to a single individual's testimony before Congress, which identified "scores of horror stories" regarding disabled individuals taking the bar exam.  J. App'x 64 n.3 (quoting *Americans with Disabilities Act of 1989: Hearing on H.R. 2273 Before the Subcomm. on Civ. & Const. Rts. of the H. Comm. on the Judiciary*, 101st Cong. 162 (1989) (statement of Laura D. Cooper, Attorney, Pettit & Martin)).  In addition, we take notice of the isolated examples of licensing discrimination flagged in Justice Breyer's *Garrett* dissent.  *See* 531 U.S. at 391, App. C (Breyer, *J.*, dissenting).  But this record is insufficient for two reasons.  First, these isolated examples do not establish a record of *unconstitutional* state behavior.  These examples lack sufficient context to understand whether each describes actual unconstitutional state conduct, or whether each references events that, while perhaps unjust, were constitutional.  The latter outcome is

particularly likely where, as here, restrictions related to professional

licensing are subject only to rational basis review, as are classifications

on the basis of disability.  *See Gabbert*, 526 U.S. at 292 (the right to

choose one's field of private employment is a right "subject to

reasonable government regulation"); *Cleburne*, 473 U.S. at 446

(regulations affecting the disabled violate the Constitution only if not

"rationally related to a legitimate governmental purpose"); *see also*

*Lane*, 541 U.S. at 529 (in *Hibbs*, "it was easier for Congress to show a

pattern of state constitutional violations than in *Garrett* or *Kimel*, both

of which concerned legislation that targeted classifications subject to

rational-basis review." (internal quotation marks omitted)).

Second, even if these examples demonstrated unconstitutional

conduct, the record would still be too sparse to support the

abrogation.  In *Garrett*, the Court held abrogation was invalid as to

Title I of the ADA because "[e]ven if it were to be determined that the

half a dozen relevant examples from the record showed

49

unconstitutional action on the part of States, these incidents taken together fall far short of even suggesting the pattern of unconstitutional discrimination on which § 5 legislation must be based." *Garrett*, 531 U.S. at 357. All the more so here, where the legislative record does not contain even six examples of unconstitutional conduct in the professional licensing context.

Finally, "the Title II remedy, as applied to professional licensing, 'far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses [to discrimination] that would be reasonable[.]'" *Guttman*, 669 F.3d at 1124 (quoting *Garrett*, 531 U.S. at 372); *see also id.* ("The abrogation of sovereign immunity here would require states to justify a significant range of rational, everyday licensing decisions that would otherwise be constitutional."); *Garcia*, 280 F.3d at 109–10 ("[W]hereas under the Fourteenth Amendment the absence of an accommodation would be presumptively permissible with the burden of challenging it squarely

on the plaintiff, Title II shifts the burden of proof onto the state to defend the absence. Indeed, this burden shift is consistent with the elevated scrutiny generally applied to suspect classifications such as race and nationality, suggesting that Title II is working a substantive elevation in the status of the disabled in equal protection jurisprudence.").

In sum, Title II of the ADA does not validly abrogate sovereign immunity in the context of professional licensing. This case exhibits three factors that the Supreme Court has found fatal to exercises of Section 5 power: the right at issue gets no heightened scrutiny, the congressional record of unconstitutional conduct is slim, and the statute cuts far wider than the Fourteenth Amendment. We therefore conclude that sovereign immunity bars T.W.'s claim for damages under Title II.

C. **Relief under** *Ex Parte Young*

Apart from her claim for damages, T.W. contends that she can pursue declaratory and injunctive relief under Title II against Board officials in their official capacities pursuant to the doctrine first articulated in *Ex parte Young*, 209 U.S. 123 (1908).

"Absent proper Congressional abrogation or State waiver, the Eleventh Amendment bars a federal court from hearing suits at law or in equity against a State brought by citizens of that State or another." *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020). However, "[t]here is a well-known exception to this rule—established by the Supreme Court in *Ex parte Young* and its progeny—by which suits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law. In determining whether a litigant's claim falls under the *Ex parte Young* exception, we ask two questions: whether the complaint (1) alleges an

ongoing violation of federal law; and (2) seeks relief properly characterized as prospective." *Id.* (footnotes omitted).

For the reasons that follow, we conclude that that T.W.'s claims for declaratory and injunctive relief cannot go forward. The declaratory relief sought by T.W. is retrospective, rather than prospective, in nature, and the injunctive relief she seeks is not sufficiently tied to an allegation of ongoing violations of federal law.

## 1. Declaratory relief

T.W. seeks "declaratory relief, finding that Defendants' actions violated Title II . . . of the Americans with Disabilities Act[.]" J. App'x 34. The district court found this relief "plainly foreclosed by the *Ex parte Young* doctrine [because a] declaration that a violation of federal law occurred in the past is entirely retroactive. It does not mandate compliance with federal law *in the future* as required by *Ex parte Young*." *T.W.*, 2022 WL 2819092, at *8.

"[T]he Supreme Court has declined to extend the reasoning of *Ex [p]arte Young* to claims for retrospective relief." *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000). "The line between prospective and retrospective relief is drawn because remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law, whereas compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Id*. (cleaned up).

We agree with the district court's conclusion that the declaratory relief sought is wholly retrospective, and therefore barred. T.W. seeks only a declaration—in the past tense—that the Board "*violated*" Title II." J. App'x 34 (emphasis added). This relief is facially retrospective, as she seeks only a declaration regarding the Board's previous actions, not its future conduct.

This case is distinguishable from those in which declaratory relief for past violations have been allowed. For example, in *Verizon*

*Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 640 (2002), the plaintiff sought a declaration that a state regulation violated the 1996 Telecommunications Act, and an injunction against future enforcement of that state order.  The Court held that the declaratory relief sought did not run afoul of *Ex parte Young* because even though the declaration was "of the past, as well as the future," "[i]nsofar as the exposure of the State is concerned, the prayer for declaratory relief adds nothing to the prayer for injunction."  535 U.S. at 646 (emphasis omitted); *see also id.* ("[T]he past financial liability of private parties may be affected.  But no past liability of the State, or of any of its commissioners, is at issue.").  In contrast, the declaratory relief sought by T.W. does not overlap with her injunctive relief, because the injunctive relief she seeks relates to the Board's continued maintenance of records of her failures on the bar exam.  *See* J. App'x 34 ("[E]njoin Defendants from maintaining and reporting records of Plaintiff's examination results received under discriminatory

55

conditions and require Defendants to take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment[.]").

Furthermore, the Supreme Court has relied, at least in part, on considerations of whether declaratory relief will lead to monetary exposure for a state in determining whether relief is prospective or retrospective. In *Green v. Mansour*, the Supreme Court found declaratory relief retrospective in part on concerns that, if issued against the government, the declaratory judgment would have a *res judicata* effect as to liability for damages in a future state court action, thus serving as an end run around the Eleventh Amendment. 474 U.S. 64, 73 (1985) ("We think that the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to

the state courts only a form of accounting proceeding whereby damages or restitution would be computed."); *see also Ward*, 207 F.3d at 119 ("At the risk of being obvious, a party armed with such relief from the federal court and the doctrine of *res judicata* would have little left to do but appear in state court, and employ the state court as a form of accounting proceeding for a retrospective (federal) award of damages against the state." (internal quotation marks omitted)). On the other side of that issue, the Supreme Court permitted the declaratory relief in *Verizon Maryland* in part because "no past liability of the State, or of any of its commissioners, is at issue. It does not impose upon the State 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.'" 535 U.S. at 646 (emphasis omitted) (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).

T.W.'s requested declaratory relief looks more like that in *Green* and *Ward* than that in *Verizon Maryland*. Although we decline to

speculate as to when or how T.W. or another litigant could use the declaratory judgment here, we nonetheless note that a potential use, and in fact, perhaps the only potential use, would be to seek damages against the Board in state court. But "declaratory judgment is not available when the result would be a partial 'end run' around the Eleventh Amendment's bar on retrospective awards of monetary relief." *Ward*, 207 F.3d at 120 (cleaned up).

In sum, the declaratory relief T.W. seeks is retrospective in nature, and is therefore barred by the Eleventh Amendment.

## 2. Injunctive relief

Finally, T.W. seeks an order to "enjoin Defendants from maintaining and reporting records of Plaintiff's examination results received under discriminatory conditions and [to] require Defendants to take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hammer Plaintiff's search for employment." J. App'x 34. The district court held that T.W.

lacked standing to pursue this relief, because it would not redress any of her alleged injuries.  Specifically, it held that expungement of her failures would not redress her claimed injuries—including, for example, "that she did not have the opportunity to gain the experience they seek from a 2013 graduate due to the disruptions caused by her bar examination failure," J. App'x 28, ¶ 62—because "expungement will neither alter T.W.'s level of experience nor undo the fact that she did not successfully pass the bar until 2015," *T.W.*, 2022 WL 2819092, at *8.  "Moreover," the district court wrote, "the injunctive relief T.W. requests would suppress a record that, according to the Board, it is prohibited from disclosing to employers under Section 90(10) of the Judiciary Law." *Id.*  We agree with the district court's dismissal of T.W.'s claim for injunctive relief, but reach that conclusion on different grounds. *See Jusino*, 54 F.4th at 100 ("We may affirm on any ground with support in the record, including

grounds upon which the district court did not rely." (internal citations and quotation marks omitted)).

"*Ex parte Young* gives life to the Supremacy Clause[] [because] remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law." *Green*, 474 U.S. at 68. Accordingly, *Ex parte Young* permits suits against state officials that "seek[] only prospective injunctive relief *in order to* 'end a continuing violation of federal law.'" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996) (emphasis added) (quoting *Green*, 474 U.S. at 68); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 287 (2d Cir. 2003) ("The Eleventh Amendment, however, does not preclude suits against state officers in their official capacity for prospective injunctive relief *to prevent* a continuing violation of federal law." (emphasis added) (citing *Ex parte Young*, 209 U.S. at 155–56)). In other words, the doctrine of *Ex parte Young* permits federal

courts to grant injunctions against state officials, but it only permits injunctions to prevent future violations of federal law.

Turning to T.W.'s complaint, we conclude that the injunctive relief she seeks is unavailable under *Ex parte Young* because it would not prevent an alleged continuing violation of federal law. To be sure, T.W.'s complaint alleges ongoing violations of federal law by the Board and, by extension, by the individual defendants named in their official capacities. For example, she alleges that the Board's "acts, policies, and practices discriminate against individuals with disabilities, including those who have mental and/or cognitive disabilities and require additional time, stop-clock breaks, and/or separate, quiet testing areas." J. App'x 31, ¶ 86. And she further alleges that the Board has "failed to make reasonable modifications to its policies and practices to ensure that Plaintiff and others with disabilities do not face [] discrimination because of their disabilities."

61

*Id.* 31, ¶ 89.  In the context of her Title II claim, these allegations amount to allegations that the Board continues to violate federal law.

But what is missing from T.W.'s complaint—and why her claim for injunctive relief cannot go forward—is the necessary nexus between the injunctive relief she seeks and the continuing violations she alleges.  T.W.'s requested injunctive relief does not seek to prevent the Board's alleged "fail first policies and practices" that she alleges "discriminate against individuals with disabilities." *Id.* 31, ¶¶ 86, 88. Rather, she seeks an injunction against the Board "maintaining and reporting records of Plaintiff's examination results" and a requirement that the Board "take affirmative steps to alleviate the ongoing repercussions of the discriminatory test administration that continue to hamper Plaintiff's search for employment." *Id.* 34.  This relief does not align with the alleged continuing violations of federal law, because even if a court granted T.W. the full suite of injunctive relief she seeks, the alleged federal law violations could continue.

T.W.'s complaint, we note, does not allege that the Board's maintenance of records of her failures violates federal law. "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). Therefore, if T.W. had alleged that the Board's maintenance of records violated Title II, her claim may well have survived. But T.W. makes no allegation that the Board's maintenance of records constitutes an ongoing violation of her rights. The injunction she seeks is accordingly unavailable.

T.W. contends that expungement is available under *Ex parte Young* for either of two reasons. First, she argues that she "allege[s] ongoing harm as a result of [the Board's] maintenance of bar examination records and refusal to expunge." Reply Br. 25. This argument, however, is unresponsive to the issue here. Even if she alleges ongoing *harm*, injunctive relief under *Ex parte Young* must seek

to stop ongoing "*violation[s]* of federal law."  *Green*, 474 U.S. at 68 (emphasis added).

Second, T.W. points to the Ninth Circuit's decision in *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007), which she contends "noted that *Ex parte Young* was available to expunge negative information in a college student's file that might jeopardize that student's future employment."  Reply Br. 26.  That case, to be sure, did hold that expungement of negative information from university records may be available under *Ex parte Young*, because "they serve the purpose of preventing present and future harm to [the plaintiff]."  *Flint*, 488 F.3d at 825.  We find this case distinguishable from the issue here.  The quoted language from *Flint* came in the course of the court's determination that the injunctive relief sought by the plaintiff, including expungement of records, "cannot be characterized solely as retroactive."  *Id.*  And we do not disagree with that conclusion as it applies here—T.W.'s requested expungement relief may well be

prospective in nature. But even if the *relief* is prospective, T.W.'s injunctive relief is unavailable under *Ex parte Young* because it is aimed exclusively at a *past violation*; it does not seek to remedy an alleged *ongoing violation* of federal law. We do not read *Flint*, 488 F.3d at 825, as having addressed this question and, in any event, we would not be bound by its holding even if it had.

### III.   Conclusion

In sum, we hold as follows:

1.  The New York State Board of Law Examiners is an arm of the state of New York for Eleventh Amendment purposes in this case because the law of the case doctrine settles that issue for this litigation.

2.  Title II of the Americans with Disabilities Act does not validly abrogate sovereign immunity as applied to T.W.'s claim, and in the context of occupational choice and professional licensing more broadly.

3. The declaratory relief sought by T.W. is unavailable under the doctrine of *Ex parte Young* because it is purely retrospective, rather than prospective, in nature.

4. The injunctive relief sought by T.W. is unavailable under the doctrine of *Ex parte Young* because it does not seek to remedy an alleged ongoing violation of federal law.

We therefore AFFIRM the district court's dismissal of T.W.'s Title II claim for compensatory, declaratory, and injunctive relief.